IN THE UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 3:20-cv-17-J-34JBT

MERLIN KAUFFMAN, an individual,

Plaintiff,

vs.

TRANS HIGH CORPORATION, a New York company and HIGH TIMES HOLDING CORPORATION, a Delaware company,

Defendants.

_______________________________________/

DEPOSITION OF: STORMY SIMON

DATE TAKEN: Wednesday, March 31, 2021

TIME: 10:57 a.m. to 11:50 a.m.

PLACE: Virtual Deposition

REPORTED BY: Theresa Lynn Kirkman, RPR
Notary Public

APPEARANCES (Appeared via videoconference):

DARREN SPIELMAN, ESQUIRE
The Concept Law Group, P.A.
6400 North Andrews Avenue, Suite 500
Fort Lauderdale, Florida 33309
DSpielman@Conceptlaw.com

Appearing on behalf of the Plaintiff

SAMUEL SHELDON, ESQUIRE
The Behar Law Firm, P.A.
3323 N.E. 163rd Street, Suite 402
North Miami Beach, Florida 33160
sms@beharlegal.com

Appearing on behalf of the Defendants

INDEX

DEPONENT:

Called by the Plaintiff:

STORMY SIMON


Examination (Mr. Spielman)............... 04

Certificate of Reporter.................. 41

Certificate of Oath...................... 42

Errata Sheet............................. 43


EXHIBITS

(No exhibits marked.)

STORMY SIMON,
having been first duly sworn, was examined and testified upon her oath as follows:

THE REPORTER: Ma'am, would you raise your right hand, please? Do you solemnly swear the testimony you're about to give in this case is the truth, the whole truth, and nothing but the truth?

THE DEPONENT: I do.

THE REPORTER: Thank you.

EXAMINATION

BY MR. SPIELMAN:

Q. Okay. Good morning, Miss Simon. My name is Darren Spielman, I am an attorney on behalf of the plaintiff in the litigation that you were sent the subpoena on.

Could you state your name for the record, please?

A. Stormy Simon.

Q. Okay. Miss Simon, have you ever had a deposition taken before?

A. I have.

Q. And have you ever had a deposition taken on Zoom?

A. Yes, actually I have.

Q. Oh, what was the occasion for having a recent

deposition on Zoom?

A. It was an old case from Overstock. Even though I've been gone five years, there's something circling on there.

Q. Okay. So just a couple of simple housekeeping ground rules for you. Please make sure you're audible with your response. Shaking your head and saying short versions like uh-huh don't work very well for purposes of keeping a record.

If you need a break at any time please tell -- please let us know, we'll gladly give you a short break. If you are unable to hear the question appropriately or correctly and you need some clarification, please don't -- don't hesitate to ask.

If you have any connectivity issues please let us know as well. I realize that we're working in this virtual environment, but we're happy to accommodate and -- have additional questions for you. First, do you have any questions about what I just said?

A. Nope.

Q. Some technological questions for you. Is there anybody present in the room with you at this time?

A. No.

Q. Okay. And are you using a laptop or a desktop to attend this deposition right now?

A. I am on my laptop.

Q. Okay. And other than the -- the Zoom deposition do you have any other active open programs that you're able to see?

A. Yeah, like my PowerPoint, just things I was working on at that point, my Word documents, stuff like that.

Q. And do those relate in any way to your understanding of the topics that are going to be covered in today's deposition?

A. No.

MR. SPIELMAN: All right. Quick housekeeping question. Sam, do you -- are you okay if we continue to use the same numbering or -- deposition exhibit numbering so that we can be consistent for it from the prior depositions?

MR. SHELDON: Yeah, I'm -- that's fine.

And just -- Miss Simon, by way of introduction, my name's Sam Sheldon and I represent High Times Corp and Trans High.

THE DEPONENT: Nice to meet you.

MR. SHELDON: Likewise.

THE DEPONENT: Thank you.

MR. SPIELMAN: Miss Court Reporter, so we had -- have already conducted one deposition and

I'll reference those -- to the extent that they're needed, I may reference exhibit letters because we had a lettering system. So to the extent that I do that, I'll make sure that I get you those or that we can just cross-reference to the last deposition, okay?

THE REPORTER: All right.

MR. SPIELMAN: Thank you very much.

BY MR. SPIELMAN:

Q. Okay. Miss Simon, prior to today did you receive a request for -- to attend today's deposition?

A. I got an email.

Q. All right. And in that email did it include a subpoena request?

A. I believe it did.

Q. Did you review that subpoena?

A. I did not.

Q. Okay. Miss Simon --

A. Could I do that?

Q. Well, we're going to find out if you're able to testify today about the topics. We'll determine if there's a need for potentially another deposition, but I think we -- hopefully we can cover some short topics and be done quick.

A. Okay.

Q. Can you tell us your current address?
A. 3315 Hidden Peak, P-E-A-K, Road, in Erda, E-R-D-A, Utah 84074.
Q. And how long have you lived at that address?
A. Almost 14 years.
Q. All right. Can you tell us your cell phone number, please?
A. (801) 842-1993.
Q. How long have you had that cell phone number?
A. Oh, my gosh, 2003 maybe. I don't know, right around there. Early, early, one of my first numbers.
Q. And what is your current email address?
A. Stormy.Simon or stormysimon@Gmail.
Q. Okay. And how long have you used that -- that email address?
A. A long -- I would say the same time, like 15 years, 2003, 2005ish, something -- a long time.
Q. Prior to receiving the email, including the subpoena from our office for today's deposition, were you ever contacted by anybody at High Times regarding a deposition?
A. No.
Q. Prior to receiving the subpoena from our office were you ever contacted by anybody at Trans High Corporation regarding a deposition?

A. No.
Q. Does that include by phone?
A. That's included by phone.
Q. And does that include your email address?
A. I'll be honest about my email, I'm way behind and haven't really done it since about December. So if there is something in there I haven't seen it. But I would say -- I do scan it, so I would say, no, I haven't received one.
Q. And did you receive any physical mail requesting your attendance at this deposition?
A. Not that I know of.
Q. Can you tell me about your experience and time with High Times Corporation -- High Times Holding Corporation, sorry?
A. And is that just in regard to when -- the current owners?
Q. When did you first become involved with High Times Holding Corporation?
A. Well, I met High Times' previous owners, Michael Kennedy and Stang, back in 2013 or '14, back in those days, when I was still with Overstock. And so I knew of them then and started a relationship with High Times as a brand with those particular owners. And then when Adam bought it in 2017 I was introduced to him. So

I've known High Times as a company for a minute through a few owners and CEOs.

Q. And you said Adam, who -- who are you referring to?

A. Adam Levin.

Q. And you indicated that Adam Levin had bought the company?

A. Yes.

Q. Do you know when that occurred?

A. I believe it was March 2017.

Q. And at what -- what point did you become formally involved with High Times Holding Corporation?

A. That was in December 2017 when I became a member of the board.

Q. And do you recall the circumstances of becoming a member of the board?

A. Yeah. We had been talking about it, one of the guys, Matt Stang that had -- was a previous owner and kind of went with Adam in the beginning, had reached out and, you know, I kind of was like, Adam, you need to get me on this board. You know, and I just joined Cannabis and I really wanted to work with High Times. I loved the brand and love advocacy. So that's what I was, you know, wanting to be a part of.

Q. Other than being a member of the board in

approximately 2017 did you have any other roles or responsibilities?
A. No. Not in December 2017, no.
Q. Okay. When -- did you have additional roles or responsibilities later?
A. I did. Once in -- I think it was about April 2019 when Craig Fox had joined I went out and spent a week or two when the -- one of the vice presidents was fired/quit, like, I'm not sure, I went out to help for a week or so. And then in January of 2020 agreed to be the CEO.
Q. Do you recall if -- in January 2020, do you know it if was -- do you know the specific day?
A. I believe Adam and I had the conversation on January 6th. I didn't go and look. I feel like it was immediately after that it was announced, maybe the 13th, where it was like, hey, we got a new CEO.
Q. And so on January 6th what was your obligation with High Times Holding at that point?
A. Well, the conversation was regarding, you know, if the CEO would be able to make decisions or not. You know, having watched Adam for two and a half years and go through a couple CEOs and knowing that a previous CEO was currently suing High Times, and I knew all of that going in, you know, it was a lot about how -- you know, does

the CEO have a voice in this company, that kind of stuff. Talking about, you know, really the way that I would want business conducted as CEO of a company and how I would want to behave and needing to know who the CFO was and who -- because apparently they had just quit as well. And then, of course, wanting to see the financials in full entirety as soon as possible.

Q. So on January 6th, is it your understanding that you were -- you were designated as the CEO of High Times Holding Corp?

A. Yes.

Q. And how long did you maintain that position?

A. Well, let's be clear. It was a title, not necessarily a position. I maintained that title until May 4th.

Q. What happened on May 4th?

A. I met Adam in this parking lot in Vegas of 2020. So we were in a pandemic and I was staying out there, and we drove to meet in a parking lot. And we had been butting heads on many, many things at this point. And it was all just in regards to business and, you know, the multitude of lawsuits that were going on. And, you know, we went in this parking lot and I kind of just quit, just had it, you know.

Q. During your -- during the time from January 6th

to May 4th you indicated that it was a title. Did you have any decision-making power?

A. No.

Q. Who did?

A. Adam.

Q. And how do you know that Adam had the decision-making power?

A. Well, there's a number of things. I brought in a revenue-making opportunity that required no money from the company. We weren't really making any money, their business plan -- I had not seen financials, we didn't have a CFO, you know, and you couldn't get these answers anywhere.

There was -- you know, he would hire a VP, the VP would go away, you wouldn't know where they went. You didn't know what was happening here, everything was separate. But really, you know, nobody could get one thing done in that company without Adam. And, I mean, from the -- there were only a handful of employees at this point, you know. There had been major layoffs right before. But, I mean, nobody could get anything done without Adam.

So even though I had a contract that was awesome that needed to be signed that would make money out of the gate -- and I am no joke with my experience, I

understand how this works. I wasn't bringing him some pie-in-the-sky thing, we could've built that company. But you couldn't get anyone in the company to work on it.

It was insane, I've never seen anything like it. The control factor is off the charts, off the charts. So, I mean, we could go through -- I could write a book on 120-day CEO, it would be a 320-page book. I mean, it's crazy.

But there was just no -- you know, as a female, and a notable one, I was put there for my name and given that title, you know. So there was no decision-making, there was no running a business. Adam controlled every single piece.

Q. So you became a member of the board in December of 2017 and on January 6th you testified that you were -- then become the CEO. Did you remain on the board even though you were the CEO during that time period?

A. Yes, during that time period I did.

Q. Can you tell me about your activities as a board member? Were there active and consistent board meetings?

A. No. I remember like there was one board meeting where Vicente Fox was on. That was a telephonic call. A lot of it would be Adam calling board members individually, I guess. He never really created an

environment where we all spoke. And then when I started in January there was an in-person board meeting which consisted of me, Paul Henderson was in the room, he was newly president, Colleen, Adam. I can't remember if Max was there, I'm not sure, his brother. And then Justin was on virtual.

Q. What's Justin's last name?
A. I think it's Erlich --
Q. And what's Colleen's last name?
A. -- Elrich maybe.
Colleen -- Colleen Manley.
Q. And of all those people that were in the room or available during that meeting how many of them were members of the board?
A. Colleen, me and Justin, and then Adam.
Q. And during that time period what is your understanding of what Adam's role was on the board?
A. Adam was executive chairman. Under Craig's Rule, Adam's executive chairman, Adam -- the CEO reports to Adam under the board rule.
Q. So when you were appointed with the title of CEO on January 6th, were you required to report directly to Adam?
A. Yes.
Q. And did you report to him?

A. I guess. I mean, Adam didn't really include people in -- it was a weird situation. I mean, it's even hard to describe. But did I report to him? I don't know. I gave him great business ideas, I -- he never -- you know, I mean, but many people did.

No, I begged him for financials, I asked him when we were going to get a CE -- or a CFO, I wondered who the attorney was that I could speak to about certain things. Those were the questions I asked him. So report to -- you know, we immediately went into quarantine, too. You have to remember this is a short period of time that we're in a building, but -- you know, that's a tough question.

Q. During that in-person meeting in January, the board meeting, do you remember what -- the topics that were discussed?

A. Oh, I think there was 2.2 million dollars -- a potential loan -- not a loan, a investment, whatever it was, it was potentially coming in. He was working with this guy out of Florida, going to get 2.2 million. That was a big piece of it.

I had put together a presentation on SEO with how you take your brand and make it bigger and do all this. Adam left the room for that, he didn't even stay to look at it, but at least Colleen and Justin did.

And then -- you know, I don't remember specifics after that. I mean, you know --

Q. Did you --

A. -- Adam wasn't -- go ahead.

Q. Did you take contemporaneous notes during that meeting?

A. No.

Q. Do you know if anybody took notes?

A. I don't.

Q. Do you know if there were meeting minutes created from that board meeting?

A. I don't remember that.

Q. If there were board meeting minutes would they have been circulated to you?

A. Well, one would think, but not necessarily. I mean, I wouldn't know because that wasn't -- it wasn't like the board spoke and then you got minutes. It wasn't a regular happening. I don't recall specifically getting those, no. I don't recall that at all.

Q. Okay. So we've been talking about High Times Holding for a little bit, let's talk about the other company, Trans High Corporation. What's your understanding of -- of the nature of that company?

A. You know, it was always complicated. Trans High, just a holding company for High Times, the brand,

the magazine, the brand.

Q. And --

A. That's my understanding, and that Trans High is where Adam holds most of his money or his -- I don't know, I don't know, the stock.

Q. Okay. Did you have any -- any day-to-day operation, control or oversight regarding Trans High Corporation?

A. No.

Q. Were you aware that Trans High Corporation is the company that is listed owner of the domain 420.com?

A. Ish, ish, you know. I knew -- I know Trans High holds everything; so, yes, I guess I did, yes.

Q. And what's your understanding of the corporate relationship between Trans High Corporation and High Times Holding Corporation?

A. You know, you never really got a full understanding, everything's connected with Adam, you know. You could ask all kinds of questions or hear these names and try to track something down, but you can't find it, you can't.

And so my understanding is just what I've put together, like the relationship is Trans High owns everything and then they divvy out these different ways that, you know, High Times, or whatever else they have in

there, 420.com, Green Market Report, whatever they bought, where they live, and they keep them separate, I think.

I mean, it was really -- I mean, you would think -- it's embarrassing, because as a CEO those are answers -- you know, I come from a big company, like, in the public world you operate a certain way. And so it's embarrassing to have to answer questions like this because it's like, no, really, no, really, I allowed myself to be used to that degree.

Q. As the CEO for Trans High -- I'm sorry, as the CEO for High Times Holding Corporation, did you have access to the -- any domain properties owned by the companies?

A. No.

Q. I'm sorry?

A. No.

Q. Were you in the position or did you have the authority to be able to buy or sell any of the company assets?

A. No.

Q. Who did?

A. Adam.

Q. Did the ability for Adam to buy or sell any of the company's assets -- that means High Times Holding or

Trans High -- did that ability require board approval?
A. Not that -- not that we've ever spoken about.
Q. Did Adam ever seek from you approval to buy or sell any of the company's assets?
A. No.
Q. Did Adam ever send an email to the board members asking about the ability for him to buy or sell any company assets?
A. I don't recall anything specifically as far as an email goes, so I would say I don't know. I don't -- I really don't recall on that. Over the course of three years, right, I'm talking about from the beginning as a board member, I don't recall.
Q. So I know you're aware of the litigation that's occurring, that's why you got a subpoena. What's your understanding about the nature of this litigation right now?
MR. SHELDON: Object to form. You can answer.
THE DEPONENT: Who was that?
MR. SHELDON: Oh, that was -- that was me. I interposed --
THE DEPONENT: Okay.
MR. SHELDON: I interposed an objection to the form of his question just for the record, but just ignore me. You can, you know, continue answering

the question as if I said nothing.
THE DEPONENT: Okay.
A. Well, what was the question? I'm sorry.
Q. What's your understanding of the nature of the litigation that you're currently sitting for a deposition on?
A. Okay. So, first, I had no idea until you got ahold of me, Darren. And so my understanding is -- and I can't remember the gentleman's name, your client, but someone paid during -- really close to the time that I am CEO someone bought 420.com. And we -- and because I was a CEO I'm one of those people, accepted that money from where, didn't know it was coming, and then people were told that I said no. That's what I understand of this litigation.
And that -- I mean, I think that High Times has the money and the domain. But that seems so crazy to me that even though I believe that's what's true, I feel like that's too crazy as a business to be true. And that's what I understand of this litigation.
Q. So let's break down some of -- some of what you're talking about. So are you aware of a Merlin Kauffman?
A. That is the name that is associated, yes. I've -- that's the name I forgot.

Q. Have you ever had any communications with Mr. Kauffman regarding the purchase or sale of the domain 420.com?

A. No.

Q. Have you -- were you aware that in December of 2019 that Mr. Kauffman and Mr. Levin were discussing the potential purchase and sale of the domain 420.com?

A. Not specifically, no.

Q. Were you ever -- did Mr. Levin ever reach out to you and ask you about selling the domain 420.com?

A. So, I want to specify how I need to answer these because asking -- asking about selling, no; did we ever discuss it, yes. Yeah, we discussed 420.com and what should happen with that, but was I ever asked, hey -- and I don't know what you mean by, like, is he asking should we sell it or what do you think about it. So you'd have to be a little more clear on that question.

Q. Not a problem, I'm going to -- I'm going to do this, I'm going to share a screen with you.

A. Okay.

THE DEPONENT: I don't know if you guys can hear my dog snoring, but I do want it on the record it's a dog. I keep trying to nudge him. I'm like, please stop. He won't.

MR. SHELDON: I thought it was a phone buzzing.

THE DEPONENT: Yeah, no. He won't stop.
MR. SPIELMAN: That's okay.
BY MR. SPIELMAN:
Q. Miss Simon, are you able to see what's on the screen right here?
A. Yes.
Q. Okay. Great.
MR. SPIELMAN: So this has been previously labeled -- this has been previously labeled as Deposition Exhibit K, for the record.
THE DEPONENT: Okay.
BY MR. SPIELMAN:
Q. Miss Simon, this is attached to the actual complaint that was filed, this is Exhibit E attached to the complaint in this litigation. It is screenshots between -- of a conversation between Mr. Levin and Mr. Kauffman. Have you ever seen this exhibit before?
A. No.
Q. Were you ever provided any of the communications between Levin and Mr. Kauffman before?
A. No.
Q. So on Thursday, December 26th of 2019, this indicates -- on the left side, this is from -- this is from Mr. Levin, on the right side this is my client that's speaking, Mr. Kauffman where --

MR. SHELDON: I'm going -- I'm going to object. You know, this witness has indicated that she's not familiar with this document, so I don't know what you're doing. You're, you know, presenting new evidence to the witness. Why don't you ask her about some -- a question about what's already in her personal knowledge?
BY MR. SPIELMAN:
Q. So --
MR. SHELDON: I mean, it's like you're giving -- you're giving her a new document and asking her to react to it, and that -- that is not appropriate for a deposition or trial.
BY MR. SPIELMAN:
Q. So, Ms. Simon, in this communication between Levin and Mr. Kauffman, Mr. Levin indicates that he has an offer for $250,000 from a strategic buyer on the 420.com domain. Were you ever aware of an offer to purchase the 420.com domain?
A. In regards to 420.com -- so my background's E-commerce, I'm obsessed with these kind of things. Like, when you have a precious domain, I get obsessed about it, it gets me excited.
No. We discussed about -- in regards to 420.com over, you know, the course of time. You know, he

would say, I want to sell it. And I would say, have you done a strategic analysis on it and how do you want -- you know, let's make it bigger, let's put some effort into it, I can turn this into a million dollar thing soon. Those kind of conversations we would have over the course of a year. I couldn't pinpoint, like, this happened on this particular day.

But I can say, without a doubt, there was at no moment that he said, I have an offer for this domain, what do you think of this offer, do you have a thought about this offer, do you -- what is your expertise on this offer. And I have a lot of expertise regarding this. But that never happened, no. I was never aware that there was an offer offer. But we did speak of 420.com over time.

Q. And were you speaking about 420.com in December of 2019?

A. I can't -- I mean, I can't -- probably. Probably in some -- I mean, it could've been anywhere, it could be, maybe, could have been.

Q. Okay.

A. I don't know how many times I've got to answer that the same way, but it could have been.

Q. Okay. No problem. So in these same communications between Mr. Levin and Mr. Kauffman he

indicates that there -- that this apparent strategic buyer was going to prepay $240,000 in advertising. In your recollection did you have clients or customers that prepaid advertising for one or more of the companies?

A. I can't answer that because I could never find out how it worked.

Q. And --

A. I mean, I was blind to this as CEO.

Q. And were you in a position to be able to approve the -- the sale of 420.com at that time?

A. No.

MR. SHELDON: Object to form.

BY MR. SPIELMAN:

Q. I'm sorry, what was your answer?

A. No.

Q. So this was December 26th, and then you'll see also in the exhibit attached to the complaint on Friday, December 27th at approximately 1:13 a.m. then there was Bank of America banking information that was provided from Mr. Levin to Mr. Kauffman. Was it commonplace for you guys -- for anyone in the company, as a member of the board, to provide banking wire information for someone to wire money?

A. I would not know about this information, it would've been something that Adam would have. Like, I

wouldn't have been able to provide -- yeah, I would have had to ask Adam for routing information.

Q. And was Adam in the position to be able to provide that information to anyone who wanted it?

A. Yes.

Q. Was he authorized to do so?

A. He was in charge. I mean, you didn't have to authorize him to do anything, he -- it's -- it was his -- his company and his -- his --

Q. And you'll see here that Kauffman indicated "307.5K for 420.com, please confirm." And that Mr. Levin indicated yes. Kauffman says thanks. And Mr. Levin says confirm. Is it your understanding that this is -- was within Mr. Levin's authority to be able to offer and to consummate a deal to sell that domain?

A. Yes. Yes, only his authority, only his.

Q. And -- hold on, a little bit more. Further -- shortly after that Mr. Kauffman indicates, quote, we never developed it, but I think it's a steal. I have two firms who were going to pay one million" -- 1 mm, meaning one million. Were you ever aware of any firm, let alone two firms, that were willing to pay a million dollars for the 420.com domain?

A. No. But why wouldn't we have taken that money? I'm sorry, I'm talking too much.

Q. You're --

THE DEPONENT: Sorry, Samuel, I'll be better.

BY MR. SPIELMAN:

Q. Okay. Were you ever aware of a company called Green Lance?

A. Can you spell the last --

MR. SHELDON: I think it's Green Lane.

A. Oh, Green Lane.

Q. Green Lane, yes.

MR. SHELDON: I wrote it down wrong, Sam, I apologize.

BY MR. SPIELMAN:

Q. Were you ever aware of a company named Green Lane?

A. Yes. But we're going to have to get there because there's so many Greens in Cannabis that -- I have heard of Green Lane. I can't remember what they do.

Q. Do you know if there was ever a discussion between High Times Holding or Trans High Corporation to sell the 420.com domain to Green Lane?

A. Not specifically, no, I'm not. I don't recall.

Q. Okay. So in late 2019 or in very early -- the first week of January 2020, did you ever receive a phone call about the transaction that you see here in this -- in this exhibit? From Adam, sorry.

A. Not that I recall, no.
Q. Do you recall -- during late 2019, the last few days, or the first week of January 2020, do you recall if you spoke to any board members about the sale of 420.com?
A. I don't recall.
Q. Do you know if -- when you had the board meeting in person later in January of 2020, was the topic of this sale of the domain 420.com discussed?
A. Not that I recall.
Q. Do you know if, during that in-person board meeting, was there a proposed or an actual physical contract circulated amongst the board members for the sale of 420.com?
A. I don't believe so, not -- not that I recall.
Q. Do you recall in 2020 that High Times Holding Corp, their -- the bank account with Bank of America was closed?
A. What?
Q. Do you recall in 2020 that the High Times Holding bank account with Bank of America was closed? Were you still part of the company at that time?
A. I remember there was an issue with it, I don't know if it was closed. I was with the company until May 4th literally. I remember something going on with the bank account, but I don't remember it being closed.

But I never saw the bank account statements. I mean --

Q. Do you know that there was a -- apparently a -- well, let me -- strike that.

Where were documents normally kept that you had access to while you were the CEO of High Times Holding Corp?

A. There were -- I'm not sure. Like, there was a drive somewhere, but it wasn't work -- I mean, I didn't find it helpful to find things. But, for example, when I needed an NDA, the NDA that the company used, I had to go to Max, and then it took a minute to get it. But, like, Max would have those things. You'd go to Max for stuff like that.

Q. Who's Max, please?

A. Max is Adam's brother. And I don't think he officially held a title at High Times during the time I was there. But he worked on stuff, he was always there. Maybe he worked for Trans High versus High Times, I'm not sure.

Q. Did anybody at Trans High report to you?

A. No, no one at High Times reported to me. Like, everyone reported to Adam.

Q. Were you able to hire or fire anybody at High Times?

A. No.

Q. Were you able to issue checks while you were at High Times?
A. No.
Q. Who was?
A. Adam.
Q. While you were at High Times Holding Corp as either a board member or as CEO was there a senior lender that was part of the company?
A. There were --
MR. SHELDON: Object to form. You can answer.
THE DEPONENT: Okay.
A. A senior lender. There were a couple people. I'm not sure, like I know Ex Works was our -- like our big -- like that was our, I guess, lender. That's who I would believe was the lender, and then there were a couple of brothers. But I think these guys were the big lenders, Ex Works.
Q. Did you ever report to or have discussions with Ex Works?
A. No. I believe I met a guy once from there that lived -- while I was a board member. Like, I was in Chicago and he lived in Chicago and I think I met him -- well, I met someone and had a bite to eat. But it really wasn't about business or anything, it was really about just introducing myself as part of High Times' board.

But we never spoke of -- these folks? Yeah, we never talked to them about work, they never spoke to me outside of that. I think he might have been an Ex Works guy, he may not have been. It was a few years ago, you know, probably two years ago, maybe three.

Q. Was -- was the board required to seek approval from Ex Works for any of its activities?

A. No.

Q. Did the board ever seek approval from Ex Works for any of its activities?

A. I did not.

Q. When you were at High Times as either a board member or as CEO do you know if there was insurance in place for any litigation or any claims against the company?

A. I know that in January the D&O insurance was maybe not up and we had to work on that. But, you know, outside of the absolute -- you know, the D&O insurance that you need and what your company requires to function I was not aware of anything additionally, or even if those policies were in place, you know, I know -- I think I was a little bit in January where we were operating without D&O insurance, you know, it was just had to track down anything or just get an answer to those, you know, traditional business questions. It was very hard to get

an answer. So, you know, I freaking hope so.
Q. During the time that Levin was on the board did he have authority to be able to sign contracts on behalf of High Times Holding?
A. Yes.
Q. Did he require approval from the other members of the board?
A. No.
MR. SHELDON: Object to form.
BY MR. SPIELMAN:
Q. Did he require approval to sign a contract from -- on behalf of High Times Holding from other members of the board?
A. Definitely not me; and then on other members, not that I'm aware of.
Q. Do you know what the approximate value of 420.com was in 2019 December?
A. No, but over the years that's what I was trying to find out. Like, I would sell it or not sell it, but I would first get a strategic analysis. Like, how do you -- I do know that we didn't build it, we didn't do anything with it, you know, that I know of. I don't know of anything we did. And when I -- you know, like I said, I love domains, so they're my -- they're like my -- get me excited. So I don't know the value, I was never able

to quantify that.
MR. SPIELMAN: Give me one more minute, I think we're almost done here.
THE DEPONENT: Okay.
MR. SHELDON: Not yet.
BY MR. SPIELMAN:
Q. Is -- you just testified a second ago about that you didn't -- your understanding is that you didn't use or exploit the domain 420.com. Could you provide some more information -- my specific question is: Were you aware whether or not 420.com generated any revenue?
MR. SHELDON: Form.
A. I was not aware.
Q. Do you know if it generated any revenue?
A. I don't.
Q. Do you know who had the login credentials in order to access the -- any of the domain properties owned by High Times Holding or Trans High Corporation?
A. I do not know who had those, but most -- most times, my -- I would believe it was Max.
Q. And were you ever made aware, during December 2019 or January of 2020, that $307,500 was wired into the High Times Holding Corporation's bank account?
A. No.
Q. Were you ever aware that -- that any of the

board members, other than yourself -- which at the time you testified was Mr. Ehrlich and Mrs. Manley -- were you aware of any conversations between either of them and Mr. Levin regarding the sale of 420.com?

A. No.

Q. Were you aware of any contract or any corporate documents that identified the rights, permissions or powers of Mr. Levin to act on behalf of High Times Holding Corporation?

A. Yes, I believe, if what -- if I understand the question correctly, yes, it was, I believe on a -- when Craig Fox was becoming CEO we got the board on the phone, and there was the business when Adam became executive chairman instead of just chairman and it was stated that he would have, like, authority over all.

I'm sure it was stated much more professionally, although I don't know who would've been that professional. But there is -- I think it's an SEC filing from then and, like, it was stated that Adam's in charge. I believe that that was in a board meeting and it's a filing and it would be near Craig Fox's -- beginning his tenure.

So it -- did that answer the question? Is that what you were asking me, like, is there a corporate document that says, hey, Adam, you are in charge? I

mean, a document, a business document.

Q. Do you know if there are any by-laws that indicate who -- who could make decisions about buying or selling assets of the company?

A. I don't know specifically, but I would assume it was in that same board meeting. I mean, I'll go back and look, I'm curious now. But, yeah, I believe it would be in that same document.

All I know is we spoke about it and, you know, those things should be included in your -- your SEC filings, so I would imagine, yes.

Q. I apologize. I was seeing your face, but I wasn't -- I apologize. Were you finished with your answer? I apologize.

A. Yeah. No, I -- that was discussed as a board on a phone call and it was right around when Craig Fox was becoming CEO. It was making clear that Adam still -- even though Craig was the new CEO, that Adam still had authority over all. And we had that discussion as a board.

And at that time there was another board member, Eleanor Kennedy, but the board was -- she was on the board at that time.

Q. At this time do you have any formal corporate relationship with High Times Holding?

A. No.

Q. Are you currently involved in any litigation with High Times Holding?

A. Just this one.

Q. Do you have any current pending claims against High Times Holding or any of its members?

A. No. Not now, no.

Q. And when you stopped working with them in, I think you testified May, was that amicable?

A. No, I mean, I -- no. We do business totally different, me and these guys, okay? Totally different. My name -- the fact that I'm here telling you guys what I've said --

THE DEPONENT: And hopefully this goes full circle, Mr. Sheldon.

A. -- the fact that they think they can speak on me and go out and tell somebody that I said no and I didn't say a word, slap my name on your company so you get a female and a bad-ass businesswoman to make you look good because your business practices are so shitty, no, it wasn't amicable.

I realized I had fallen into the trap because they had a brand that I loved and so did this guy. Everybody falls in the trap because they love this brand.

I don't do business like these guys do

business. And it's embarrassing that I put my name on it. And the idea and audacity of taking someone's money and not giving it back or giving them the domain is insanity to me.

And don't ever fucking do that when my name's on your company. You want to use my name do good business. You want to sit and do this kind of stuff, you better take my name out of your mouth. And that's how I feel about when I left High Times.

And I didn't even know about this. I knew about the other 50 that he's putting my name on as an answer as to why we're not paying a bill. Every time I go to the store and buy my nicotine juice, every single time, I pay for it, I get it. I can't imagine walking in a store and paying for something and not getting it.

My business compass is ethical and theirs weren't and I'm so grateful to have that on the record.

THE DEPONENT: That's why I did this deposition today, Sheldon -- Mr. Sheldon, you can let them know. Take my -- take my name out of their mouth. Thank you.

MR. SPIELMAN: Thank you, Miss Simon, that's all the questions I have for you this after -- this morning. It's still morning.

THE DEPONENT: Yes. I'm happy to answer

anything, Mr. Sheldon.

MR. SHELDON: I -- I don't have any questions.

THE DEPONENT: Okay. If you do later, I am happy to do this, I promise, I will give you any time and respect that I've given Mr. Spielman.

MR. SHELDON: Thank you.

MR. SPIELMAN: All right. Miss Simon, you have the opportunity, if you want, to read this deposition and --

THE DEPONENT: Oh, every word, can't wait. I'm going to read it, I'm going to like frame this last paragraph in a Facebook post.

MR. SPIELMAN: You have the opportunity to read your deposition and review it to -- to determine if something was written down inaccurately and to make a correction, or you have the option also to waive that right and just have the transcript prepared and finalized. Do you know what you would like to do in that situation?

THE DEPONENT: I want to -- I want to double-check what I've said and would like to review it, yeah.

MR. SPIELMAN: Okay. We'll make sure that the court reporter gets you a copy of it for your review. And thank you for your time.

THE DEPONENT: Thank you.

THE REPORTER: So, Mr. Spielman, you are ordering this?

MR. SPIELMAN: Yes, we're going to order.

THE REPORTER: Okay. Mr. Sheldon, do you need a copy?

MR. SHELDON: I'm going to pass for now; but if I change my mind, I'll get your information.

THE REPORTER: Sure, you can let Magna know.

(The deposition of STORMY SIMON was concluded at 11:50 a.m.)

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF PINELLAS )

I, Theresa Lynn Kirkman, RPR, certify that I was authorized to and did stenographically report the deposition held via videoconference of STORMY SIMON; that a review of the transcript was requested; and that the foregoing pages, numbered 1-40, are a true and complete record of my stenographic notes taken during said deposition.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 12th day of April 2021.

Theresa Lynn Kirkman

THERESA LYNN KIRKMAN, RPR

CERTIFICATE OF OATH

STATE OF FLORIDA ]

COUNTY OF PINELLAS ]

I, the undersigned authority, certify that STORMY SIMON personally appeared before me via videoconference and was duly sworn on the 31st day of March 2021.

WITNESS my hand and official seal this 12th day of April 2021.

THERESA LYNN KIRKMAN, RPR
Notary Public - State of Florida
My Commission No. GG 207812
Expires: May 17, 2022

PLEASE ATTACH TO THE DEPOSITION OF STORMY SIMON TAKEN ON MARCH 31, 2021 IN THE CASE OF MERLIN KAUFFMAN AND TRANS HIGH CORPORATION, etc., et al.

PAGE LINE CORRECTION AND REASON THEREFOR

I HAVE READ THE FOREGOING PAGES AND, EXCEPT FOR ANY CORRECTIONS OR AMENDMENTS INDICATED ABOVE, I HEREBY SUBSCRIBE TO THE ACCURACY OF THIS TRANSCRIPT.

_____________________________ __________________

STORMY SIMON DATE

_____________________________ __________________

WITNESS TO SIGNATURE DATE

**A**

**a.m** 1:20,20 26:18 40:11
**ability** 19:24 20:1 20:7
**able** 6:4 7:20 11:21 19:19 23:4 26:9 27:1 27:3,14 30:23 31:1 33:3,25
**absolute** 32:18
**accepted** 21:12
**access** 19:13 30:5 34:17
**accommodate** 5:17
**account** 29:16,20 29:25 30:1 34:23
**ACCURACY** 43:21
**act** 35:8
**action** 41:16,17
**active** 6:3 14:20
**activities** 14:19 32:7,10
**actual** 23:13 29:11
**Adam** 9:25 10:3 10:5,6,19,20 11:14,22 12:17 13:5,6,18,22 14:12,24 15:4 15:15,18,19,20 15:23 16:1,24 17:4 18:4,18 19:23,24 20:3,6 26:25 27:2,3 28:25 30:22 31:5 35:13,25 36:17,18
**Adam's** 15:17,19 30:15 35:19
**additional** 5:18 11:4
**additionally** 32:20
**address** 8:1,4,12 8:15 9:4
**advertising** 26:2 26:4
**advocacy** 10:23
**ago** 32:4,5 34:7
**agreed** 11:10
**ahead** 17:4
**ahold** 21:8
**al** 43:2
**allowed** 19:9
**AMENDMEN...** 43:20
**America** 26:19 29:16,20
**amicable** 37:9,21
**analysis** 25:2 33:20
**Andrews** 2:3
**announced** 11:16
**answer** 19:8 20:18 22:11 25:22 26:5,14 31:10 32:24 33:1 35:23 36:14 38:12,25
**answering** 20:25
**answers** 13:12 19:6
**anybody** 5:22 8:20,24 17:8 30:20,23
**apologize** 28:11 36:12,13,14
**apparent** 26:1
**apparently** 12:5 30:2
**APPEARANC...** 2:1
**appeared** 2:1 42:7
**Appearing** 2:5,9
**appointed** 15:21
**appropriate** 24:13
**appropriately** 5:12
**approval** 20:1,3 32:6,9 33:6,11
**approve** 26:10
**approximate** 33:16
**approximately** 11:1 26:18
**April** 11:6 41:18 42:14
**asked** 16:6,9 22:14
**asking** 20:7 22:12,12,16 24:12 35:24
**assets** 19:20,25 20:4,8 36:4
**associated** 21:24
**assume** 36:5
**ATTACH** 43:1
**attached** 23:13 23:14 26:17
**attend** 5:25 7:11
**attendance** 9:11
**attorney** 4:13 16:8 41:14
**attorneys** 41:16
**audacity** 38:2
**audible** 5:6
**authority** 19:19 27:14,16 33:3 35:15 36:19 42:6
**authorize** 27:8
**authorized** 27:6 41:7
**available** 15:13
**Avenue** 2:3
**aware** 18:10 20:14 21:22 22:5 24:18 25:13 27:21 28:4,13 32:20 33:15 34:11,13 34:21,25 35:3,6
**awesome** 13:24

**B**

**back** 9:21,21 36:6 38:3
**background's** 24:20
**bad-ass** 37:19
**bank** 26:19 29:16 29:16,20,20,25 30:1 34:23
**banking** 26:19,22
**Beach** 2:8
**becoming** 10:15 35:12 36:17
**begged** 16:6
**beginning** 10:19 20:12 35:22
**behalf** 2:5,9 4:13 33:3,12 35:8
**Behar** 2:7
**behave** 12:4
**believe** 7:15 10:10 11:14 21:18 29:14 31:15,20 34:20 35:10,11,20 36:7
**better** 28:2 38:8
**big** 16:21 19:6 31:14,16
**bigger** 16:23 25:3
**bill** 38:12
**bit** 17:21 27:17 32:22
**bite** 31:23
**blind** 26:8
**board** 10:14,16 10:21,25 14:14 14:16,20,20,22 14:24 15:2,14 15:17,20 16:15 17:11,13,17 20:1,6,13 26:22 29:4,6,10,12 31:7,21,25 32:6 32:9,12 33:2,7 33:13 35:1,12 35:20 36:6,15 36:20,21,22,23
**book** 14:7,7
**bought** 9:25 10:6 19:2 21:11
**brand** 9:24 10:23 16:23 17:25 18:1 37:23,24
**break** 5:10,11 21:21
**bringing** 14:1
**brother** 15:5 30:15
**brothers** 31:16
**brought** 13:8
**build** 33:21
**building** 16:12
**built** 14:2
**business** 12:3,21 13:11 14:12 16:4 21:19 31:24 32:25 35:13 36:1 37:10,20,25 38:1,7,16
**businesswoman** 37:19
**butting** 12:20
**buy** 19:19,24 20:3,7 38:13
**buyer** 24:17 26:2
**buying** 36:3
**buzzing** 22:25
**by-laws** 36:2

**C**

**call** 14:24 28:24 36:16
**called** 3:3 28:4
**calling** 14:24
**Cannabis** 10:21 28:16
**case** 1:2 4:6 5:2

43:1
**CE** 16:7
**cell** 8:6,9
**CEO** 11:11,17,21 11:23 12:1,3,9 14:7,16,17 15:19,22 19:5 19:11,12 21:11 21:12 26:8 30:5 31:7 32:13 35:12 36:17,18
**CEOs** 10:2 11:23
**certain** 16:8 19:7
**Certificate** 3:5,6 41:1 42:1
**certify** 41:6,13 42:6
**CFO** 12:4 13:12 16:7
**chairman** 15:18 15:19 35:14,14
**change** 40:8
**charge** 27:7 35:20,25
**charts** 14:5,6
**checks** 31:1
**Chicago** 31:22,22
**circle** 37:15
**circling** 5:3
**circulated** 17:14 29:12
**circumstances** 10:15
**claims** 32:14 37:5
**clarification** 5:13
**clear** 12:13 22:17 36:17
**client** 21:9 23:24
**clients** 26:3
**close** 21:10
**closed** 29:17,20 29:23,25
**Colleen** 15:4,11 15:11,15 16:25
**Colleen's** 15:9
**come** 19:6
**coming** 16:19 21:13
**Commission** 42:19
**commonplace** 26:20
**communication** 24:15
**communications** 22:1 23:20 25:25
**companies** 19:14 26:4
**company** 1:8,8 10:1,7 12:1,3 13:10,18 14:2,3 17:22,23,25 18:11 19:6,19 20:8 26:21 27:9 28:4,13 29:21 29:23 30:10 31:8 32:15,19 36:4 37:18 38:6
**company's** 19:25 20:4
**compass** 38:16
**complaint** 23:14 23:15 26:17
**complete** 41:10
**complicated** 17:24
**Concept** 2:2
**concluded** 40:10
**conducted** 6:25 12:3
**confirm** 27:11,13
**connected** 18:18 41:16
**connectivity** 5:15
**consisted** 15:3
**consistent** 6:15 14:20
**consummate** 27:15
**contacted** 8:20 8:24
**contemporane...** 17:5
**continue** 6:14 20:25
**contract** 13:23 29:12 33:11 35:6
**contracts** 33:3
**control** 14:5 18:7
**controlled** 14:12
**conversation** 11:14,20 23:16
**conversations** 25:5 35:3
**copy** 39:24 40:6
**Corp** 6:20 12:10 29:16 30:6 31:6
**corporate** 18:14 35:6,24 36:24
**Corporation** 1:7 1:8 8:25 9:14 9:15,19 10:12 17:22 18:8,10 18:15,16 19:12 28:19 34:18 35:9 43:2
**Corporation's** 34:23
**correction** 39:16 43:3
**CORRECTIO...** 43:20
**correctly** 5:13 35:11
**could've** 14:2 25:19
**counsel** 41:14,16
**COUNTY** 41:4 42:3
**couple** 5:5 11:23 31:12,16
**course** 12:6 20:11 24:25 25:6
**court** 1:1 6:24 39:24
**cover** 7:23
**covered** 6:9
**Craig** 11:7 35:12 35:21 36:16,18
**Craig's** 15:18
**crazy** 14:8 21:17 21:19
**created** 14:25 17:11
**credentials** 34:16
**cross-reference** 7:5
**curious** 36:7
**current** 8:1,12 9:17 37:5
**currently** 11:24 21:5 37:2
**customers** 26:3

**D**

**D&O** 32:16,18 32:23
**Darren** 2:2 4:13 21:8
**DATE** 1:18 43:23,24
**Dated** 41:18
**day** 11:13 25:7 41:18 42:8,14
**day-to-day** 18:6
**days** 9:22 29:3
**deal** 27:15
**December** 9:6 10:13 11:3 14:14 22:5 23:22 25:16 26:16,18 33:17 34:22
**decision-making** 13:2,7 14:11
**decisions** 11:21 36:3
**Defendants** 1:10 2:9
**Definitely** 33:14
**degree** 19:10
**Delaware** 1:8
**DEPONENT** 3:2 4:8 6:21,23 20:19,22 21:2 22:21 23:1,11 28:2 31:11 34:4 37:14 38:18,25 39:3,10,20 40:1
**deposition** 1:16 1:22 4:20,22 5:1,25 6:3,10 6:14,25 7:5,11 7:22 8:19,21,25 9:11 21:5 23:10 24:13 38:18 39:9,14 40:10 41:8,12 43:1
**depositions** 6:16
**describe** 16:3
**designated** 12:9
**desktop** 5:24
**determine** 7:21 39:14
**developed** 27:19
**different** 18:24 37:11,11
**directly** 15:22
**discuss** 22:13
**discussed** 16:16 22:13 24:24 29:8 36:15
**discussing** 22:6
**discussion** 28:18 36:19
**discussions** 31:18
**DISTRICT** 1:1,1
**divvy** 18:24
**document** 24:3 24:11 35:25 36:1,1,8
**documents** 6:6 30:4 35:7
**dog** 22:22,23
**doing** 24:4
**dollar** 25:4
**dollars** 16:17

27:22
**domain** 18:11 19:13 21:17 22:2,7,10 24:18 24:19,22 25:9 27:15,23 28:20 29:8 34:9,17 38:3
**domains** 33:24
**double-check** 39:21
**doubt** 25:8
**drive** 30:8
**drove** 12:19
**DSpielman@C...** 2:4
**duly** 4:2 42:8

**E**

**E** 23:14
**E-commerce** 24:21
**E-R-D-A** 8:3
**early** 8:11,11 28:22
**eat** 31:23
**effort** 25:3
**Ehrlich** 35:2
**either** 31:7 32:12 35:3
**Eleanor** 36:22
**Elrich** 15:10
**email** 7:12,13 8:12,15,18 9:4 9:5 20:6,10
**embarrassing** 19:5,8 38:1
**employee** 41:14 41:15
**employees** 13:19
**entirety** 12:7
**environment** 5:17 15:1
**Erda** 8:2
**Erlich** 15:8
**Errata** 3:6
**ESQUIRE** 2:2,6
**et** 43:2
**ethical** 38:16
**Everybody** 37:24
**everything's** 18:18
**evidence** 24:5
**Ex** 31:13,17,19 32:3,7,9
**Examination** 3:5 4:10
**examined** 4:2
**example** 30:9
**excited** 24:23 33:25
**executive** 15:18 15:19 35:13
**exhibit** 6:15 7:2 23:10,14,17 26:17 28:25
**exhibits** 3:8,9
**experience** 9:13 13:25
**expertise** 25:11 25:12
**Expires** 42:20
**exploit** 34:9
**extent** 7:1,3

**F**

**face** 36:12
**Facebook** 39:12
**fact** 37:12,16
**factor** 14:5
**fallen** 37:22
**falls** 37:24
**familiar** 24:3
**far** 20:9
**feel** 11:15 21:18 38:9
**female** 14:9 37:19
**filed** 23:14
**filing** 35:19,21
**filings** 36:11
**finalized** 39:18
**financially** 41:17
**financials** 12:6 13:11 16:6
**find** 7:20 18:20 26:5 30:9,9 33:19
**fine** 6:17
**finished** 36:13
**fire** 30:23
**fired/quit** 11:9
**firm** 2:7 27:21
**firms** 27:20,22
**first** 4:2 5:18 8:11 9:18 21:7 28:23 29:3 33:20
**five** 5:3
**Florida** 1:1 2:3,8 16:20 41:3 42:2 42:19
**folks** 32:1
**follows** 4:3
**foregoing** 41:10 43:20
**forgot** 21:25
**form** 20:18,24 26:12 31:10 33:9 34:12
**formal** 36:24
**formally** 10:12
**Fort** 2:3
**Fox** 11:7 14:23 35:12 36:16
**Fox's** 35:21
**frame** 39:11
**freaking** 33:1
**Friday** 26:17
**fucking** 38:5
**full** 12:7 18:17 37:14
**function** 32:19
**further** 27:17 41:13

**G**

**gate** 13:25
**generated** 34:11 34:14
**gentleman's** 21:9
**getting** 17:18 38:15
**GG** 42:19
**give** 4:6 5:11 34:2 39:4
**given** 14:10 39:5
**giving** 24:11,11 38:3,3
**gladly** 5:11
**go** 11:15,22 13:15 14:6 17:4 30:10 30:12 36:6 37:17 38:13
**goes** 20:10 37:14
**going** 6:9 7:20 11:24 12:22 16:7,20 22:18 22:18,19 24:1,1 26:2 27:20 28:15 29:24 39:11,11 40:4,7
**good** 4:12 37:20 38:6
**gosh** 8:10
**grateful** 38:17
**great** 16:4 23:7
**Green** 19:1 28:5 28:7,8,9,13,17 28:20
**Greens** 28:16
**ground** 5:6
**Group** 2:2
**guess** 14:25 16:1 18:13 31:14
**guy** 16:20 31:20 32:3 37:23
**guys** 10:18 22:21 26:21 31:16 37:11,12,25

**H**

**half** 11:22
**hand** 4:5 42:13
**handful** 13:19
**happen** 22:14
**happened** 12:16 25:7,13
**happening** 13:16 17:18
**happy** 5:17 38:25 39:4
**hard** 16:3 32:25
**head** 5:7
**heads** 12:20
**hear** 5:12 18:19 22:22
**heard** 28:17
**held** 30:16 41:8
**help** 11:9
**helpful** 30:9
**Henderson** 15:3
**hesitate** 5:14
**hey** 11:17 22:15 35:25
**Hidden** 8:2
**High** 1:7,8 6:20 6:20 8:20,24 9:14,14,18,20 9:23 10:1,12,22 11:19,24 12:9 17:20,22,25,25 18:3,7,10,13,15 18:15,23,25 19:11,12,25 20:1 21:16 28:19,19 29:15 29:19 30:5,16 30:18,18,20,21 30:23 31:2,6,25 32:12 33:4,12 34:18,18,23 35:8 36:25 37:3 37:6 38:9 43:2
**hire** 13:14 30:23
**hold** 27:17
**holding** 1:8 9:14 9:19 10:12 11:19 12:10 17:21,25 18:16

19:12,25 28:19 29:15,20 30:5 31:6 33:4,12 34:18,23 35:9 36:25 37:3,6
**holds** 18:4,13
**honest** 9:5
**hope** 33:1
**hopefully** 7:23 37:14
**housekeeping** 5:5 6:12

**I**

**idea** 21:7 38:2
**ideas** 16:4
**identified** 35:7
**ignore** 20:25
**imagine** 36:11 38:14
**immediately** 11:16 16:10
**in-person** 15:2 16:14 29:10
**inaccurately** 39:15
**include** 7:13 9:2 9:4 16:1
**included** 9:3 36:10
**including** 8:18
**INDEX** 3:1
**indicate** 36:3
**indicated** 10:6 13:1 24:2 27:10 27:12 43:20
**indicates** 23:23 24:16 26:1 27:18
**individual** 1:4
**individually** 14:25
**information** 26:19,22,24 27:2,4 34:10 40:8
**insane** 14:4
**insanity** 38:4
**insurance** 32:13 32:16,18,23
**interested** 41:17
**interposed** 20:21 20:23
**introduced** 9:25
**introducing** 31:25
**introduction** 6:19
**investment** 16:18
**involved** 9:18 10:12 37:2
**ish** 18:12,12
**issue** 29:22 31:1
**issues** 5:15

**J**

**January** 11:10 11:12,15,18 12:8,25 14:15 15:2,22 16:14 28:23 29:3,7 32:16,22 34:22
**joined** 10:21 11:7
**joke** 13:25
**juice** 38:13
**Justin** 15:5,15 16:25
**Justin's** 15:7

**K**

**K** 23:10
**Kauffman** 1:4 21:23 22:2,6 23:17,20,25 24:16 25:25 26:20 27:10,12 27:18 43:1
**keep** 19:2 22:23
**keeping** 5:9
**Kennedy** 9:21 36:22
**kept** 30:4
**kind** 10:19,20 12:1,23 24:21 25:5 38:7
**kinds** 18:19
**Kirkman** 1:24 41:6,22 42:18
**knew** 9:23 11:24 18:12 38:10
**know** 5:11,16 8:10 9:12 10:9 10:20,21,23 11:13,13,20,22 11:25,25 12:2,4 12:21,23,24 13:6,12,14,15 13:16,17,20 14:9,11 16:4,5 16:10,12 17:1,2 17:8,10,16,24 18:5,5,12,12,17 18:19,25 19:6 20:10,14,25 21:13 22:15,21 24:2,3,4,25,25 25:3,22 26:24 28:18 29:6,10 29:23 30:2 31:13 32:4,13 32:16,17,18,21 32:21,23,24 33:1,16,21,22 33:22,22,23,25 34:14,16,19 35:17 36:2,5,9 36:9 38:10,20 39:18 40:9
**knowing** 11:23
**knowledge** 24:7
**known** 10:1

**L**

**labeled** 23:9,9
**Lance** 28:5
**Lane** 28:7,8,9,14 28:17,20
**laptop** 5:24 6:1
**late** 28:22 29:2
**Lauderdale** 2:3
**Law** 2:2,7
**lawsuits** 12:22
**layoffs** 13:20
**left** 16:24 23:23 38:9
**lender** 31:7,12,14 31:15
**lenders** 31:17
**let's** 12:13 17:21 21:21 25:3,3
**lettering** 7:3
**letters** 7:2
**Levin** 10:5,6 22:6 22:9 23:16,20 23:24 24:16,16 25:25 26:20 27:11,12 33:2 35:4,8
**Levin's** 27:14
**Likewise** 6:22
**LINE** 43:3
**listed** 18:11
**literally** 29:24
**litigation** 4:14 20:14,16 21:5 21:15,20 23:15 32:14 37:2
**little** 17:21 22:17 27:17 32:22
**live** 19:2
**lived** 8:4 31:21 31:22
**loan** 16:18,18
**login** 34:16
**long** 8:4,9,14,16 8:17 12:12
**look** 11:15 16:25 36:7 37:19
**lot** 11:25 12:17 12:19,23 14:24 25:12
**love** 10:23 33:24 37:24
**loved** 10:22
37:23
**Lynn** 1:24 41:6 41:22 42:18

**M**

**Ma'am** 4:4
**magazine** 18:1
**Magna** 40:9
**mail** 9:10
**maintain** 12:12
**maintained** 12:14
**major** 13:20
**making** 13:10 36:17
**Manley** 15:11 35:2
**March** 1:18 10:10 42:9 43:1
**marked** 3:9
**Market** 19:1
**Matt** 10:18
**Max** 15:4 30:11 30:12,12,14,15 34:20
**mean** 13:18,21 14:6,8 16:1,2,5 17:2,16 19:4,4 21:16 22:15 24:10 25:18,19 26:8 27:7 30:1 30:8 36:1,6 37:10
**meaning** 27:20
**means** 19:25
**meet** 6:21 12:19
**meeting** 14:23 15:2,13 16:14 16:15 17:6,10 17:11,13 29:7 29:11 35:20 36:6
**meetings** 14:21
**member** 10:14 10:16,25 14:14 14:20 20:13

26:21 31:7,21
32:13 36:22
**members** 14:24
15:14 20:7 29:4
29:12 33:6,13
33:14 35:1 37:6
**Merlin** 1:4 21:22
43:1
**met** 9:20 12:17
31:20,22,23
**Miami** 2:8
**Michael** 9:21
**MIDDLE** 1:1
**million** 16:17,20
25:4 27:20,21
27:22
**mind** 40:8
**minute** 10:1
30:11 34:2
**minutes** 17:10,13
17:17
**mm** 27:20
**moment** 25:9
**money** 13:9,10
13:24 18:4
21:12,17 26:23
27:24 38:2
**morning** 4:12
38:24,24
**mouth** 38:8,20
**multitude** 12:22

**N**

**N.E** 2:7
**name** 4:12,16
14:10 15:7,9
21:9,24,25
37:12,18 38:1,6
38:8,11,20
**name's** 6:19 38:5
**named** 28:13
**names** 18:20
**nature** 17:23
20:16 21:4
**NDA** 30:10,10
**near** 35:21
**necessarily** 12:14
17:15
**need** 5:10,13 7:22
10:20 22:11
32:19 40:5
**needed** 7:2 13:24
30:10
**needing** 12:4
**never** 14:4,25
16:4 18:17
25:13,13 26:5
27:19 30:1 32:1
32:1,2 33:25
**new** 1:7 11:17
24:4,11 36:18
**newly** 15:4
**Nice** 6:21
**nicotine** 38:13
**Nope** 5:20
**normally** 30:4
**North** 2:3,8
**notable** 14:10
**Notary** 1:25
42:19
**notes** 17:5,8
41:11
**nudge** 22:23
**number** 8:7,9
13:8
**numbered** 41:10
**numbering** 6:14
6:15
**numbers** 8:11

**O**

**oath** 3:6 4:3 42:1
**object** 20:18 24:1
26:12 31:10
33:9
**objection** 20:23
**obligation** 11:18
**obsessed** 24:21
24:22
**occasion** 4:25
**occurred** 10:9
**occurring** 20:15
**offer** 24:17,18
25:9,10,11,12
25:14,14 27:14
**office** 8:19,23
**official** 42:13
**officially** 30:16
**Oh** 4:25 8:10
16:17 20:20
28:8 39:10
**okay** 4:12,19 5:5
5:24 6:2,13 7:6
7:10,18,25 8:14
11:4 17:20 18:6
20:22 21:2,7
22:20 23:2,7,11
25:21,24 28:4
28:22 31:11
34:4 37:11 39:3
39:23 40:5
**old** 5:2
**once** 11:6 31:20
**open** 6:3
**operate** 19:7
**operating** 32:22
**operation** 18:7
**opportunity** 13:9
39:8,13
**option** 39:16
**order** 34:17 40:4
**ordering** 40:3
**outside** 32:2,18
**oversight** 18:7
**Overstock** 5:2
9:22
**owned** 19:13
34:17
**owner** 10:18
18:11
**owners** 9:17,20
9:24 10:2
**owns** 18:23

**P**

**P-E-A-K** 8:2
**P.A** 2:2,7
**PAGE** 43:3
**pages** 41:10
43:20
**paid** 21:10
**pandemic** 12:18
**paragraph** 39:12
**parking** 12:17,19
12:23
**part** 10:24 29:21
31:8,25
**particular** 9:24
25:7
**parties** 41:14
**parties'** 41:15
**pass** 40:7
**Paul** 15:3
**pay** 27:20,22
38:14
**paying** 38:12,15
**Peak** 8:2
**pending** 37:5
**people** 15:12
16:2,5 21:12,13
31:12
**period** 14:17,18
15:16 16:11
**permissions** 35:7
**person** 29:7
**personal** 24:7
**personally** 42:7
**phone** 8:6,9 9:2,3
22:25 28:23
35:12 36:16
**physical** 9:10
29:11
**pie-in-the-sky**
14:2
**piece** 14:13 16:21
**PINELLAS** 41:4
42:3
**pinpoint** 25:6
**place** 1:22 32:14
32:21
**plaintiff** 1:5 2:5
3:3 4:14
**plan** 13:11
**please** 4:5,17 5:6
5:10,11,13,15
8:7 22:24 27:11
30:14 43:1
**point** 6:6 10:11
11:19 12:20
13:20
**policies** 32:21
**position** 12:12,14
19:18 26:9 27:3
**possible** 12:7
**post** 39:12
**potential** 16:18
22:7
**potentially** 7:22
16:19
**power** 13:2,7
**PowerPoint** 6:5
**powers** 35:8
**practices** 37:20
**precious** 24:22
**prepaid** 26:4
**prepared** 39:17
**prepay** 26:2
**present** 5:22
**presentation**
16:22
**presenting** 24:4
**president** 15:4
**presidents** 11:8
**previous** 9:20
10:18 11:23
**previously** 23:8,9
**prior** 6:16 7:10
8:18,23
**probably** 25:18
25:19 32:5
**problem** 22:18
25:24
**professional**
35:18
**professionally**
35:17
**programs** 6:3
**promise** 39:4
**properties** 19:13
34:17

**proposed** 29:11
**provide** 26:22 27:1,4 34:9
**provided** 23:19 26:19
**public** 1:25 19:7 42:19
**purchase** 22:2,7 24:19
**purposes** 5:8
**put** 14:10 16:22 18:22 25:3 38:1
**putting** 38:11

**Q**

**quantify** 34:1
**quarantine** 16:10
**question** 5:12 6:13 16:13 20:24 21:1,3 22:17 24:6 34:10 35:11,23
**questions** 5:18,19 5:21 16:9 18:19 19:8 32:25 38:23 39:2
**quick** 6:12 7:24
**quit** 12:5,24
**quote** 27:18

**R**

**raise** 4:4
**reach** 22:9
**reached** 10:19
**react** 24:12
**read** 39:8,11,13 43:20
**realize** 5:16
**realized** 37:22
**really** 9:6 10:22 12:2 13:10,17 14:25 16:1 18:17 19:4,9,9 20:11 21:10 31:23,24
**REASON** 43:3
**recall** 10:15 11:12 17:18,19 20:9,11,13 28:21 29:1,2,3 29:5,9,14,15,19
**receive** 7:11 9:10 28:23
**received** 9:9
**receiving** 8:18,23
**recollection** 26:3
**record** 4:16 5:9 20:24 22:22 23:10 38:17 41:11
**reference** 7:1,2
**referring** 10:3
**regard** 9:16
**regarding** 8:20 8:25 11:20 18:7 22:2 25:12 35:4
**regards** 12:21 24:20,24
**regular** 17:18
**relate** 6:8
**relationship** 9:23 18:15,23 36:25
**relative** 41:13,15
**remain** 14:16
**remember** 14:22 15:4 16:11,15 17:1,12 21:9 28:17 29:22,24 29:25
**report** 15:22,25 16:3,9 19:1 30:20 31:18 41:7
**reported** 1:24 30:21,22
**reporter** 3:5 4:4 4:9 6:24 7:7 39:24 40:2,5,9 41:1
**reports** 15:19
**represent** 6:19
**request** 7:11,14
**requested** 41:9
**requesting** 9:11
**require** 20:1 33:6 33:11
**required** 13:9 15:22 32:6
**requires** 32:19
**respect** 39:5
**response** 5:7
**responsibilities** 11:2,5
**revenue** 34:11,14
**revenue-making** 13:9
**review** 7:16 39:14,21,25 41:9
**right** 4:5 5:25 6:12 7:7,13 8:6 8:10 13:20 20:12,16 23:5 23:24 36:16 39:7,17
**rights** 35:7
**Road** 8:2
**role** 15:17
**roles** 11:1,4
**room** 5:22 15:3 15:12 16:24
**routing** 27:2
**RPR** 1:24 41:6 41:22 42:18
**rule** 15:19,20
**rules** 5:6
**running** 14:12

**S**

**sale** 22:2,7 26:10 29:4,8,13 35:4
**Sam** 6:13,19 28:10
**Samuel** 2:6 28:2
**saw** 30:1
**saying** 5:7
**says** 27:12,12 35:25
**scan** 9:8
**screen** 22:19 23:5
**screenshots** 23:15
**seal** 42:13
**SEC** 35:18 36:10
**second** 34:7
**see** 6:4 12:6 23:4 26:16 27:10 28:24
**seeing** 36:12
**seek** 20:3 32:6,9
**seen** 9:7 13:11 14:4 23:17
**sell** 19:19,24 20:4 20:7 22:16 25:1 27:15 28:20 33:19,19
**selling** 22:10,12 36:4
**send** 20:6
**senior** 31:7,12
**sent** 4:14
**SEO** 16:22
**separate** 13:17 19:2
**Shaking** 5:7
**share** 22:19
**Sheet** 3:6
**Sheldon** 2:6 6:17 6:19,22 20:18 20:20,23 22:25 24:1,10 26:12 28:7,10 31:10 33:9 34:5,12 37:15 38:19,19 39:1,2,6 40:5,7
**shitty** 37:20
**short** 5:7,11 7:23 16:11
**shortly** 27:18
**side** 23:23,24
**sign** 33:3,11
**SIGNATURE** 43:24
**signed** 13:24
**Simon** 1:16 3:4 4:1,12,18,19 6:18 7:10,18 23:4,13 24:15 38:22 39:7 40:10 41:8 42:7 43:1,23
**simple** 5:5
**single** 14:13 38:13
**sit** 38:7
**sitting** 21:5
**situation** 16:2 39:19
**slap** 37:18
**sms@beharleg...** 2:8
**snoring** 22:22
**solemnly** 4:5
**somebody** 37:17
**someone's** 38:2
**soon** 12:7 25:5
**sorry** 9:15 19:11 19:16 21:3 26:14 27:25 28:2,25
**speak** 16:8 25:14 37:16
**speaking** 23:25 25:16
**specific** 11:13 34:10
**specifically** 17:18 20:9 22:8 28:21 36:5
**specifics** 17:2
**specify** 22:11
**spell** 28:6
**spent** 11:7
**Spielman** 2:2 3:5 4:11,13 6:12,24 7:8,9 23:2,3,8 23:12 24:8,14 26:13 28:3,12 33:10 34:2,6 38:22 39:5,7,13

39:23 40:2,4
**spoke** 15:1 17:17 29:4 32:1,2 36:9
**spoken** 20:2
**Stang** 9:21 10:18
**started** 9:23 15:1
**state** 4:16 41:3 42:2,19
**stated** 35:14,16 35:19
**statements** 30:1
**STATES** 1:1
**stay** 16:24
**staying** 12:18
**steal** 27:19
**stenographic** 41:11
**stenographically** 41:7
**stock** 18:5
**stop** 22:24 23:1
**stopped** 37:8
**store** 38:13,15
**Stormy** 1:16 3:4 4:1,18 40:10 41:8 42:7 43:1 43:23
**Stormy.Simon** 8:13
**stormysimon@...** 8:13
**strategic** 24:17 25:2 26:1 33:20
**Street** 2:7
**strike** 30:3
**stuff** 6:6 12:1 30:12,17 38:7
**subpoena** 4:15 7:14,16 8:19,23 20:15
**SUBSCRIBE** 43:21
**suing** 11:24
**Suite** 2:3,7
**sure** 5:6 7:4 11:9 15:5 30:7,19 31:13 35:16 39:23 40:9
**swear** 4:5
**sworn** 4:2 42:8
**system** 7:3

**T**

**take** 16:23 17:5 38:8,20,20
**taken** 1:18 4:20 4:22 27:24 41:11 43:1
**talk** 17:21
**talked** 32:2
**talking** 10:17 12:2 17:20 20:12 21:22 27:25
**technological** 5:21
**telephonic** 14:23
**tell** 5:10 8:1,6 9:13 14:19 37:17
**telling** 37:12
**tenure** 35:22
**testified** 4:2 14:15 34:7 35:2 37:9
**testify** 7:21
**testimony** 4:6
**thank** 4:9 6:23 7:8 38:21,22 39:6,25 40:1
**thanks** 27:12
**theirs** 38:16
**THEREFOR** 43:3
**Theresa** 1:24 41:6,22 42:18
**thing** 13:18 14:2 25:4
**things** 6:5 12:20 13:8 16:9 24:21 30:9,12 36:10
**think** 7:23 11:6 15:8 16:17 17:15 19:3,5 21:16 22:16 25:10 27:19 28:7 30:15 31:16,22 32:3 32:21 34:2 35:18 37:9,16
**thought** 22:25 25:10
**three** 20:11 32:5
**Thursday** 23:22
**time** 1:20 5:10,22 8:16,17 9:13 12:25 14:17,18 15:16 16:11 21:10 24:25 25:15 26:10 29:21 30:16 33:2 35:1 36:21 36:23,24 38:12 38:14 39:5,25
**times** 1:8 6:20 8:20 9:14,14,19 9:24 10:1,12,22 11:19,24 12:10 17:20,25 18:16 18:25 19:12,25 21:16 25:22 28:19 29:15,19 30:5,16,18,21 30:24 31:2,6 32:12 33:4,12 34:18,20,23 35:8 36:25 37:3 37:6 38:9
**Times'** 9:20 31:25
**title** 12:13,14 13:1 14:11 15:21 30:16
**today** 7:10,21 38:19
**today's** 6:10 7:11 8:19
**told** 21:14
**topic** 29:7
**topics** 6:9 7:21,23 16:15
**totally** 37:10,11
**tough** 16:12
**track** 18:20 32:23
**traditional** 32:25
**Trans** 1:7 6:20 8:24 17:22,24 18:3,7,10,12,15 18:23 19:11 20:1 28:19 30:18,20 34:18 43:1
**transaction** 28:24
**transcript** 39:17 41:9 43:21
**trap** 37:22,24
**trial** 24:13
**true** 21:18,19 41:10
**truth** 4:7,7,7
**try** 18:20
**trying** 22:23 33:18
**turn** 25:4
**two** 11:8,22 27:19,22 32:5

**U**

**uh-huh** 5:8
**unable** 5:12
**undersigned** 42:6
**understand** 14:1 21:14,20 35:10
**understanding** 6:9 12:8 15:17 17:23 18:3,14 18:18,22 20:16 21:4,8 27:13 34:8
**UNITED** 1:1
**use** 6:14 34:9 38:6
**Utah** 8:3

**V**

**value** 33:16,25
**Vegas** 12:17
**versions** 5:8
**versus** 30:18
**vice** 11:8
**Vicente** 14:23
**videoconference** 2:1 41:8 42:8
**virtual** 1:22 5:17 15:6
**voice** 12:1
**VP** 13:14,15
**vs** 1:6

**W**

**wait** 39:10
**waive** 39:16
**walking** 38:14
**want** 12:2,4 22:11,22 25:1,2 38:6,7 39:8,20 39:20
**wanted** 10:22 27:4
**wanting** 10:24 12:6
**wasn't** 14:1 17:4 17:16,16,17 30:8 31:24 36:13 37:21
**watched** 11:22
**way** 6:8,18 9:5 12:2 19:7 25:23
**ways** 18:24
**we'll** 5:11 7:21 39:23
**we're** 5:16,17 7:20 16:12 28:15 34:3 38:12 40:4
**we've** 17:20 20:2
**Wednesday** 1:18

**week** 11:8,10 28:23 29:3
**weird** 16:2
**went** 10:19 11:7 11:9 12:23 13:15 16:10
**weren't** 13:10 38:17
**willing** 27:22
**wire** 26:22,23
**wired** 34:22
**witness** 24:2,5 42:13 43:24
**wondered** 16:7
**word** 6:6 37:18 39:10
**work** 5:8 10:22 14:3 30:8 32:2 32:17
**worked** 26:6 30:17,18
**working** 5:16 6:6 16:19 37:8
**works** 14:1 31:13 31:17,19 32:3,7 32:9
**world** 19:7
**would've** 26:25 35:17
**wouldn't** 13:15 17:16 27:1,24
**write** 14:6
**written** 39:15
**wrong** 28:10
**wrote** 28:10

**X**

**Y**

**yeah** 6:5,17 10:17 22:13 23:1 27:1 32:1 36:7,15 39:22
**year** 25:6
**years** 5:3 8:5,17 11:22 20:12 32:4,5 33:18
**York** 1:7

**Z**

**Zoom** 4:23 5:1 6:2

**0**

**04** 3:5

**1**

**1** 27:20
**1-40** 41:10
**1:13** 26:18
**10:57** 1:20
**11:50** 1:20 40:11
**120-day** 14:7
**12th** 41:18 42:13
**13th** 11:16
**14** 8:5 9:21
**15** 8:17
**163rd** 2:7
**17** 42:20

**2**

**2.2** 16:17,20
**2003** 8:10,17
**2005ish** 8:17
**2013** 9:21
**2017** 9:25 10:10 10:13 11:1,3 14:15
**2019** 11:7 22:6 23:22 25:17 28:22 29:2 33:17 34:22
**2020** 11:10,12 12:18 28:23 29:3,7,15,19 34:22
**2021** 1:18 41:18 42:9,14 43:1
**2022** 42:20
**207812** 42:19
**240,000** 26:2
**250,000** 24:17
**26th** 23:22 26:16
**27th** 26:18

**3**

**3:20-cv-17-J-3...** 1:2
**307,500** 34:22
**307.5K** 27:11
**31** 1:18 43:1
**31st** 42:8
**320-page** 14:7
**3315** 8:2
**33160** 2:8
**3323** 2:7
**33309** 2:3

**4**

**402** 2:7
**41** 3:5
**42** 3:6
**420.com** 18:11 19:1 21:11 22:3 22:7,10,13 24:18,19,20,25 25:15,16 26:10 27:11,23 28:20 29:4,8,13 33:17 34:9,11 35:4
**43** 3:6
**4th** 12:15,16 13:1 29:24

**5**

**50** 38:11
**500** 2:3

**6**

**6400** 2:3
**6th** 11:15,18 12:8 12:25 14:15 15:22

**7**

**8**

**801** 8:8
**84074** 8:3
**842-1993** 8:8

**9**