# Exhibit A

IN THE UNITED STATES DISTRICT COURT.

FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO.: 3:20-cv-17-J-34JBT

MERLIN KAUFFMAN, an individual,

Plaintiff,

vs.

TRANS HIGH CORPORATION, a New York company and HIGH TIMES HOLDING CORPORATION, a Delaware company,

Defendants.

_______________________________________/

VIDEOTAPED ZOOM DEPOSITION

OF

ADAM LEVIN

Taken on behalf of Plaintiff

Videotaped Zoom Deposition taken on:
Tuesday, November 2, 2021
2:30 p.m. - 4:23 p.m.

Videotaped Zoom Deposition taken at:
Mr. Levin's Residence
California

Reported By: Michelle Portyansky, Court Reporter

APPEARANCES BY VIDEOTAPED ZOOM:
On behalf of the Plaintiff:
DARREN J. SPIELMAN, ESQUIRE
THE CONCEPT LAW GROUP, PA
6400 N Andrews Ave
Suite 500
Fort Lauderdale, FL 33309
Telephone: 754-300-1500
E-mail: Dspielman@conceptlaw.com

On behalf of the Defendant:
JESSE ABRAHAM HASKINS, ESQUIRE
J HASKINS LAW, PA
10437 Canary Isle Dr
Tampa, FL 33647
Telephone: 727-371-9730
E-mail: Jesse@jhaskinslaw.com

- - -

Also Present,
Chris Russo, Magna Legal Videographer
Alexander Brown, Esquire - with Plaintiff
Ravi Seepersad, Esquire - with Plaintiff



- - -
INDEX
- - -


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ADAM LEVIN | | | | |
| BY: MR. SPIELMAN: | 6 | | | |

| | PAGE |
|---|---|
| Certificate of Oath | 79 |
| Reporter's Certificate | 80 |

EXHIBITS

| PLAINTIFFS | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit S | Hightimes Holding Corporation | 7 |
| Exhibit T | Re-Notice | 7 |
| Exhibit U | 7,000-Plus Documents | 59 |
| Exhibit V | Documents | 59 |
| Exhibit W | Bates Page Number 25 | 74 |


- - -
Five (5) Exhibits Marked and Attached
- - -



Videotaped Zoom Deposition of Adam Levin
taken Tuesday, November 2, 2021
- - -
P-R-O-C-E-E-D-I-N-G-S
- - -

Videotaped Zoom Deposition taken before MICHELLE PORTYANSKY, Court Reporter and Notary Public in and for the State of Florida at Large, in the above cause.

- - -

THE VIDEOGRAPHER: We are now on the record. This begins Videotape Number 1 in the deposition of Adam Levin in the matter of Merlin Kauffman versus Trans High Corp.
Today is November 2nd, 2021. The time is now 2:33 p.m. This deposition is being taken virtually at the request of The Concept Law Group.
Your videographer is Chris Russo of Magna Legal Services, and your court reporter is Michelle Portyansky of Magna Legal Services.
Will counsel and all parties state their appearances and whom they represent.
MR. SPIELMAN: This is Darren Spielman on behalf of Plaintiff from The Concept Law Group.



Present at the deposition are my partners, Alexander Brown and Ravi Seepersad. They are not going to be participating other than -- than observing and listening today.
MR. HASKINS: Jesse Haskins on behalf of Defendants.
THE VIDEOGRAPHER: Will the court reporter please swear in the witness.
THE COURT REPORTER: Raise your right hand, please.
(Oath administered.)
THE WITNESS: I do.
Thereupon:
ADAM LEVIN,
having been first duly sworn or affirmed, was examined and testified as follows:
MR. SPIELMAN: Okay. Let's move my stuff around.
Videographer, I have a question. Is it possible for purposes of the recording -- is the entire screen going to be recorded or is it able to be focused on the -- the deponent himself.
THE VIDEOGRAPHER: I have the deponent pinned, so it's just him in the video.
MR. SPIELMAN: Got it. All right. I always



MAGNA LEGAL SERVICES

like to ask. Everyone does things a little bit differently, but I wanted to double check.
THE VIDEOGRAPHER: Gotcha.
MR. SPIELMAN: Thank you.
THE VIDEOGRAPHER: You're welcome.
DIRECT EXAMINATION
BY MR. SPIELMAN:
Q. Okay. Mr. Levin, good -- well, it's afternoon here. I don't know where you are.
Where are you, Mr. Levin?
A. Los Angeles.
Q. Los Angeles. All right. Well, may -- maybe it's morning time --
A. Midday.
Q. Good morning. Mr. Levin, this is the continued deposition by court order for the two corporate defendants, Trans High and Hightimes Holding.
Are you aware of that?
A. Yes.
Q. And are you going to be the corporate representative for both of those companies today?
A. Yes.
Q. And -- and did you receive a copy of the re-notices of deposition for the continue -- continued



deposition for both of the companies today?
A. Yes.
Q. Okay. What I'm going to do is --
MR. SPIELMAN: And, Counsel, unless you have an -- an objection, we had previously in the first deposition ended on Exhibit R. And what I would like to do is continue with the -- the alphabetical order. And to the extent that somehow we end up into -- past Z, we can -- we can start either numbering or -- or double lettering if that's okay.
MR. HASKINS: No objection.
MR. SPIELMAN: Great. All right. So what I would like to do -- chat box -- okay.
I am dropping into the chat for everybody the re-notices of the continued 30(b)(6) deposition.
The first one being for Hightimes Holding Corporation, which we will label as -- a different document here -- as Exhibit S.
And then as Exhibit T is the re-notice continued for Trans High.
(Defendants' Exhibits S and T were marked for identification purposes.)
BY MR. SPIELMAN:
Q. Okay. Mr. Levin, did you -- those two



documents that I just put into the chat, have you reviewed and seen those prior to today's deposition?
A. No, I have not.
Q. Are you prepared to discuss the topics that the court ordered you to discuss today?
A. Yes, I -- I am.
Q. Okay.
A. I -- I -- go on. Sorry.
Q. Did you want to say something additional?
A. No, sir.
Q. Okay. Mr. Levin, we're going to start with the electronically stored information that is present in -- in both of the corporate defendants.
Prior to today's deposition, what did you do to find out how electronically stored information is maintained in each of the corporate defendant companies?
A. I reviewed the policies and then previous transactions and consulted with Darren Liu, who is our webmaster, about procedures that we take in storing corporate records.
Q. Can you spell Mr. Liu's last name?
A. L-I-U.
Q. And is it D-A-R-R-E-N, like my name?
A. Yes. Yes, sir.



Q. And how long has Mr. Liu been employed by -- which company is he employed by?
A. He is an employee -- he is an employee of Trans High Corporation.
Q. How long has he worked for Trans High?
A. I believe about 16 months.
Q. Okay. And can you tell me, did you consult with anybody with respect to Hightimes Holdings' electronically stored information?
A. The -- the same person -- the same person would be responsible for both subsidiary -- for both subsidiary and the holding company.
Q. Okay. All right. For Trans High, is there an -- an e-mail system that is utilized for internal and external communications?
A. Yes, sir.
Q. And what is it?
A. It's the hightimes.com servers, and it's powered by a -- a Google mail solution.
Q. Where are the Hightimes' mail servers stored?
A. It's a virtual solution powered by Google.
Q. Are there backups made?
A. No, there are not.
Q. Have you ever had a data loss as a result of a breach or some other event that resulted in the



MAGNA LEGAL SERVICES

deletion or loss of e-mails?
A. Not to my knowledge.
Q. Okay. Is there a data deletion policy that is present for Trans High?
A. Yes.
Q. And what is that policy?
A. I don't recall the exact policy, but it's basically -- we -- we -- we don't delete e-mails for a period of -- for a period of time.
Q. How long?
A. I don't know specifically, sir.
Q. Did you ask about that information to Mr. Liu?
A. I confirmed with him that we had a data protection -- that we have -- that we had a data protection policy and -- and talked to him about the policy.
Q. But you were unable to find out if there are e-mails that -- or -- or electronic communications that are deleted?
A. Can you repeat your question, please.
Q. Are you -- are you able to confirm whether or not there are e-mails or electronic communications that are deleted?
A. No, I cannot confirm.



Q. Is there someone else in the company that could have confirmed that for today?
A. No.
Q. Does every employee of Trans High have a -- a similar e-mail address? Meaning, a name or some kind of indicator "at" and then a certain "at?" What -- what is the -- what's the structured e-mails for the company?
A. No.
Q. Can you identify the e-mail structure for the company?
A. It varies. There's not a specific structure.
Q. How does -- is there a -- a -- is there a list of everyone's e-mail somewhere?
A. Yes.
Q. Where?
A. It's -- would be on the -- the Google mail service, there would be a -- a list of every e-mail provided that -- that Google provides as -- as each e-mail -- each individual e-mail.
Q. Is there a general structure for certain types of employees for what their e-mail address would be?
A. It has changed over time obviously. There -- you know, the company has been around and had its



e-mail for so -- as the organization has -- has grown, there has been a need to change the -- the -- you know, add a dot, and obviously there's duplicate names with such employees.
Q. Okay. So you generally under- -- do you generally understand how -- how e-mail addresses are written?
A. Yes.
Q. Okay. So, for instance, what is your e-mail with -- with Hightimes?
A. Adam@hightimes.com.
Q. And -- and do you have a separate e-mail for Trans High?
A. No.
Q. Okay. So how many approximate employees have a name @hightimes.com e-mail address?
A. Approximately 200.
Q. Okay. And of the -- outside of those 200, how many other employees have a different e-mail address with a different "at?"
A. I -- I -- there's approximately 200 e-mail accounts is what I wanted to say. Not -- that doesn't mean each one -- each one of them is a specific employee, so I need to correct the -- the -- there's about 200 accounts when I looked -- when I reviewed



number of the accounts for Hightimes' e-mail addresses, there's 200 accounts.
Q. And of those accounts, do they all have the @high -- @hightimes.com suffix?
A. Yes.
Q. Are there any other suffixes for e-mail accounts associated with Hightimes Holding or Trans High?
A. There's cannabiscup.com.
Q. Okay. Any others?
A. Not to my knowledge.
Q. Are there any e-mail addresses with a suffix that are associated to the 420.com domain?
A. There may be some re-forwards that are -- that are used as 420.com's suffixes, but I'm not sure if they exist today.
Q. Did you search?
A. No, I did not.
Q. Why not?
A. Because I didn't think to.
Q. But you were under a court order to be able to be prepared to discuss --
MR. HASKINS: Objection; argumentative.
BY MR. SPIELMAN:
Q. You were under a court order to be able to



MAGNA LEGAL SERVICES

discuss the electronically stored information, and you're not prepared to discuss that topic; is that correct?
A. That's not what I said.
Q. Okay. I asked if you were ready to -- if -- if you knew information about the 420.com and maybe I misheard it. I'll ask it again.
Are you able to discuss which e-mail addresses are associated with the suffix @420.com?
A. As -- as I said, I believe there are re-forwards, but there are not mailboxes at 420.com.
Q. What are the "re-forward" e-mail addresses?
A. There may be a few employees that have re-forward e-mail addresses used at 420.com.
Q. What are those e-mail addresses for re-forwarding purposes?
A. I don't know -- I don't -- I can't recall every specific one. I can't recall every specific one.
Q. How many do you think there are?
A. Less than five.
Q. Okay. And it's difficult for you to recall those five?
A. I -- I -- I'm telling you that I believe there to be less than five, but I can't recall all



five.
Q. Which employees would have access to that information?
A. Myself, Maxx Abramowitz, and Darren Liu and Natalia Kandic.
Q. Can you spell Natalia's last name, please?
A. K-A-N-D-I-C.
Q. The e-mails are -- you said are -- are saved in -- in a Google online mail server.
What about company records? Where are those stored -- stored?
A. In -- in multiple places.
Q. Where?
A. "Company records" is very broad.
What do you mean by "company records?"
Q. Where are the corporate records for Trans High stored?
MR. HASKINS: Objection to form.
THE WITNESS: What -- what do you -- can you clarify what you mean about "company records?"
BY MR. SPIELMAN:
Q. Sure. Let's talk about a really specific question.
How many places and where are they for Trans High -- are any of the records associated with the



operation of the business for Trans High? Where are the records and documents stored?
A. So there's documents stored at the company's office headquarters at 2110 Narcissus Court in Venice, California. There's company records stored at the Columbus, Ohio office. There's company records stored at each specific dispensary.
There's company records stored in a storage -- in multiple storage facilities, distributed all over the com- -- all over the country. And then, obviously, there's store -- there's company records that are now stored digitally.
There's probably also company records stored at -- at the corporate law offices of our cooperate counsel.
Q. The records that are stored physically at those office locations, are those backed up somewhere?
A. Some of them may be.
Q. Which ones are?
A. We're talking about hundreds of thousands of documents, sir.
Q. Yep, we are. So let's go through.
Which ones are backed up?
MR. HASKINS: Objection; argumentative.
BY MR. SPIELMAN:



Q. You can answer the question.
A. What's your question again?
MR. SPIELMAN: Ms. Court reporter, could you read back the question, please.
(Question was read back.)
THE WITNESS: Can you ask your question again, Mr. Spielman?
BY MR. SPIELMAN:
Q. She repeated it. Which records are backed up?
A. And you'd like me to go record by record?
Q. I'd like you to identify at least the categories of documents that are -- that are preserved and backed up in your company.
A. So I'm sure the bylaws are backed up in a few different places since they're sent to a few different place- -- they're sent in e-mail to different sources.
Q. What other records?
A. I think the bylaws are also stored on the SEC's website. And I -- if you look at employee records, they're stored probably with ADP, but there's hard copies of every paycheck delivery sent each week that are stored at the office.
When you talk about magazine records and the publishing -- the -- the different issues we've



MAGNA LEGAL SERVICES

Page 18

published, they're all backed up at both offices in Ohio and Los Angeles -- or Venice, California.
Most accounting records today are digital. When you look at -- talk about store receipts from an individual transaction, those are backed up digitally, but I think that there are backup tape drives to some of that storage at each individual office at each individual retail location.
When you talk about BCC and State regulatory data, those are each indiv- -- stored at each individual store and then on a quarterly basis are migrated to the Los Angeles office.
Is there a specific record you would like me to address?
Q. I'd like to know your knowledge about how records are maintained and stored in the -- in the Trans High company. You've given me some information about bylaws, employees, magazines, some accounting, some store receipts, regulatory data.
Are there other categories that are backed up or saved somewhere?
A. I'm sure.
MR. HASKINS: Objection to form.
BY MR. SPIELMAN:
Q. You can answer.

Page 19

A. I am sure.
Q. Which ones are additionally that we have not discussed?
A. The pictures from the various magazines and events. They are stored and backed up at -- at each individual office.
Q. At these individual offices, are they stored on a specific server or is that server accessible by anyone in -- in the company?
A. No. That server is not accessible by anyone in the company.
Q. Is it a server that is accessible online by certain members of the company?
A. I don't know what server you are referring to.
MR. HASKINS: Objection to form.
BY MR. SPIELMAN:
Q. How many servers are available at each location?
A. At the Los Angeles office, I don't believe there to be any servers. I believe it to all be up in the Cloud at this point.
Q. What Cloud-based system do you use to save corporate records at the Los Angeles office?
A. In which corporate office -- which corporate

Page 20

records are you referring to, sir?
Q. For Trans High.
A. But which corporate records, sir?
Q. Well, you don't have a -- a physical server, so it must be all of them. Am I incorrect? Is there -- is there a physical server at your California office for Trans High?
A. Didn't I answer that question for you?
Q. You said -- you said there is none --
A. Correct.
Q. -- am I incorrect?
A. No, you're correct.
Q. Okay. So there's no physical server, so -- and then you just testified a minute ago that there is -- that records are being stored in the Cloud.
What records are stored in the Cloud?
A. So we -- we use QuickBooks -- QuickBooks Pro Online, which is stored in the Cloud, which has a lot of accounting records.
Q. Okay. Besides QuickBooks Pro, what other services do you use that store your records virtually?
A. We have Dropbox.
Q. What else?
A. We have Google drives.
Q. Is there a corporate Google drive? Does

Page 21

everyone have their own Google drive? How does that -- how is that set up in Trans High?
A. There's both.
Q. There's both?
A. There's both.
Q. Okay. And how are the access rights provided for the corporate drive versus individual drives?
A. Through the Web administrator.
Q. And that's Mr. Liu?
A. Maxx -- Maxx administers most of the corporate -- the -- the Web. Maxx and Natalia -- Maxx Abramowitz and Natalia Kandic administer most of the rights on -- on Google -- on Google access.
Q. Okay. Other than the e-mail systems that you use, are there any internal communication mechanisms that are used? Instant messing services or something similar to that?
MR. HASKINS: Objection to form.
THE WITNESS: I've communicated with some -- some employees via text. I commun- -- and I -- and I communicate with some employees via WhatsApp as well. And I'm sure other -- there's been a Slack group in the past.
BY MR. SPIELMAN:
Q. Did you use Slack as well?



MAGNA LEGAL SERVICES

A. No, I did not.
Q. Other than text and WhatsApp and this Slack group, are there any other ways that the employees or members -- officers or members of the board communicate with each other?
MR. HASKINS: Objection; form.
BY MR. SPIELMAN:
Q. I'm sorry. I didn't hear your answer.
A. E-mail.
Q. Any other manners of communication?
A. Telephone.
Q. Are there telephone records that are maintained identifying when a call was made or received?
A. I don't believe so. Those are personal cell phone records that I'm sure maintains to call logs and whatnot.
Q. Okay. And the personal cell phone, we had talked about that once before.
And did you identify how many cell phones were in possession of the different members of the board back in December of 2019?
MR. HASKINS: Form.
THE WITNESS: So I did. And on -- at -- at that time Justin kept three cell phones. One was



a Bahamian cell phone and there were two U.S. cell phones.
BY MR. SPIELMAN:
Q. Okay. Anyone else?
A. Stormy had one cell phone.
Q. And I think there was one more board member, correct?
A. Correct. She had one as well.
Q. That's Ms. Manley?
A. Correct.
Q. And how many did you have at the time?
A. I've only had one.
Q. Okay. Were you able to identify if any -- how many laptops or -- or other mobile devices those board members had at that time?
A. Justin owns several -- Justin and his family own several different iPads. He couldn't give me a specific number. He said that he uses iPads for my -- for his kids' iPads for much more than anything. And so he has one iPad and one main computer that he uses.
Q. What about --
A. Ms. Manley -- Ms. Manley -- Stormy never responded to my question. And Ms. Manley -- Ms. Manley said that she uses one personally and several at her office, at a law practice.



Q. During the time in question, back in December of 2019, you had previously testified that there were a number of telephone calls between you and the board members.
Do you recall that?
A. Yes, sir.
Q. Okay. And in -- specifically, those phone calls related to the -- the -- the dispute at hand regarding the 420.com domain, correct?
A. Yes, sir.
Q. Were there any voice mails that were left from you or to you by any of the board members in connection with those phone calls?
A. Not to my knowledge, sir.
Q. Did you check?
A. Yes. I checked my own voice mail.
Q. Okay. And during that December 2019 and then following up into January of 2020 time period, were there any e-mails between you and the board members regarding the 420.com domain?
A. I haven't been able to find the one that I -- I -- I believe there is one specifically between Justin, myself, and Colleen, and I don't believe I can find that.
Q. Where did you search?



A. I searched my -- my entire e-mail box.
Q. Did you ask anyone in your company to help with that search?
A. Yes, I did.
Q. Who?
A. Natalia Kandic.
Q. And what search did she accomplish for you?
A. She searched all terms, all key words, and -- and -- and the applicable dates.
Q. What terms did she search for?
A. I wouldn't be able to recall.
Q. Did you give her a list of terms to search for?
A. I gave her a list of terms to search for, yes, I did, sir.
Q. And what were those terms?
A. I believe they resulted with Merlin or Merlin Kauffman, 420.com, with all the -- with all board members' names and e-mail addresses.
Q. Do -- all three of those terms in one search? That's what you were looking for?
A. And -- and individually.
Q. So there was a search completed for Merlin Kauffman, for 420.com, and then you said that there was a search for e-mails between -- with all the board



MAGNA LEGAL SERVICES

Page 26

members' names on it; is that correct?
A. Correct.
Q. And during what time period was that search completed for?
A. Shortly after our last deposition, sir.
Q. No. No. The -- the -- let me rephrase this question.
The -- the search that was conducted for those e-mails, was there a date range that was conducted for those --
A. It was conducted through the whole e-mail, sir, the -- the entire e-mail search.
Q. So someone in your company, I think you said Natalia, did -- upon your direction, conducted a search for e-mails between all the board members with no date restriction and there were no results?
A. There was no results, sir.
Q. Did you ever communicate with your board members via e-mail?
MR. HASKINS: Objection; form.
THE WITNESS: I did.
BY MR. SPIELMAN:
Q. Okay. So why would there be no results if Natalia did a search for all board members' e-mails? How are there no e-mail records?

Page 27

A. How are there no e-mail records? That doesn't mean there wasn't a conversation.
Q. Let me go back. A minute ago you just said you would e-mail with your -- with your board members, right?
A. Correct.
MR. HASKINS: Asked and answered.
BY MR. SPIELMAN:
Q. And then a search was completed after our last deposition for e-mails between you and your board members, and apparently Natalia did not find any?
A. We turned over everything we -- that we found.
Q. In the documents that you've produced, approximately a little more than 7,000 pages, you did not produce a single e-mail.
Is there any e-mail communications related to 420.com?
A. I don't believe so.
Q. Why not?
A. I believe there might have been some between that and Counsel.
Q. Were there e-mail communications regarding the use of the domain 420.com?
A. Can you repeat your question.

Page 28

Q. Were there e-mail communications within your company -- with anyone in your company regarding the use of the domain 420.com?
A. I don't recall.
Q. Did you look?
A. Yes.
Q. And what did you find?
A. I -- I mentioned to you what -- exactly what we found.
Q. You said you found nothing.
A. Correct, sir.
Q. So it's -- it's either you don't recall or you found nothing. I'm -- I'm trying to understand exactly what -- what --
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. You can answer.
What was the result of your search for 420.com e-mail in -- in -- anywhere in your company regarding an e-mail about the use of the domain? Just the use of it.
A. I don't recall.
Q. So you're the corporate representative who is supposed to testify about --
MR. HASKINS: Objection. It's argumentative.

Page 29

BY MR. SPIELMAN:
Q. And you're unprepared to discuss that; is that correct?
A. No, sir.
Q. If you don't recall, then you're not prepared to discuss it.
A. I'm totally prepared to discuss it.
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. Okay. You're totally prepared.
What was the result of the search, please?
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. You can answer.
Mr. Levin, what was the result of the search for 420.com in your e-mails?
A. I've looked through the e-mails, and I didn't see anything.
Q. Are you -- you're currently in front of your computer for this Zoom deposition, I assume, yes?
A. Yes, sir.
Q. Do you have any other open windows on your computer at this moment?
A. No, sir. Not one.
Q. Okay. The time period that you communicated



MAGNA LEGAL SERVICES

with those board members, after -- in -- in January of 2020, were there any e-mails with the board members about any activities of the company?
A. Yes.
Q. Did you search for those records?
A. Yes.
Q. Did you produce those records?
A. I believe we did.
Q. You produced e-mails between you and board members?
A. I think -- I think -- well, what wasn't client -- attorney/client privilege, we did.
Q. We're going to get back to that.
Okay. Let me put a document up for you. I'm going to share my screen.
All right, Mr. Levin. I'm showing you what was from our prior deposition, previously labeled as Exhibit G. This is the 420.com "Who Is" information.
I'm going to scroll down because this is the way they -- when you print it to PDF, and I want to get to the important part. So this is on page 4 of that document. This is the "Who Is" information.
You've seen these kinds of documents before, I assume?
A. Yes, sir.



Q. Okay. And since your deposition, have you been able to determine who Jeffrey Weston is? This is the admin name --
A. Yes, sir.
Q. Who is Jeffrey Weston?
A. Jeffrey Weston is an employee of a consulting company that we used early on in my -- under my ownership period to do some IT consulting.
Q. What company was that?
A. If you can give me a minute, I'll remember the name. I -- I believe it's 123 Consulting. It's like -- I can --
Q. Okay.
A. I can confirm with you either during a break or after the -- after the deposition, whichever you prefer, Mr. Spielman.
Q. Okay. And so Mr. Weston was an employee of that company?
A. I believe so. Was -- was -- was a representative of that company. I don't know employee or contract or I don't know.
Q. Does he still work for that company or -- I mean, have some capacity with that company?
A. I don't know.
Q. All right. And on the same document, it



identifies that the registrant e-mail is admin@hightimes.com.
Is that an e-mail address that was searched for in connection with the regular production of documents in this case?
A. I don't know. I'm -- I'm not sure of that.
Q. Why are you unsure?
A. Because I know my e-mail was searched. I don't know if admin@hightimes was searched or not. It's not an e-mail that's regularly used.
Q. Do you know if somebody tried to search for it?
A. I just answered your question.
Q. So the publicly listed e-mail address for 420.com, you're unsure if it receives e-mail communications from anywhere outside the public, correct?
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. You can answer.
A. Could you repeat your question.
MR. SPIELMAN: Ms. Court Reporter, could you repeat the question, please.
(Question was read back.)
THE WITNESS: I believe it's a forward to,



and forwards to myself and -- and -- and the rest of the officers of the company. So there wouldn't be a box to search.
BY MR. SPIELMAN:
Q. Okay. So let's talk about -- you had just mentioned the officers.
Could you identify in -- during the time period of late December 2019, beginning December 26th of -- through the end of 2019, what was your role with Trans High Corporation?
A. I was the executive chairman of the company from December -- from December -- from December through -- through January is -- that period I think you said.
What was the two dates you mentioned.
Q. So in December -- beginning of December 26th, 2019, up until the end of the year, so let's -- we'll stop it on the last day of December 2019, what was -- what was your role at Trans High Corporation?
A. So I was executive chairman of the company, and I may have served as their -- and there may have been a vacancy of -- in the CEO where -- where I -- where I was -- where I would have been assumed to be making those decisions.
Q. Did you -- did you verify what your role was



MAGNA LEGAL SERVICES

with somebody prior to this deposition?
A. I -- I -- yes, I did, sir.
Q. Who did you verify that with?
A. With corporate counsel.
Q. Okay. And you're -- you're saying that you may have -- you're unsure what your role was on that date?
A. It was -- I was executive chairman, and I think due to the holiday, there could be some ambiguity.
Q. Were you the -- the CEO of Trans High during that time period?
A. I -- I spoke to Counsel.
THE WITNESS: Jesse, isn't there any attorney/client privilege here?
MR. HASKINS: Yes.
MR. SPIELMAN: Please do not -- please -- please do not tell me what you spoke to Counsel about.
THE WITNESS: Well, you were just asking me to.
Jesse, is there attorney/client privilege?
Can I take a break?
MR. HASKINS: Yeah. Let's take a break.
MR. SPIELMAN: We'll take a quick break.



THE VIDEOGRAPHER: Off the record at 3:15 p.m.
(Zoom videotaped deposition went off the record at 3:15 p.m.)
THE VIDEOGRAPHER: On the record at 3:26 p.m.
BY MR. SPIELMAN:
Q. Okay. Mr. Levin, you had an opportunity to take a break.
During that break, did you have a discussion with your counsel about this deposition?
A. Yes.
Q. What was the nature of your discussion with your counsel?
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. What was the nature of your discussion?
MR. HASKINS: Objection. This is privileged.
BY MR. SPIELMAN:
Q. You're talking to your counsel about this deposition during a deposition, which is not proper during a civil deposition.
So what was the subject matter of your discussion?
MR. HASKINS: I'm instructing my client not to answer that.



MR. SPIELMAN: Okay. We're going to certify that, and we're definitely going to bring that up with the judge on Thursday.
(Question was certified.)
BY MR. SPIELMAN:
Q. Mr. Levin, other than Mr. Haskins, did you have a discussion with anybody else about this deposition during your break?
A. No.
Q. Did you e-mail anybody about -- during your break?
A. No.
Q. Where are you currently?
A. At -- at my -- at -- at a house in Los Angeles -- Venice, California.
Q. Is it your own home?
A. It's a rental.
Q. Okay. Is there anybody there with you?
A. No, sir.
Q. You're by yourself in that room?
A. Yes, sir.
Q. Okay. So let's go back to the last set of questions.
So in the end of December 2019, do you know what your role was with Trans High Corporation?



A. Say that again.
Q. The end of 2019 starting around December 25th, 26th, the time period when you began communicating with Mr. Kauffman, up to the end of 2019, what was your role -- official role with Trans High Corporation?
A. I was the executive chairman of Hightimes Holding Corp.
Q. Were you also the CEO?
A. I've talked to my counsel and --
MR. HASKINS: Objection. This is asked and answered, and it is protected by the attorney/client privilege.
BY MR. SPIELMAN:
Q. Okay. Let's -- let's clarify.
Which counsel did you talk to?
A. Steve Weiss.
Q. Mr. Weiss?
A. Mr. Weiss.
Q. And is he counsel for the company?
A. Yes, sir.
Q. For Trans High?
A. Yes, sir.
Q. And -- and identifying your role as a -- whether or not you were the CEO, that is -- is that a



MAGNA LEGAL SERVICES

privilege --
MR. HASKINS: This is -- we are the asserting privilege. I am instructing my client not to answer.
THE WITNESS: Mr. Fox had been terminated. I'll tell you, the -- the previous CEO had resigned on December 26th, effectively. And so I believed there to be a vacancy from December 26th to January -- some date in January.
BY MR. SPIELMAN:
Q. Okay. And then at some date in January, what happened?
A. Stormy -- Stormy Simon became engaged as the chief executive officer.
Q. Of what company?
A. Of Hightimes Holdings.
Q. So let's go back to my question because maybe there confusion. I'm asking first about Trans High.
Who was the CEO of Trans High in end of December 2019?
A. As -- as CEO of Hightimes Holding, she would have been the -- the executive in charge of -- of Trans High.
Q. So she would also be listed as the CEO of Trans High at the time?



A. I believe the officers of the subsidiary -- the officers of the holding company I believe were listed as the -- the holding company itself was listed at the officers of the subsidiary, if I'm not mistaken.
Q. And then at some point -- I think we maybe talked about this briefly, but let's -- because it's -- it's been some time. Let's talk about it again.
So you're suggesting that at some point Stormy Simon then took over as CEO of Hightimes Holding in January; is that right?
A. Yes, sir.
Q. Okay. And that time she was a board member and the CEO if I recall?
A. Yes, sir.
Q. And it's your testimony that as the CEO of --
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. As the CEO of Hightimes, she would also be the CEO of Trans High?
A. I believe so, yes.
Q. Okay. I'm showing you what was from our last deposition. This was labeled as Exhibit D. This was from the Department of State for New York, Division of



Corporations, January 14th, 2020. And it identifies that the chief executive officer was you, Adam Levin, as CEO.
So in the middle of January 2020, you were the publically listed CEO. When we previously asked you about this, you were unable to confirm it. So today I'm going to ask you again.
In January of 2020, were you the CEO of Trans High?
MR. HASKINS: Objection.
THE WITNESS: I believe -- I believe the documents in -- in the State -- on the State -- the State documents were out of date.
BY MR. SPIELMAN:
Q. Why do you believe they were out of date?
A. Because they hadn't -- they hadn't been amended properly.
Q. How would they have -- how would they need to have been amended?
A. They would have been amended with Craig Fox's name previous to that. And then -- and then Stormy Simon who filled that vacancy.
Q. Okay. Were you a member of the board of directors for Trans High in December -- late December 2019?



A. I believe the corporation was the board of director for Trans High at that time.
Q. Can you clarify that? I'm -- I'm unclear what you mean.
A. I believe the corporation itself -- the Hightimes Holding Corporation was the board member -- the sole board member of the subsidiary.
Q. So Hightimes Holding was a -- a singular vote as a board member for Trans High?
A. Correct. It was a 100 percent owned subsidiary.
Q. And in December -- late December 2019, you testified that you think Mr. Fox was no longer the president.
Who were the other officers of Trans High at that time?
A. I believe just the entity itself.
Q. There was no other officers of Trans High in late 2019?
A. I believe all of the -- all of the officers and directors reside at the holding company level.
Q. And today who is the -- are the officers of Trans High?
A. Peter Horvath is the C- -- who are the officers of Trans High?

Q. Right.
A. I believe, again, it is the -- the sole officer of the company is the holding company, Hightimes Holding Corp. And there's the officers and directors of Hightimes Holding Corp which oversee all the 100 percent subsidiaries that are owned by Hightimes Holding Corp.
Q. Who are the officers of Hightimes Holding Corp today?
A. Paul -- Peter Horvath and Jay Paul, who is CEO -- Jay Paul.
MR. HASKINS: Mr. Spielman, how long do you plan on going for with this deposition today?
MR. SPIELMAN: A while.
BY MR. SPIELMAN:
Q. Continue answering your question.
MR. HASKINS: How long?
MR. SPIELMAN: I don't know. I haven't finished my questions.
BY MR. SPIELMAN:
Q. You can continue.
MR. HASKINS: Well, you -- the previous deposition was five and a half hours. You've had a number of argumentative questions. You've also raised your voice a number of times. I would



hope that we can agree on some fixed amount of time.
MR. SPIELMAN: Well, since there are two corporations being deposed here, I technically have two full depositions, but we combined them to try to make things easier. And considering that we've only gone an hour plus the ten-minute break that you took, I think it's reasonable for us to continue.
Additionally, during our negotiation on this reset depo, you said "no problem" if we start at 2:30, that you could let us go past the 5 o'clock hour time. So we're not even an hour and a half before that 5 o'clock time.
I think it's entirely reasonable, based on even your own expectations, that we're going to be spending some time going through this court-ordered continued deposition.
MR. HASKINS: You've also represented that you did not anticipate the deposition being that long. I would like to hopefully reach some type of understanding of what the approximate length of time is that you need.
MR. SPIELMAN: I don't know the answer to that.



BY MR. SPIELMAN:
Q. Mr. Levin, could you please continue answering the question?
A. Yeah. What's your question, please? Repeat the question.
MR. SPIELMAN: Ms. Court Reporter, could you repeat my last question.
(Last question was read back.)
THE WITNESS: The officers of Hightimes Holding Corp are myself, Adam Levin, and Peter Horvath, who is the -- the -- the officers of the -- the company are myself as executive chairman, who is technically a board member, and -- and -- and based on the bylaws, has some types of duties of an officer.
Peter -- Peter Horvath, who is CEO.
Jay Paul Henderson, who is CFO and secretary and COO and president.
BY MR. SPIELMAN:
Q. Trying to grab a document. I apologize.
Okay. In 2019 -- the end of 2019 and into early 2020, who were the officers of Hightimes Holding?
A. Can you repeat your question. I'm sorry about that.



Q. In end of December 2019 and continuing through part way on to December into January 2020, the time period that we've discussed multiple times in this depo, who were the officers?
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. Who were the officers of the Hightimes Holding Corp?
A. So Craig Fox terminated on -- on -- on December 26th. Okay? My position as executive chairman -- I was executive chairman through that whole period. David Newberg was CFO. And I believe these were all the officers and directors at the point -- all the officers at that point.
Q. Craig Fox was the CEO up until December 26th of High Times.
Who was the CEO after him?
A. Stormy Fox -- Stormy Simon.
Q. She began in January sometime, right?
A. Yes, sir.
Q. Okay. So during that period in between, who was the -- who was the chief executive officer of Hightimes Holding?
A. I was the interim -- I was the interim officer at that point.



MAGNA LEGAL SERVICES

Page 46

Q. Do you know when on December 26th Craig Fox stopped -- stopped acting as the CEO of Hightimes Holding?
A. I don't remember the exact time. I'd -- I'd have to look at the document.
Q. What document was provided to -- in relation to his resignation?
A. There's a resignation letter.
Q. Was that e-mailed?
A. There is an e-mail version of that resignation letter.
Q. Have you produced that document?
A. I believe we have under -- under protective order or whatnot.
Q. I don't think there's a protective order in this case.
Did you -- did you --
A. I -- I know we found it. I -- I've talked to my lawyers about it, so I know it's been produced to -- to Counsel.
Q. Okay.
MR. SPIELMAN: Counsel, we'd like that record, please.
MR. HASKINS: Matt, there is certain information that is protected by confidentiality

Page 47

agreements. It has been redacted.
(Simultaneous speakers.)
MR. SPIELMAN: The redacted version has been produced?
MR. HASKINS: We have produced the redacted version, I believe. That was attached as an exhibit.
MR. SPIELMAN: Oh, okay. I think I might know what it is then. We're going to get to that in a moment.
BY MR. SPIELMAN:
Q. Okay. A moment ago you said that you were the executive chairman of the board of directors for Hightimes Holding and that you had some authorities and responsibilities.
Could you identify what those were?
Let me -- let me clarify. This is during that time period of December -- late December 2019 up through mid January of 2020, you were identifying who the officers and board members were.
So my question is during that time period, as the executive chairman of the board for Hightimes Holding, what were your responsibilities and authorities?
A. I spoke to Counsel about them. And, I mean,

Page 48

aren't they privileged by -- aren't they privileged -- isn't that a privileged conversation?
Q. I don't think it's privileged about what your job responsibilities were.
MR. HASKINS: Objection. Are you asking about discussions with Counsel or are you asking about his understanding separate from discussions with Counsel?
MR. SPIELMAN: I'm asking about his court-ordered understanding of what his responsibilities were as a executive chairman of the board of directors during the time in question.
BY MR. SPIELMAN:
Q. What is your knowledge about what you were authorized to do and what your responsibilities were?
A. I was authorized to do whatever the board had asked me to do or -- or granted me to do and authorized me to do.
Q. Such as what? Give me some examples, please.
A. Operate the business --
Q. Which business?
A. -- per the -- per the guidelines of the board of directors, to enter into contracts per the guidelines of the business.

Page 49

It was really the holiday season, so there wasn't much going on.
Q. Okay. And that power that you're identifying from the board of directors is identified from a document?
A. Say that again.
Q. The power that you're identifying -- what the -- responsibilities that you were --
A. I -- I don't -- I don't believe it was powered -- documented in anything.
Q. The activities that you performed as chairman of the board -- executive chairman, that -- that was your title -- executive chairman of the board of directors at Hightimes Holding, the responsibilities that you undertook were at the behest of the board of directors, correct?
A. Yes.
Q. And the board of directors vested power for you to do so?
A. As executive chairman?
Q. Yes.
A. Yes.
Q. And what gave the board of directors the power for -- the -- the authority to give you the ability to do those business activities?



MAGNA LEGAL SERVICES

Page 50

A. That they were acting as board of directors of the company.
Q. And is there a document that identified their role as board of directors?
A. I believe the bylaws.
Q. Okay. We're talking about the bylaws of Hightimes Holding, correct?
A. Correct.
Q. Okay. Showing you what was produced in your supplemental production. It is Bates pages 1 through 7,024. And previously, if you recall from our last deposition -- I'm going to scroll down -- you had previously produced up to pages 1 through 24.
I'm just going to -- oh, I'm sorry. I'm going to scroll down to page 25. We're going to start on page 25 since we've already asked about page 24 -- up through pages 24.
So here's page 25. So there's approximately 6,999 pages.
Which one of these documents identifies the -- the bylaws that you were just talking about?
A. You're asking me which page out of the 724?
Q. Out of 7,000 pages, yes.
A. I don't know. I'd have to go through them, but let's -- if you give me some -- (Zoom

Page 51

interruption) -- I will go through it or if you want to provide me a copy, I'll go through it for you.
Q. Let me see if I can upload this into the system or not.
MR. HASKINS: Mr. Spielman, we are going to assert the 7-hour cap that is provided in the federal rules. It specifically states unless there's a specific order to the contrary allowing it to exceed 7 hours, then there is a 7-hour limit. And so I believe there's about -- even with the break, it would be about 20 minutes left.
MR. SPIELMAN: I hear your assertion. If you'd like to bring that up with the court, you certainly can, considering that this is a court-ordered continued deposition for failure to answer -- (Zoom interruption) -- prior questions. And considering the fact that this is a combined deposition, covering two different corporations, I think the court is going to give us some leeway.
But if you want to assert that, then that's certainly your right to try to do so. If you need to file a separate motion, then you can do so. Knowing full well that if we're going to

Page 52

start at 2:30 -- and you expressly told me by e-mail and by phone that you would be able to go later if needed -- then the 7-hour cap couldn't possibly make any sense since it's now 3:50.
So I'm not sure why you're making such an assertion. It seems highly unreasonable and does not line up with the rule that you think you're citing to.
But we will continue and I will see if I can get this document uploaded over to Mr. Levin.
BY MR. SPIELMAN:
Q. Chat...
All right. It looks like it is uploading into the chat box, and then you should be able to open up that document.
A. No problem.
It's not uploading into my box just so --
Q. Yeah. It --
A. -- I -- I just wanted you to make sure that --
Q. Yeah.
A. -- you weren't waiting on me. Sorry.
Q. Okay. I got you. I'll -- I'll tell you when it's completed. It looks like it's about 80 percent done.

Page 53

A. Okay.
Q. Almost complete.
A. I figured. I just wanted to make sure we were...
Q. I appreciate it. No. It should be there momentarily. Okay. You should see that now.
A. I do.
Q. Great. Would you open up that document for me.
A. Yeah, I am. One second. I'm going to open up another box on my screen just -- with -- with your permission.
Q. Sure.
A. Well, first of all, it's going to take a few minutes to download it looks like, but eventually I'm going to open up another screen just because I have nothing else open right now, just so you know.
Q. Okay.
A. Looks like it's 50 percent there, just so you know.
Q. Are you communicating with somebody on your cell phone right now, Mr. Levin?
A. No. I just -- I just declined a -- a cell phone num- -- a cell phone call. I haven't communicated with anyone. I had it turned over.



MAGNA LEGAL SERVICES

Sorry. I looked at the time and turned it over. My apologies.
Okay. I have it open, sir.
Q. All right. So can you identify the document that you were just referencing?
A. You're talking the bylaws?
Q. Yes. For Hightimes Holding.
A. No problem.
Q. Is there a specific place that would assist you in pointing me towards where that record is, Mr. Levin?
A. I'm going through the pages now, as you asked.
Q. How are you going through them, please?
A. Scrolling through them.
Q. It'll take a long time to go through 7,000 pages.
Are you familiar with these records?
MR. HASKINS: This is harassment at this point. And we're, as I said, bordering on the -- the time that -- (Zoom interruption). And you've raised a number of argumentative questions that are -- are far beyond the bounds of a normal deposition. If you want to take the time to call the judge before the close of chambers, we can do



that as well.
MR. SPIELMAN: I don't know that it's harassing.
Your -- your counsel -- Mr. Haskins, you refused to identify the subject matter which the 7,000 pages related to, despite the fact that the Middle District of Florida rules clearly state that, and you're reliance was these are usual course of business records.
The Middle District of Florida, rules governing the manner of production, clearly state that if they're kept as the usual course of business, the producing party has the obligation to explain the general scheme of recordkeeping to us.
The objective is to acquaint the inspecting party with how and where those documents are maintained. If they're produced to correspond with categories in a request, reasonable effort should be made to identify certain groups of produced documents with particular categories of the request to provide meaningful description of the documents produced.
You have refused to provide that. So I'm only -- I -- I have to ask the witness the



information since you will not do that.
(Simultaneous speakers.)
THE WITNESS: Mr. -- Mr. -- Sir? Guys?
MR. HASKINS: Tone of voice and the particular language used is not just a simple matter of asking questions. It is harassment.
BY MR. SPIELMAN:
Q. Mr. Levin, are you familiar with the documents that are in that production that's uploaded?
A. Yes. Yes, sir.
Q. Did you commission the -- the supplemental production of those documents?
A. Yes, sir.
Q. Okay. And where were those documents located?
A. They were located from a -- various sources. So you have SEC records, which have all the bylaws on them and -- and links to them, and I see a -- a link to -- to the bylaws here. I don't see the bylaw, but I'm on page 122 of 7 -- 7 -- 7,024. So I'm continuing to scroll as fast as possible.
Q. Okay. Well, I don't -- I don't think that's going to be an efficient use of our time. So why don't we stop having you scroll.
A. Okay.



Q. You --
A. I was just doing what you asked me to, so...
Q. I understand.
To your knowledge, are you able to pinpoint, without scrolling through that document, where the bylaws or the articles of incorporation are for Hightimes Holding Corporation?
A. On the -- the -- the easiest place that I can tell you to refer to them are on the SEC website, under the Hightimes Holding Company index, I believe it -- it's one of the first things filed with the SEC.
Q. Are those records that are maintained within your company organization's documents?
A. Correct. Yes, sir.
Q. And -- and are those the documents that you produced or did you produce the records from the SEC?
A. I believe we may have produced both, but I'm not -- I'm not 100 percent mistaken since there's 7,024 different pages in this production.
Q. And your time as the -- you, personally -- in your time with Hightimes Holding, do you have any employment agreements with Hightimes Holding?
A. Yes, sir.
Q. And are you able to produce those?
A. I believe they've been produced somewhere in



MAGNA LEGAL SERVICES

this 7,024 pages.
Q. As part of -- I'm sorry.
A. I -- I saw a part where it referred to the terms of it, so I did see it. Where the employment -- I -- I don't believe I saw the employment agreement, but I -- I believe it's attached as part of those.
Q. All right.
A. So I can find it. If you want to give me a few minutes, I can find it.
Q. No. That's okay. We're going to move to another topic.
All right. I am uploading another document for you. I'm going to put it on the screen.
A. I'm trying -- yeah. I can...
Q. All right.
A. I'm trying -- oh, there you are.
Q. Stop -- share -- let me share this -- production of that to share...
I am showing you what we're going to label as Exhibit U. No, I'm sorry. I take that back. Correction.
Exhibit U is going to be labeled as the -- the prior document that we uploaded, the 7,000-plus documents.
And this is going to be Exhibit V.



(Defendants' Exhibits U and V were marked for identification purposes.)
BY MR. SPIELMAN:
Q. Exhibit V, which you -- after the 7,000-plus documents then, recently your -- your counsel provided an additional supplemental production.
A. Yes, sir.
Q. And this was part of that supplemental production. I'll hold out that this is not the full thing, but I broke up those documents, and there was two documents.
This specific one --
A. Yet again, I don't understand what you just meant about the two documents.
Q. Sure. It was --
A. I can't really see since it's small on the screen. Sorry. My -- I'm getting older and my eyes...
Q. That's okay. Let me see if I can zoom in a little bit more.
A. Thank you.
Q. Okay. Your -- your counsel provided two different written consent documents. They were combined into -- to one full -- I broke them into two because one was earlier and we're not going to discuss



that right now.
A. Okay.
Q. I want to discuss this specific Hightimes Holding Corp Written Consent of the Majority of the Board of Directors in Lieu of a Special Meeting.
A. Yes, sir.
Q. Do you recognize this document?
A. Yes, sir. I've reviewed it.
Q. You reviewed it. And there's a number of things that are redacted.
I think this is what you were referring to before about redacted information?
A. Yes, sir.
Q. Okay. It says "Confidential under Employment Agreements."
Whose employment agreement creates the need for confidentiality of this document?
MR. HASKINS: Objection. This is confidential.
MR. SPIELMAN: I think we can identify who. I don't that that's confidential.
BY MR. SPIELMAN:
Q. Mr. Levin, can you say whose employment?
A. I believe -- I believe Mr. Fox's.
Q. Mr. Fox's employment agreement is what causes



some of these sections to be redacted?
A. I believe so.
Q. Okay. All right. So this -- I want to go through this document.
So this is undersigned by a majority of the members of the board of directors. And I would like to talk about each one of these topics. So some of them we can't see. You've redacted them. But I want to talk about the ones that we can see.
It says: "The Company deems it to be in [the] best interest to hire Paul Anderson [sic] as the Company's president."
And I believe -- I'm going to scroll down just so that I can verify for you -- this blank page -- January 5th, 2020, does -- is that correct?
A. I believe that was the date that that was executed. They may have been circulated previous to that date, but I -- at least, you know, you have the holiday and everything, so I don't know when they were circulated, but I believe them to be finally executed on the 5th of July -- of January as it -- as it says.
Q. So on January -- at -- at least as executed on January 5th, Hightimes Holding deemed it -- to hire Paul --
A. And there's a doc ID there, by the way, to --



MAGNA LEGAL SERVICES

to understand the timeline, so...
Q. Okay. Is this an accurate document in your understanding?
A. Yes, sir.
Q. Is -- is it a complete document from what you produced?
A. Subject -- subject to the -- yes, I believe it to be a complete document.
Q. Subject to what's hidden under the confidential portions --
A. Correct.
Q. Okay. All right. So did Hightimes Holding hire Paul Henderson as the company's president?
A. Jay -- yes. His correct name is Jay Paul Henderson. His full name. But he goes by Paul Henderson.
Q. Jay, J-A-Y, or the letter J?
A. J-A-Y.
Q. Okay. All right. And the next part says that it was in the best interest to extend the Reg A offering until June 2020.
Did Hightimes Holding do that?
A. Yes, sir.
Q. And the next part says the company deems it in its best interest, and I'm paraphrasing so that we



can be efficient with our time, but if you would like me to be really specific, we can -- that best interest to file --
A. Specific would be good. Just -- just because you're asking me to be specific, if we could be specific just...
Q. It says, "The Company deems it in its best interests to file with the Securities and Exchange Commission ("SEC"), a Current Reports on Form 1-U, substantially in the forms previously distributed to the Board for the purposes of" -- the next part is confidential -- "and to extend that Offering until as late as June 30th, 2020."
Did Hightimes Holding file with the SEC the Form 1-U as indicated here?
A. Yes.
Q. Okay. The next part says, "The Company deems it in its best interests to sell the website domain [www.]420.com."
Did the company, Hightimes Holding, sell that domain?
A. I don't believe so.
Q. The next part says: "The Company has been advised that its directors' and officers' liability insurance (the "D&O" Insurance") has been reduced from



a $10.0 million policy to a $5.0 million policy as the result of non-payment of insurance premiums and that the remaining $5.0 million of the D&O Insurance will be terminated on January 13, 2020 (the "Cancellation Date") unless $230,000 in premium payments is made in advance of the Cancellation Date."
Did -- my question to you is did Hightimes Holding -- what -- was their D&O Insurance terminated?
A. No, I do not believe so.
Q. Was there a $230,000 premium payment made?
A. I am unsure if it was or there was a -- or -- or some type of agreement made, but the -- the policy was never terminated.
Q. Okay.
A. I think there may have been an extension or something. I don't -- I don't know for sure on that one to be honest.
Q. At some point after that extension, was there a policy premium paid?
A. Yes, sir.
Q. Do you still have active D&O Insurance premiums?
A. Yes, sir.
Q. The next part says: "The Board deems it imperative that the Company take necessary actions to



raise capital in order to timely cover the costs of the D&O Insurance Premium so that the Company may maintain an active D&O Insurance policy."
What actions we are taken by Hightimes Holding to raise capital?
A. We were in conversations at that point with several different investors.
Q. Did you raise any capital at that point?
A. Yes, sir.
Q. From who?
A. From an investor, Ray Ray Investments, LLC, I believe.
Q. And that ability to raise capital was done by authorization of this document?
A. No. I believe there was a separate document -- I believe there's a separate document that specified the terms and whatnot of -- of that investment.
Q. But the authorization to raise capital, not that specific investment. The authorization to raise capital was because of the board's written consent here; is that correct?
A. Yeah. I mean, in -- listen. In the cannabis industry, you're always trying to raise capital, so I don't think, you know, like, you know -- I -- to be



MAGNA LEGAL SERVICES

honest, as a CEO or executive chairman or -- or any officer of the -- you know, a -- a cannabis company, I don't think you're ever limited to not trying to raise capital. Whether you close on the capital, that's a different story. But you're always in the process of running on the treadmill, if you get what I mean.
Q. Okay. And -- and the last major one, "Whereas" -- says: "The company deems it in its best interests to terminate its present lease at 10990 Wilshire Blvd., Los Angeles, California and enter into a one-year lease (the "Lease") for the property located at 815 Hampton Drive, Unit 1B, Venice, California 90291, a copy of which is being distributed to the Board herewith, for purposes of renting executive office space at a reduced monthly rent."
Did Hightimes Holding terminate that lease?
A. It did terminate that lease. It did not enter into the 815 Hampton Drive, Unit 1B lease.
Q. Okay. And then there's a bunch of resolutions, which confirm all of the things that we just said.
And I'd like to scroll down to specifically this one below. It says, "Resolved, that the Company be, and hereby is, authorized to sell the website domain [www.]420.com for a cash purchase price of not



less than $350,000, and be it further, and it is further..."
Do you recall that authorization in this written consent from your board of directors?
A. Yes, sir.
Q. Did Hightimes Holding offer to sell the domain -- or offer to sell the domain for $350,000?
A. I believe there was a -- a board member who said, "Hey, if you're going to sell it for that, I'd sell -- I'd buy it for 500,000." And there was other interests as well.
Q. But this resolution permits the -- the board to sell it for $350,000, correct?
A. Yes, sir. Of not less than 350.
Q. Of not less than 350, right? That's what words here say?
A. I just -- yes, of course.
Q. All right. I'm going to scroll down. And in the general, it specifically says that "The Executive Chairman of the Company" -- this was you at the time, correct?
A. Yes, sir.
Q. Okay.
"...is authorized and directed to do and perform or cause to be done and performed all such



acts, deeds, and things, and to make, execute, and deliver, or cause to be made, executed, and delivered all such agreements, undertakings, documents, instruments, or certificates in the name of the Company and to retain such counsel, agents, and advisors and to incur and pay such expenses, fees, taxes as shall, in the opinion of such Authorized Person executing the same, be deemed necessary or advisable (such necessity or advisability to be conclusively evidenced by an execution thereof) to effectuate or carry out fully the purpose and interest of all the foregoing resolutions."
I'm going to pause there.
So you, as the executive chairman, were permitted and authored to effectuate and carry out these foregoing resolutions, correct?
A. Yes, sir.
Q. And then lastly as we scroll down, this additional -- this Resolved says: "That any and all actions taken by the Authorized Person" -- in this case, you -- "or any of them, prior to the date of the foregoing resolutions adopted hereby, that are within the authority conferred thereby, are hereby ratified, confirmed, and approved as acts and deeds of the Company."



So if any of these activities occurred -- my question to you is if any of these activities occurred before this February -- sorry -- before this January 5th date, this authorized you to do the same, correct?
A. Correct.
Q. Okay. And then lastly, this -- this one more Resolved says: "That these resolutions shall be filed in the minute book of the Company and become part of the [Company records]."
Was this resolution filed with -- in the minute book of the company?
A. I believe so, with company counsel.
Q. Okay. We had previously talked in the last deposition, and we're going to follow up again about company minutes.
Are there any company minutes in connection with -- that were on -- in the December or January time period of 2019 and -- and January of 2020? Are there any company minutes?
A. I think you have everything that has been provided to you.
Q. My question is are there any company minutes from December 2019 --
MR. HASKINS: Objection.
BY MR. SPIELMAN:



MAGNA LEGAL SERVICES

Page 70

Q. -- or January 2020?
A. Can you repeat your question again. Sounds simple, but I'm really getting lost here.
Q. Sure. A minute ago we -- we -- I showed you the -- the document which said that they should be filed with the company minutes. You indicated that they were.
A. Yes.
Q. My question is those company minutes, where are they?
A. I believe they're all stored with company counsel.
Q. And have you produced those company minutes as previously requested?
A. I believe so. You have them right there.
Q. The document I just showed you -- do you believe that those are the company minutes?
A. That was -- that's my understanding. I'm not a lawyer as -- so maybe that's where the -- I'm not trying to be misunderstanding. I'm just not a lawyer.
Q. Okay. All right. I'm going to share my screen with you again. All right.
In that board resolution that we just discussed, it indicated that there was authorization for you to sell the domain for $350,000, correct?

Page 71

A. Say that again.
Q. In that board resolution that we just read from January --
A. Yes, sir.
Q. -- it authorized you, as chairman, to be able to sell the 420.com domain for $350,000, correct?
A. Correct.
Q. Okay.
A. That was for -- that was on January 5th, as you know.
Q. On January 5th.
But as we discussed, it -- it was retroactive for any activity --
A. It does.
Q. -- that occurred previously?
A. Yes, sir.
Q. Okay. So if you recall, these are the -- from Exhibit K from your first deposition. This is the -- the text message communications between you and Mr. Kauffman when -- on Thursday, December 26th, when these communications first began about the purchase and sale of the 420.com.
Do you remember seeing these text messages?
A. Yes, sir.
Q. And what I want to do is I want to scroll

Page 72

down to this page 2, where on the left-hand side, this was your text -- you said, "Could you do 350K? I'd do that now."
And my client responded: "I'd do 275 right now."
And then you offered to split the difference.
So on December 26th, at that time you offered to sell the domain for $350,000, correct?
A. Correct.
Q. And according to that board resolution, you were authorized to sell that domain for $350,000 on date?
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. You can answer.
A. Yes, sir.
Q. All right. So what I'd also like to show you then is Exhibit N that we previously identified, and I'd like to go to -- these are the requests -- response to requests for admissions for Hightimes Holding. And I'm going to scroll down to Number 8.
It says: "Admit that you were prepared to sell the disputed domain for $350,000 on December 26th, 2019."
And your response is "denied."

Page 73

Is that an incorrect response based upon now what you know about the board resolution and your prior testimony?
A. I still had to get board authorization. I thought that was a -- you know, based on a -- on a phone call or any conversation I had had, that was something I thought I could get approved. But that doesn't mean I didn't have to get board authorization.
Q. All right. But we had board authorization based on that -- that --
A. I did not have board authorization on that date.
MR. HASKINS: Objection.
BY MR. SPIELMAN:
Q. Based upon the board resolution that occurred a few days later, you -- you ended up with -- with authorization, correct?
MR. HASKINS: Objection.
THE WITNESS: What -- 10 days later -- 12 -- 15 days -- 12 days later.
BY MR. SPIELMAN:
Q. Correct. A few days -- a few days later, you ended up with board authorization.
So is this an incorrect response?
A. That is an incorrect response, correct -- no.



MAGNA LEGAL SERVICES

Page 74

That is a correct response, sir.
Q. Why is it correct, please?
A. Because "admit you were prepared to sell the disputed domain for 350,000 on December 26th, 2019." The answer is no, I was not prepared. If I would have board authorization on that date, I could have been prepared to.
Q. And then a few days later, you had board authorization that was retroactive. So as of the date --
A. That doesn't mean that -- it -- so that doesn't mean that I had board authorization on December 26th.
Q. Share...
I'm showing you what was marked as your Bates Page Number 25, and we're going to make this Exhibit W.
(Defendants' Exhibit W was marked for identification purposes.)
BY MR. SPIELMAN:
Q. Do you recognize this document?
A. Yes.
Q. What is it?
A. It's a statement from Bank of America about the checking account.

Page 75

Q. And this was in response to show the wire amount from the -- for the 307,500 -- the 30- -- the $307,500 in connection with the -- this domain, correct?
A. It shows a wire from Trellian Party Limited for 307,500.
Q. Which is the amount of money that my client indicated would be wired to you, correct?
A. Correct.
Q. And this was received by Hightimes Holding, correct?
A. Correct.
Q. And, if I recall from the last deposition, you had said that your Bank of America account closed and that you had moved all your funds to a -- to some different bank.
Is that still accurate?
A. Yes, sir.
Q. And during the last deposition, you indicated that there were QuickBooks records that related to the line items for this wire transfer?
A. Yes, sir.
Q. Were you able to find those QuickBooks records?
A. Yes, sir.

Page 76

Q. Did you produce those QuickBooks records?
A. I don't recall if -- I could go through the product discovery and see if we did. I believe we -- we were going to. I -- I don't know what's been -- what -- I believe they -- they are in there, so I'm happy to go through them and look.
Q. I'd like you to supplement them and provide those QuickBooks records in connection with the -- the 307-5 -- $307,500 that was put into the Hightimes Holding Corp account.
A. No problem.
Q. Great.
Do you know what the current status of those funds are in Hightimes Holding?
A. What do you mean by that?
Q. Is it still funds that are -- that are in the possession of Hightimes Holding or has it been spent?
A. Listen, it's not like the -- the funds were segregated. But there are still funds that supercede that amount in Hightimes Holding's bank accounts.
Q. They weren't earmarked for any specific reason?
A. Just as I said before, no, sir.
MR. HASKINS: Mr. Spielman, you've exceeded the seven hours at this point, so we are going to

Page 77

end the deposition.
MR. SPIELMAN: We will take that up with the judge on Thursday. And we'll pause for now because you're refusing to allow your client to continue on behalf of two companies, correct?
MR. HASKINS: On behalf of what?
MR. SPIELMAN: On behalf of two different companies.
MR. HASKINS: You didn't -- you didn't specify which defendant this deposition today is.
MR. SPIELMAN: We did. And re-noticed for both and I made them exhibits.
MR. HASKINS: You've asked to choose -- you -- you need to choose one or the other.
MR. SPIELMAN: No. This is a court-ordered continued deposition of the party -- parties because of failure to comply with the first set of depositions and failure to present a corporate representative who could discuss information about the deposition topics.
Again, if you want to raise this with the court, we will raise this on Thursday.
Are you stopping the deposition?
MR. HASKINS: Yes.
MR. SPIELMAN: Understood. Okay. We're



MAGNA LEGAL SERVICES

going to pause here.

THE VIDEOGRAPHER: Off the record at 4:23 p.m.

(Zoom videotaped deposition ceased at 4:23 p.m.)



CERTIFICATE OF OATH

STATE OF FLORIDA :
COUNTY OF BROWARD :

I, the undersigned authority, certify that the aforementioned witness, ADAM LEVIN, personally appeared before me via Zoom on the 2nd day of November, 2021 and was duly sworn.

WITNESS my hand and official seal this 3rd day of November, 2021.

______________________________
Michelle Portyansky,
Notary Public-State of Florida
My Commission No. GG166408
Expires: December 7, 2021



REPORTER'S CERTIFICATE

STATE OF FLORIDA
COUNTY OF BROWARD

I, MICHELLE PORTYANSKY, Registered Court Reporter and Notary Public in and for the State of Florida at Large, do hereby certify that I was authorized to and did report said Zoom deposition in stenotype; and that the foregoing pages are a true and correct transcription of my shorthand notes of said Zoom deposition.

I further certify that said Zoom deposition was taken at the time and place herein above set forth and that the taking of said Zoom deposition was commenced and completed as herein above set out.

I further certify that I am not an attorney or counsel of any of the parties, nor am I a relative or employee of any attorney or counsel of party connected with the action, nor am I financially interested in the action.

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or direction of the certifying reporter.

DATED this 3rd day of November, 2021.

______________________________
MICHELLE PORTYANSKY,
Court Reporter

**A**

**ability** 49:25 65:13
**able** 5:21 10:22 13:21,25 14:8 23:13 24:21 25:11 31:2 52:2,14 57:4 57:24 71:5 75:23
**ABRAHAM** 2:9
**Abramowitz** 15:4 21:12
**access** 15:2 21:6,13
**accessible** 19:8,10 19:12
**accomplish** 25:7
**account** 74:25 75:14 76:10
**accounting** 18:3,18 20:19
**accounts** 12:22,25 13:1,2,3,7 76:20
**accurate** 62:2 75:17
**acquaint** 55:16
**acting** 46:2 50:1
**action** 80:13,13
**actions** 64:25 65:4 68:20
**active** 64:21 65:3
**activities** 30:3 49:11,25 69:1,2
**activity** 71:13
**acts** 68:1,24
**Adam** 1:17 3:5 4:1 4:13 5:14 40:2 44:10 79:7
**Adam@hightime...** 12:11
**add** 12:3
**additional** 8:9 59:6 68:19
**additionally** 19:2 43:10
**address** 11:5,22 12:16,20 18:14 32:3,14
**addresses** 12:6 13:2 13:12 14:9,12,14 14:15 25:19
**admin** 31:3
**admin@hightimes** 32:9
**admin@hightim...** 32:2
**administer** 21:12
**administered** 5:11
**administers** 21:10
**administrator** 21:8
**admissions** 72:20
**admit** 72:22 74:3
**adopted** 68:22
**ADP** 17:21
**advance** 64:6
**advisability** 68:9
**advisable** 68:9
**advised** 63:24
**advisors** 68:6
**affirmed** 5:15
**aforementioned** 79:7
**afternoon** 6:9
**agents** 68:5
**ago** 20:14 27:3 47:12 70:4
**agree** 43:1
**agreement** 58:5 60:16,25 64:12
**agreements** 47:1 57:22 60:15 68:3
**Alexander** 2:16 5:2
**allow** 77:4
**allowing** 51:8
**alphabetical** 7:8
**ambiguity** 34:10
**amended** 40:17,19 40:20
**America** 74:24 75:14
**amount** 43:1 75:2,7 76:20
**and/or** 80:16
**Anderson** 61:11
**Andrews** 2:4
**Angeles** 6:11,12 18:2,12 19:20,24 36:15 66:10
**answer** 17:1 18:25 20:8 22:8 28:17 29:14 32:20 35:25 38:4 43:24 51:17 72:15 74:5
**answered** 27:7 32:13 37:12
**answering** 42:16 44:3
**anticipate** 43:20
**anybody** 9:8 36:7 36:10,18
**apologies** 54:2
**apologize** 44:20
**apparently** 27:11
**appearances** 2:1 4:23
**appeared** 79:8
**applicable** 25:9
**apply** 80:15
**appreciate** 53:5
**approved** 68:24 73:7
**approximate** 12:15 43:22
**approximately** 12:17,21 27:15 50:18
**argumentative** 13:23 16:24 28:25 42:24 54:22
**articles** 57:6
**asked** 14:5 27:7 37:11 40:5 48:18 50:16 54:13 57:2 77:13
**asking** 34:20 38:18 48:5,6,9 50:22 56:6 63:5
**assert** 51:6,22
**asserting** 38:2
**assertion** 51:13 52:6
**assist** 54:9
**associated** 13:7,13 14:9 15:25
**assume** 29:20 30:24
**assumed** 33:23
**attached** 3:19 47:6 58:6
**attorney** 80:12,12
**attorney/client** 30:12 34:15,22 37:13
**authored** 68:15
**authorities** 47:14 47:24
**authority** 49:24 68:23 79:6
**authorization** 65:14,19,20 67:3 70:24 73:4,8,9,11 73:17,23 74:6,9 74:12
**authorized** 48:16 48:17,19 66:24 67:24 68:7,20 69:4 71:5 72:11 80:6
**available** 19:18
**Ave** 2:4
**aware** 6:19

**B**

**B** 3:12
**back** 17:4,5 22:22 24:1 27:3 30:13 32:24 36:22 38:17 44:8 58:20
**backed** 16:17,23 17:9,14,15 18:1,5 18:20 19:5
**backup** 18:6
**backups** 9:22
**Bahamian** 23:1
**bank** 74:24 75:14 75:16 76:20
**based** 43:15 44:14 73:1,5,10,15
**basically** 10:8
**basis** 18:11
**Bates** 3:16 50:10 74:15
**BCC** 18:9
**began** 37:3 45:19 71:21
**beginning** 33:8,16
**begins** 4:12
**behalf** 1:18 2:2,8 4:25 5:5 77:5,6,7
**behest** 49:15
**believe** 9:6 14:10 14:24 19:20,21 22:15 24:22,23 25:17 27:19,21 30:8 31:11,19 32:25 39:1,2,22 40:11,11,15 41:1 41:5,17,20 42:2 45:12 46:13 47:6 49:9 50:5 51:10 57:10,17,25 58:5 58:6 60:24,24 61:2,13,16,20 62:7 63:22 64:9 65:12,15,16 67:8 69:12 70:11,15,17 76:3,5
**believed** 38:8
**best** 61:11 62:20,25 63:2,7,18 66:8
**beyond** 54:23
**bit** 6:1 59:20
**blank** 61:14
**Blvd** 66:10
**board** 22:4,22 23:6 23:15 24:3,12,19 25:18,25 26:15,18 26:24 27:4,10 30:1,2,9 39:14 40:23 41:1,6,7,9 44:13 47:13,20,22 48:12,17,23 49:4 49:12,13,15,18,23

50:1,4 60:5 61:6 63:11 64:24 66:14 67:4,8,12 70:23 71:2 72:10 73:2,4 73:8,9,11,15,23 74:6,8,12
**board's** 65:21
**book** 69:8,11
**bordering** 54:20
**bounds** 54:23
**box** 7:14 25:1 33:3 52:14,17 53:11
**breach** 9:25
**break** 31:14 34:23 34:24,25 35:8,9 36:8,11 43:8 51:11
**briefly** 39:7
**bring** 36:2 51:14
**broad** 15:14
**broke** 59:10,24
**BROWARD** 79:4 80:3
**Brown** 2:16 5:2
**bunch** 66:19
**business** 16:1 48:21 48:22,25 49:25 55:9,13
**buy** 67:10
**bylaw** 56:19
**bylaws** 17:15,19 18:18 44:14 50:5 50:6,21 54:6 56:17,19 57:6

**C**

**C-** 41:24
**California** 1:23 16:5 18:2 20:6 36:15 66:10,13
**call** 22:13,16 53:24 54:24 73:6
**calls** 24:3,8,13
**Canary** 2:10
**Cancellation** 64:4,6
**cannabis** 65:23 66:2
**cannabiscup.com** 13:9
**cap** 51:6 52:3
**capacity** 31:23
**capital** 65:1,5,8,13 65:19,21,24 66:4 66:4
**carry** 68:11,15
**case** 1:3 32:5 46:16 68:21
**cash** 66:25
**categories** 17:13 18:20 55:19,21
**cause** 4:9 67:25 68:2
**causes** 60:25
**ceased** 78:4
**cell** 22:15,18,20,25 23:1,2,5 53:22,23 53:24
**CEO** 33:22 34:11 37:9,25 38:6,19 38:21,24 39:11,15 39:17,20,21 40:3 40:5,8 42:11 44:16 45:15,17 46:2 66:1
**certain** 11:6,21 19:13 46:24 55:20
**certainly** 51:15,23
**Certificate** 3:8,9 79:1 80:1
**certificates** 68:4
**certification** 80:14
**certified** 36:4
**certify** 36:1 79:6 80:5,8,11
**certifying** 80:16
**CFO** 44:17 45:12
**chairman** 33:11,20 34:8 37:7 44:13 45:11,11 47:13,22 48:11 49:11,12,13 49:20 66:1 67:20 68:14 71:5
**chambers** 54:25
**change** 12:2
**changed** 11:24
**charge** 38:22
**chat** 7:14,15 8:1 52:12,14
**check** 6:2 24:15
**checked** 24:16
**checking** 74:25
**chief** 38:14 40:2 45:22
**choose** 77:13,14
**Chris** 2:15 4:19
**circulated** 61:17,20
**citing** 52:8
**civil** 35:21
**clarify** 15:20 37:15 41:3 47:17
**clearly** 55:7,11
**client** 30:12 35:24 38:3 72:4 75:7 77:4
**close** 54:25 66:4
**closed** 75:14
**Cloud** 19:22 20:15 20:16,18
**Cloud-based** 19:23
**Colleen** 24:23
**Columbus** 16:6
**com-** 16:10
**combined** 43:5 51:18 59:24
**commenced** 80:10
**commission** 56:11 63:9 79:17
**commun-** 21:20
**communicate** 21:21 22:5 26:18
**communicated** 21:19 29:25 53:25
**communicating** 37:4 53:21
**communication** 21:15 22:10
**communications** 9:15 10:19,23 27:17,23 28:1 32:16 71:19,21
**companies** 6:22 7:1 8:17 77:5,8
**company** 1:10,11 9:2,12 11:1,8,11 11:25 15:10,14,15 15:20 16:5,6,8,11 16:13 17:14 18:17 19:9,11,13 25:2 26:13 28:2,2,19 30:3 31:7,9,18,20 31:22,23 33:2,11 33:20 37:20 38:15 39:2,3 41:21 42:3 42:3 44:12 50:2 57:10,13 61:10 62:24 63:7,17,20 63:23 64:25 65:2 66:2,8,23 67:20 68:5,25 69:8,9,11 69:12,15,16,19,22 70:6,9,11,13,17
**company's** 16:3 61:12 62:13
**complete** 53:2 62:5 62:8
**completed** 25:23 26:4 27:9 52:24 80:10
**comply** 77:17
**computer** 23:20 29:20,23
**Concept** 2:3 4:17 4:25
**conclusively** 68:10
**conducted** 26:8,10 26:11,14
**conferred** 68:23
**confidential** 60:14 60:19,21 62:10 63:12
**confidentiality** 46:25 60:17
**confirm** 10:22,25 31:14 40:6 66:20
**confirmed** 10:14 11:2 68:24
**confusion** 38:18
**connected** 80:13
**connection** 24:13 32:4 69:16 75:3 76:8
**consent** 59:23 60:4 65:21 67:4
**considering** 43:6 51:15,18
**consult** 9:7
**consulted** 8:19
**consulting** 31:6,8 31:11
**continue** 6:25 7:7 42:16,21 43:9 44:2 52:9 77:5
**continued** 6:16,25 7:16,21 43:18 51:16 77:16
**continuing** 45:1 56:20
**contract** 31:21
**contracts** 48:24
**contrary** 51:8
**control** 80:15
**conversation** 27:2 48:2 73:6
**conversations** 65:6
**COO** 44:18
**cooperate** 16:14
**copies** 17:22
**copy** 6:24 51:2 66:13
**Corp** 4:14 37:8 42:4,5,7,9 44:10 45:8 60:4 76:10
**corporate** 6:17,21 8:13,16,21 15:16 16:14 19:24,25,25 20:3,25 21:7,11 28:23 34:4 77:18
**corporation** 1:9,11 3:14 7:18 9:4 33:10,19 36:25

37:6 41:1,5,6 57:7
**corporations** 40:1 43:4 51:19
**correct** 12:24 14:3 20:10,12 23:7,8 23:10 24:9 26:1,2 27:6 28:11 29:3 32:17 41:10 49:16 50:7,8 57:14 61:15 62:11,14 65:22 67:13,21 68:16 69:4,5 70:25 71:6,7 72:8 72:9 73:17,22,25 74:1,2 75:4,8,9,11 75:12 77:5 80:7
**Correction** 58:21
**correspond** 55:18
**costs** 65:1
**counsel** 4:22 7:4 16:15 27:22 34:4 34:13,18 35:10,13 35:19 37:10,16,20 46:20,22 47:25 48:6,8 55:4 59:5 59:22 68:5 69:12 70:12 80:12,12
**country** 16:10
**COUNTY** 79:4 80:3
**course** 55:9,12 67:17
**court** 1:1,25 4:7,20 5:7,9 6:16 8:5 13:21,25 16:4 17:3 32:22 44:6 51:14,20 77:22 80:4,20
**court-ordered** 43:18 48:10 51:16 77:15
**cover** 65:1
**covering** 51:19
**Craig** 40:20 45:9 45:15 46:1
**creates** 60:16
**CROSS** 3:4
**current** 63:9 76:13
**currently** 29:19 36:13

**D**

**D** 3:1 39:24
**D-A-R-R-E-N** 8:24
**D&O** 63:25 64:3,8 64:21 65:2,3
**Darren** 2:3 4:24 8:19 15:4
**data** 9:24 10:3,14 10:15 18:10,19
**date** 26:9,16 34:7 38:9,11 40:13,15 61:16,18 64:5,6 68:21 69:4 72:12 73:12 74:6,10
**DATED** 80:17
**dates** 25:9 33:15
**David** 45:12
**day** 33:18 79:8,11 80:17
**days** 73:16,19,20 73:20,22,22 74:8
**December** 22:22 24:1,17 33:8,8,12 33:12,12,16,16,18 36:24 37:3 38:7,8 38:20 40:24,24 41:12,12 45:1,2 45:10,15 46:1 47:18,18 69:17,23 71:20 72:7,24 74:4,13 79:17
**decisions** 33:24
**declined** 53:23
**deeds** 68:1,24
**deemed** 61:23 68:8
**deems** 61:10 62:24 63:7,17 64:24 66:8
**defendant** 2:8 8:16 77:10
**defendants** 1:12
5:6 6:17 8:13
**Defendants'** 7:22 59:1 74:18
**definitely** 36:2
**Delaware** 1:11
**delete** 10:8
**deleted** 10:20,24
**deletion** 10:1,3
**deliver** 68:2
**delivered** 68:2
**delivery** 17:22
**denied** 72:25
**Department** 39:25
**depo** 43:11 45:4
**deponent** 5:22,23
**deposed** 43:4
**deposition** 1:15,20 1:22 4:1,6,12,16 5:1 6:16,25 7:1,6 7:16 8:2,14 26:5 27:10 29:20 30:17 31:1,15 34:1 35:3 35:10,20,20,21 36:8 39:24 42:13 42:23 43:18,20 50:12 51:16,19 54:24 69:14 71:18 75:13,19 77:1,10 77:16,20,23 78:4 80:6,7,9,10
**depositions** 43:5 77:18
**description** 3:13 55:22
**despite** 55:6
**determine** 31:2
**devices** 23:14
**difference** 72:6
**different** 7:19 12:19,20 17:16,16 17:17,25 22:21 23:17 51:19 57:19 59:23 65:7 66:5 75:16 77:7
**differently** 6:2
**difficult** 14:22
**digital** 18:3
**digitally** 16:12 18:5
**direct** 3:4 6:6 80:15
**directed** 67:24
**direction** 26:14 80:16
**director** 41:2
**directors** 40:24 41:21 42:5 45:13 47:13 48:12,24 49:4,14,16,18,23 50:1,4 60:5 61:6 67:4
**directors'** 63:24
**discovery** 76:3
**discuss** 8:4,5 13:22 14:1,2,8 29:2,6,7 59:25 60:3 77:19
**discussed** 19:3 45:3 70:24 71:12
**discussion** 35:9,12 35:16,23 36:7
**discussions** 48:6,7
**dispensary** 16:7
**dispute** 24:8
**disputed** 72:23 74:4
**distributed** 16:9 63:10 66:13
**District** 1:1,2 55:7 55:10
**Division** 39:25
**doc** 61:25
**document** 7:19 30:14,22 31:25 44:20 46:5,6,12 49:5 50:3 52:10 52:15 53:8 54:4 57:5 58:12,23 60:7,17 61:4 62:2 62:5,8 65:14,16 65:16 70:5,16 74:21
**documented** 49:10
**documents** 3:15,16 8:1 16:2,3,21
17:13 27:14 30:23 32:5 40:12,13 50:20 55:17,21,23 56:9,12,14 57:13 57:15 58:24 59:5 59:10,11,14,23 68:3
**doing** 57:2
**domain** 13:13 24:9 24:20 27:24 28:3 28:20 63:18,21 66:25 67:7,7 70:25 71:6 72:8 72:11,23 74:4 75:3
**dot** 12:3
**double** 6:2 7:10
**download** 53:15
**Dr** 2:10
**drive** 20:25 21:1,7 66:12,18
**drives** 18:6 20:24 21:7
**Dropbox** 20:22
**dropping** 7:15
**Dspielman@con...** 2:6
**due** 34:9
**duly** 5:15 79:9
**duplicate** 12:3
**duties** 44:15

**E**

**E** 3:1,12
**e-mail** 2:6,11 9:14 11:5,10,14,18,20 11:20,22 12:1,6,9 12:12,16,19,21 13:1,6,12 14:8,12 14:14,15 17:17 21:14 22:9 25:1 25:19 26:11,12,19 26:25 27:1,4,16 27:17,23 28:1,19 28:20 32:1,3,8,10 32:14,15 36:10

46:10 52:2
**e-mailed** 46:9
**e-mails** 10:1,8,19 10:23 11:7 15:8 24:19 25:25 26:9 26:15,24 27:10 29:16,17 30:2,9
**earlier** 59:25
**early** 31:7 44:22
**earmarked** 76:21
**easier** 43:6
**easiest** 57:8
**effectively** 38:7
**effectuate** 68:11,15
**efficient** 56:23 63:1
**effort** 55:19
**either** 7:10 28:12 31:14
**electronic** 10:19,23
**electronically** 8:12 8:15 9:9 14:1
**employed** 9:1,2
**employee** 9:3,3 11:4 12:24 17:20 31:6,17,20 80:12
**employees** 11:22 12:4,15,19 14:13 15:2 18:18 21:20 21:21 22:3
**employment** 57:22 58:4,5 60:14,16 60:23,25
**ended** 7:6 73:16,23
**engaged** 38:13
**enter** 48:24 66:10 66:18
**entire** 5:21 25:1 26:12
**entirely** 43:15
**entity** 41:17
**Esquire** 2:3,9,16,17
**event** 9:25
**events** 19:5
**eventually** 53:15
**everybody** 7:15
**everyone's** 11:14
**evidenced** 68:10
**exact** 10:7 46:4
**exactly** 28:8,14
**EXAMINATION** 6:6
**examined** 5:15
**examples** 48:20
**exceed** 51:9
**exceeded** 76:24
**Exchange** 63:8
**execute** 68:1
**executed** 61:17,20 61:22 68:2
**executing** 68:8
**execution** 68:10
**executive** 33:11,20 34:8 37:7 38:14 38:22 40:2 44:12 45:10,11,22 47:13 47:22 48:11 49:12 49:13,20 66:1,15 67:19 68:14
**exhibit** 3:14,15,15 3:16,16 7:6,19,20 30:18 39:24 47:7 58:20,22,25 59:4 71:18 72:18 74:17 74:18
**exhibits** 3:19 7:22 59:1 77:12
**exist** 13:16
**expectations** 43:16
**expenses** 68:6
**Expires** 79:17
**explain** 55:14
**expressly** 52:1
**extend** 62:20 63:12
**extension** 64:15,18
**extent** 7:8
**external** 9:15
**eyes** 59:18

**F**

**facilities** 16:9
**fact** 51:18 55:6
**failure** 51:16 77:17 77:18
**familiar** 54:18 56:8
**family** 23:16
**far** 54:23
**fast** 56:21
**February** 69:3
**federal** 51:7
**fees** 68:6
**figured** 53:3
**file** 51:24 63:3,8,14
**filed** 57:11 69:7,10 70:6
**filled** 40:22
**finally** 61:20
**financially** 80:13
**find** 8:15 10:18 24:21,24 27:11 28:7 58:8,9 75:23
**finished** 42:19
**first** 5:15 7:6,17 38:18 53:14 57:11 71:18,21 77:17
**five** 3:19 14:21,23 14:25 15:1 42:23
**fixed** 43:1
**FL** 2:5,10
**Florida** 1:2 4:8 55:7,10 79:3,16 80:2,5
**focused** 5:22
**follow** 69:14
**following** 24:18
**follows** 5:16
**foregoing** 68:12,16 68:22 80:6,14
**form** 15:18 18:23 19:16 21:18 22:6 22:23 26:20 63:9 63:15
**forms** 63:10
**Fort** 2:5
**forth** 80:9
**forward** 32:25
**forwards** 33:1
**found** 27:13 28:9 28:10,13 46:18
**Fox** 38:5 41:13 45:9 45:15,18 46:1
**Fox's** 40:20 60:24 60:25
**front** 29:19
**full** 43:5 51:25 59:9 59:24 62:15
**fully** 68:11
**funds** 75:15 76:14 76:16,18,19
**further** 67:1,2 80:8 80:11

**G**

**G** 30:18
**general** 11:21 55:14 67:19
**generally** 12:5,6
**getting** 59:17 70:3
**GG166408** 79:17
**give** 23:17 25:12 31:10 48:20 49:24 50:25 51:20 58:8
**given** 18:17
**go** 8:8 16:22 17:11 27:3 36:22 38:17 43:12 50:24 51:1 51:2 52:2 54:16 61:3 72:19 76:2,6
**goes** 62:15
**going** 5:3,21 6:21 7:3 8:11 30:13,15 30:19 36:1,2 40:7 42:13 43:16,17 47:9 49:2 50:12 50:14,15,15 51:5 51:20,25 53:10,14 53:16 54:12,14 56:23 58:10,13,19 58:22,25 59:25 61:13 67:9,18 68:13 69:14 70:21 72:21 74:16 76:4 76:25 78:1
**good** 6:8,15 63:4
**Google** 9:19,21 11:17,19 15:9 20:24,25 21:1,13 21:13
**Gotcha** 6:3
**governing** 55:11
**grab** 44:20
**granted** 48:18
**Great** 7:13 53:8 76:12
**group** 2:3 4:18,25 21:23 22:3
**groups** 55:20
**grown** 12:1
**guidelines** 48:23,25
**Guys** 56:3

**H**

**H** 3:12
**half** 42:23 43:13
**Hampton** 66:12,18
**hand** 5:9 24:8 79:11
**happened** 38:12
**happy** 76:6
**harassing** 55:3
**harassment** 54:19 56:6
**hard** 17:22
**Haskins** 2:9,9 5:5,5 7:12 13:23 15:18 16:24 18:23 19:16 21:18 22:6,23 26:20 27:7 28:15 28:25 29:8,12 32:18 34:16,24 35:14,17,24 36:6 37:11 38:2 39:18 40:10 42:12,17,22 43:19 45:5 46:24 47:5 48:5 51:5 54:19 55:4 56:4 60:18 69:24 72:13 73:13,18 76:24 77:6,9,13,24
**headquarters** 16:4
**hear** 22:8 51:13

**help** 25:2
**Henderson** 44:17 62:13,15,16
**herewith** 66:14
**Hey** 67:9
**hidden** 62:9
**high** 1:9,10 4:14 6:17 7:21 9:4,5,13 10:4 11:4 12:13 13:4,8 15:17,25 16:1 18:17 20:2,7 21:2 33:10,19 34:11 36:25 37:6 37:22 38:18,19,23 38:25 39:21 40:9 40:24 41:2,9,15 41:18,23,25 45:16
**highly** 52:6
**Hightimes** 3:14 6:17 7:17 9:8 12:10 13:7 37:7 38:16,21 39:11,20 41:6,8 42:4,5,7,8 44:9,22 45:7,23 46:2 47:14,22 49:14 50:7 54:7 57:7,10,21,22 60:3 61:23 62:12 62:22 63:14,20 64:7 65:4 66:16 67:6 72:20 75:10 76:9,14,17,20
**Hightimes'** 9:20 13:1
**hightimes.com** 9:18 12:16 13:4
**hire** 61:11,23 62:13
**hold** 59:9
**holding** 1:11 3:14 6:18 7:17 9:12 13:7 37:8 38:21 39:2,3,12 41:6,8 41:21 42:3,4,5,7,8 44:10,23 45:8,23 46:3 47:14,23 49:14 50:7 54:7 57:7,10,21,22 60:4 61:23 62:12 62:22 63:14,20 64:8 65:5 66:16 67:6 72:21 75:10 76:10,14,17
**Holding's** 76:20
**Holdings** 38:16
**Holdings'** 9:8
**holiday** 34:9 49:1 61:19
**home** 36:16
**honest** 64:17 66:1
**hope** 43:1
**hopefully** 43:21
**Horvath** 41:24 42:10 44:11,16
**hour** 43:7,13,13
**hours** 42:23 51:9 76:25
**house** 36:14
**hundreds** 16:20

**I**

**ID** 61:25
**identification** 7:23 59:2 74:19
**identified** 49:4 50:3 72:18
**identifies** 32:1 40:1 50:20
**identify** 11:10 17:12 22:20 23:13 33:7 47:16 54:4 55:5,20 60:20
**identifying** 22:13 37:24 47:19 49:3 49:7
**imperative** 64:25
**important** 30:21
**incorporation** 57:6
**incorrect** 20:5,11 73:1,24,25
**incur** 68:6
**index** 57:10
**indicated** 63:15 70:6,24 75:8,19
**indicator** 11:6
**indiv-** 18:10
**individual** 1:6 11:20 18:5,7,8,11 19:6,7 21:7
**individually** 25:22
**industry** 65:24
**information** 8:12 8:15 9:9 10:12 14:1,6 15:3 18:17 30:18,22 46:25 56:1 60:12 77:19
**inspecting** 55:16
**instance** 12:9
**Instant** 21:16
**instructing** 35:24 38:3
**instruments** 68:4
**insurance** 63:25,25 64:2,3,8,21 65:2,3
**interest** 61:11 62:20,25 63:2 68:11
**interested** 80:13
**interests** 63:8,18 66:9 67:11
**interim** 45:24,24
**internal** 9:14 21:15
**interruption** 51:1 51:17 54:21
**investment** 65:18 65:20
**Investments** 65:11
**investor** 65:11
**investors** 65:7
**iPad** 23:20
**iPads** 23:17,18,19
**Isle** 2:10
**issues** 17:25
**It'll** 54:16
**items** 75:21

**J**

**J** 2:3,9 62:17
**J-A-Y** 62:17,18
**January** 24:18 30:1 33:13 38:9,9,11 39:12 40:1,4,8 45:2,19 47:19 61:15,21,22,23 64:4 69:3,17,18 70:1 71:3,9,11
**Jay** 42:10,11 44:17 62:14,14,17
**Jeffrey** 31:2,5,6
**Jesse** 2:9 5:5 34:14 34:22
**Jesse@jhaskinsl...** 2:11
**job** 48:4
**judge** 36:3 54:25 77:3
**July** 61:21
**June** 62:21 63:13
**Justin** 22:25 23:16 23:16 24:23

**K**

**K** 71:18
**K-A-N-D-I-C** 15:7
**Kandic** 15:5 21:12 25:6
**Kauffman** 1:6 4:13 25:18,24 37:4 71:20
**kept** 22:25 55:12
**key** 25:8
**kids'** 23:19
**kind** 11:5
**kinds** 30:23
**knew** 14:6
**know** 6:9 10:11 11:25 12:3 14:17 18:15 19:14 31:20 31:21,24 32:6,8,9 32:11 36:24 42:18 43:24 46:1,18,19 47:9 50:24 53:17 53:20 55:2 61:18 61:19 64:16 65:25 65:25 66:2 71:10 73:2,5 76:4,13
**Knowing** 51:25
**knowledge** 10:2 13:11 18:15 24:14 48:15 57:4

**L**

**L-I-U** 8:23
**label** 7:18 58:19
**labeled** 30:17 39:24 58:22
**language** 56:5
**laptops** 23:14
**Large** 4:8 80:5
**lastly** 68:18 69:6
**late** 33:8 40:24 41:12,19 47:18 63:13
**Lauderdale** 2:5
**law** 2:3,9 4:17,25 16:14 23:25
**lawyer** 70:19,20
**lawyers** 46:19
**lease** 66:9,11,11,16 66:17,18
**leeway** 51:21
**left** 24:11 51:12
**left-hand** 72:1
**Legal** 2:15 4:20,21
**length** 43:22
**let's** 5:17 15:22 16:22 33:5,17 34:24 36:22 37:15 37:15 38:17 39:7 39:8 50:25
**letter** 46:8,11 62:17
**lettering** 7:11
**level** 41:21
**Levin** 1:17 3:5 4:1 4:13 5:14 6:8,10 6:15 7:25 8:11 29:15 30:16 35:7 36:6 40:2 44:2,10 52:10 53:22 54:11 56:8 60:23 79:7
**Levin's** 1:23

**liability** 63:24
**Lieu** 60:5
**limit** 51:10
**limited** 66:3 75:5
**line** 52:7 75:21
**link** 56:18
**links** 56:18
**list** 11:14,18 25:12 25:14
**listed** 32:14 38:24 39:3,3 40:5
**listen** 65:23 76:18
**listening** 5:4
**little** 6:1 27:15 59:20
**Liu** 8:19 9:1 10:13 15:4 21:9
**Liu's** 8:22
**LLC** 65:11
**located** 56:15,16 66:12
**location** 18:8 19:19
**locations** 16:17
**logs** 22:16
**long** 9:1,5 10:10 42:12,17 43:21 54:16
**longer** 41:13
**look** 17:20 18:4 28:5 46:5 76:6
**looked** 12:25 29:17 54:1
**looking** 25:21
**looks** 52:13,24 53:15,19
**Los** 6:11,12 18:2,12 19:20,24 36:14 66:10
**loss** 9:24 10:1
**lost** 70:3
**lot** 20:18

**M**

**magazine** 17:24
**magazines** 18:18 19:4
**Magna** 2:15 4:19 4:21
**mail** 9:19,20 11:17 15:9 24:16
**mailboxes** 14:11
**mails** 24:11
**main** 23:20
**maintain** 65:3
**maintained** 8:16 18:16 22:13 55:18 57:12
**maintains** 22:16
**major** 66:7
**majority** 60:4 61:5
**making** 33:24 52:5
**Manley** 23:9,22,22 23:23,24
**manner** 55:11
**manners** 22:10
**marked** 3:19 7:22 59:1 74:15,18
**Matt** 46:24
**matter** 4:13 35:22 55:5 56:6
**Maxx** 15:4 21:10 21:10,11,11
**mean** 12:23 15:15 15:20 27:2 31:23 41:4 47:25 65:23 66:6 73:8 74:11 74:12 76:15
**Meaning** 11:5
**meaningful** 55:22
**means** 80:15
**meant** 59:14
**mechanisms** 21:15
**Meeting** 60:5
**member** 23:6 39:14 40:23 41:6,7,9 44:13 67:8
**members** 19:13 22:4,4,21 23:15 24:4,12,19 26:15 26:19 27:4,11 30:1,2,10 47:20 61:6
**members'** 25:19 26:1,24
**mentioned** 28:8 33:6,15
**Merlin** 1:6 4:13 25:17,17,23
**message** 71:19
**messages** 71:23
**messing** 21:16
**Michelle** 1:25 4:7 4:21 79:16 80:4 80:19
**mid** 47:19
**Midday** 6:14
**middle** 1:2 40:4 55:7,10
**migrated** 18:12
**million** 64:1,1,3
**minute** 20:14 27:3 31:10 69:8,11 70:4
**minutes** 51:11 53:15 58:9 69:15 69:16,19,22 70:6 70:9,13,17
**misheard** 14:7
**mistaken** 39:5 57:18
**misunderstanding** 70:20
**mobile** 23:14
**moment** 29:23 47:10,12
**momentarily** 53:6
**money** 75:7
**monthly** 66:15
**months** 9:6
**morning** 6:13,15
**motion** 51:24
**move** 5:17 58:10
**moved** 75:15
**multiple** 15:12 16:9 45:3

**N**

**N** 2:4 3:1 72:18
**name** 8:22,24 11:5 12:16 15:6 31:3 31:11 40:21 62:14 62:15 68:4
**names** 12:3 25:19 26:1
**Narcissus** 16:4
**Natalia** 15:5 21:11 21:12 25:6 26:14 26:24 27:11
**Natalia's** 15:6
**nature** 35:12,16
**necessary** 64:25 68:8
**necessity** 68:9
**need** 12:2,24 40:18 43:23 51:24 60:16 77:14
**needed** 52:3
**negotiation** 43:10
**never** 23:22 64:13
**New** 1:9 39:25
**Newberg** 45:12
**non-payment** 64:2
**normal** 54:23
**Notary** 4:7 79:16 80:5
**notes** 80:7
**November** 1:20 4:2 4:15 79:9,12 80:17
**num-** 53:24
**number** 3:16 4:12 13:1 23:18 24:3 42:24,25 54:22 60:9 72:21 74:16
**numbering** 7:10

**O**

**o'clock** 43:12,14
**Oath** 3:8 5:11 79:1
**objection** 7:5,12 13:23 15:18 16:24 18:23 19:16 21:18 22:6 26:20 28:15 28:25 29:8,12 32:18 35:14,17 37:11 39:18 40:10 45:5 48:5 60:18 69:24 72:13 73:13 73:18
**objective** 55:16
**obligation** 55:13
**observing** 5:4
**obviously** 11:24 12:3 16:11
**occurred** 69:1,2 71:15 73:15
**offer** 67:6,7
**offered** 72:6,7
**offering** 62:21 63:12
**office** 16:4,6,17 17:23 18:7,12 19:6,20,24,25 20:7 23:25 66:15
**officer** 38:14 40:2 42:3 44:15 45:22 45:25 66:2
**officers** 22:4 33:2,6 39:1,2,4 41:15,18 41:20,22,25 42:4 42:8 44:9,11,22 45:4,7,13,14 47:20
**officers'** 63:24
**offices** 16:14 18:1 19:7
**official** 37:5 79:11
**oh** 47:8 50:14 58:16
**Ohio** 16:6 18:2
**okay** 5:17 6:8 7:3 7:11,14,25 8:7,11 9:7,13 10:3 12:5,9 12:15,18 13:10 14:5,22 20:13,20 21:6,14 22:18 23:4,13 24:7,17 26:23 29:10,25 30:14 31:1,13,17 33:5 34:5 35:7 36:1,18,22 37:15

38:11 39:14,23 40:23 44:21 45:10 45:21 46:21 47:8 47:12 49:3 50:6,9 52:23 53:1,6,18 54:3 56:14,22,25 58:10 59:19,22 60:2,14 61:3 62:2 62:12,19 63:17 64:14 66:7,19 67:23 69:6,13 70:21 71:8,17 77:25
**older** 59:17
**once** 22:19
**one-year** 66:11
**ones** 16:19,23 19:2 61:9
**online** 15:9 19:12 20:18
**open** 29:22 52:14 53:8,10,16,17 54:3
**Operate** 48:21
**operation** 16:1
**opinion** 68:7
**opportunity** 35:7
**order** 6:16 7:8 13:21,25 46:14,15 51:8 65:1
**ordered** 8:5
**organization** 12:1
**organization's** 57:13
**outside** 12:18 32:16
**oversee** 42:5
**owned** 41:10 42:6
**ownership** 31:8
**owns** 23:16

**P**

**P-R-O-C-E-E-D-...** 4:4
**p.m** 1:21,21 4:16 35:2,4,5 78:3,5
**PA** 2:3,9
**page** 3:7,13,16 30:21 50:15,16,16 50:18,22 56:20 61:15 72:1 74:16
**pages** 27:15 50:10 50:13,17,19,23 54:12,17 55:6 57:19 58:1 80:6
**paid** 64:19
**paraphrasing** 62:25
**part** 30:21 45:2 58:2,3,6 59:8 62:19,24 63:11,17 63:23 64:24 69:8
**participating** 5:3
**particular** 55:21 56:5
**parties** 4:22 77:16 80:12
**partners** 5:1
**party** 55:13,17 75:5 77:16 80:13
**Paul** 42:10,10,11 44:17 61:11,24 62:13,14,15
**pause** 68:13 77:3 78:1
**pay** 68:6
**paycheck** 17:22
**payment** 64:10
**payments** 64:5
**PDF** 30:20
**percent** 41:10 42:6 52:24 53:19 57:18
**perform** 67:25
**performed** 49:11 67:25
**period** 10:9,9 24:18 26:3 29:25 31:8 33:8,13 34:12 37:3 45:3,12,21 47:18,21 69:18
**permission** 53:12
**permits** 67:12
**permitted** 68:15
**person** 9:10,10 68:8 68:20
**personal** 22:15,18
**personally** 23:24 57:20 79:7
**Peter** 41:24 42:10 44:10,16,16
**phone** 22:16,18 23:1,5 24:7,13 52:2 53:22,24,24 73:6
**phones** 22:20,25 23:2
**physical** 20:4,6,13
**physically** 16:16
**pictures** 19:4
**pinned** 5:24
**pinpoint** 57:4
**place** 54:9 57:8 80:9
**place-** 17:17
**places** 15:12,24 17:16
**Plaintiff** 1:7,18 2:2 2:16,17 4:25
**PLAINTIFFS** 3:13
**plan** 42:13
**please** 5:8,10 10:21 15:6 17:4 29:11 32:23 34:17,17,18 44:2,4 46:23 48:20 54:14 74:2
**plus** 43:7
**point** 19:22 39:6,10 45:14,14,25 54:20 64:18 65:6,8 76:25
**pointing** 54:10
**policies** 8:18
**policy** 10:3,6,7,16 10:17 64:1,1,12 64:19 65:3
**portions** 62:10
**Portyansky** 1:25 4:7,21 79:16 80:4 80:19
**position** 45:10
**possession** 22:21 76:17
**possible** 5:20 56:21
**possibly** 52:4
**power** 49:3,7,18,24
**powered** 9:19,21 49:10
**practice** 23:25
**prefer** 31:16
**premium** 64:5,10 64:19 65:2
**premiums** 64:2,22
**prepared** 8:4 13:22 14:2 29:5,7,10 72:22 74:3,5,7
**present** 2:14 5:1 8:12 10:4 66:9 77:18
**preserved** 17:13
**president** 41:14 44:18 61:12 62:13
**previous** 8:18 38:6 40:21 42:22 61:17
**previously** 7:5 24:2 30:17 40:5 50:11 50:13 63:10 69:13 70:14 71:15 72:18
**price** 66:25
**print** 30:20
**prior** 8:2,14 30:17 34:1 51:17 58:23 68:21 73:3
**privilege** 30:12 34:15,22 37:13 38:1,3
**privileged** 35:17 48:1,1,2,3
**Pro** 20:17,20
**probably** 16:13 17:21
**problem** 43:11 52:16 54:8 76:11
**procedures** 8:20
**process** 66:5
**produce** 27:16 30:7 57:16,24 76:1
**produced** 27:14 30:9 46:12,19 47:4,5 50:9,13 55:18,21,23 57:16 57:17,25 62:6 70:13
**producing** 55:13
**product** 76:3
**production** 32:4 50:10 55:11 56:9 56:12 57:19 58:18 59:6,9
**proper** 35:20
**properly** 40:17
**property** 66:11
**protected** 37:12 46:25
**protection** 10:15,16
**protective** 46:13,15
**provide** 51:2 55:22 55:24 76:7
**provided** 11:19 21:6 46:6 51:6 59:5,22 69:21
**provides** 11:19
**public** 4:7 32:16 80:5
**Public-State** 79:16
**publically** 40:5
**publicly** 32:14
**published** 18:1
**publishing** 17:25
**purchase** 66:25 71:21
**purpose** 68:11
**purposes** 5:20 7:23 14:16 59:2 63:11 66:14 74:19
**put** 8:1 30:14 58:13 76:9

**Q**

**quarterly** 18:11
**question** 5:19 10:21 15:23 17:1,2,4,5,6

20:8 23:23 24:1 26:7 27:25 32:13 32:21,23,24 36:4 38:17 42:16 44:3 44:4,5,7,8,24 47:21 48:13 64:7 69:2,22 70:2,9
**questions** 36:23 42:19,24 51:17 54:22 56:6
**quick** 34:25
**QuickBooks** 20:17 20:17,20 75:20,23 76:1,8

**R**

**R** 7:6
**raise** 5:9 65:1,5,8 65:13,19,20,24 66:3 77:21,22
**raised** 42:25 54:22
**range** 26:9
**ratified** 68:23
**Ravi** 2:17 5:2
**Ray** 65:11,11
**re-forward** 14:12 14:14
**re-forwarding** 14:16
**re-forwards** 13:14 14:11
**re-notice** 3:15 7:20
**re-noticed** 77:11
**re-notices** 6:25 7:16
**reach** 43:21
**read** 17:4,5 32:24 44:8 71:2
**ready** 14:5
**really** 15:22 49:1 59:16 63:2 70:3
**reason** 76:22
**reasonable** 43:8,15 55:19
**recall** 10:7 14:17,18 14:22,25 24:5 25:11 28:4,12,22 29:5 39:15 50:11 67:3 71:17 75:13 76:2
**receipts** 18:4,19
**receive** 6:24
**received** 22:14 75:10
**receives** 32:15
**recognize** 60:7 74:21
**record** 4:11 17:11 17:11 18:13 35:1 35:4,5 46:23 54:10 78:2
**recorded** 5:21
**recording** 5:20
**recordkeeping** 55:14
**records** 8:21 15:10 15:14,15,16,20,25 16:2,5,6,8,11,13 16:16 17:9,18,21 17:24 18:3,16 19:24 20:1,3,15 20:16,19,21 22:12 22:16 26:25 27:1 30:5,7 54:18 55:9 56:17 57:12,16 69:9 75:20,24 76:1,8
**RECROSS** 3:4
**redacted** 47:1,3,5 60:10,12 61:1,8
**REDIRECT** 3:4
**reduced** 63:25 66:15
**refer** 57:9
**referencing** 54:5
**referred** 58:3
**referring** 19:14 20:1 60:11
**refused** 55:5,24
**refusing** 77:4
**Reg** 62:20
**regarding** 24:9,20 27:23 28:2,20
**Registered** 80:4
**registrant** 32:1
**regular** 32:4
**regularly** 32:10
**regulatory** 18:9,19
**related** 24:8 27:17 55:6 75:20
**relation** 46:6
**relative** 80:12
**reliance** 55:8
**remaining** 64:3
**remember** 31:10 46:4 71:23
**rent** 66:15
**rental** 36:17
**renting** 66:14
**repeat** 10:21 27:25 32:21,23 44:4,7 44:24 70:2
**repeated** 17:9
**rephrase** 26:6
**report** 80:6
**Reported** 1:25
**reporter** 1:25 4:7 4:20 5:7,9 17:3 32:22 44:6 80:5 80:16,20
**Reporter's** 3:9 80:1
**Reports** 63:9
**represent** 4:23
**representative** 6:22 28:23 31:20 77:19
**represented** 43:19
**reproduction** 80:15
**request** 4:17 55:19 55:22
**requested** 70:14
**requests** 72:19,20
**reset** 43:11
**reside** 41:21
**Residence** 1:23
**resignation** 46:7,8 46:11
**resigned** 38:7
**resolution** 67:12 69:10 70:23 71:2 72:10 73:2,15
**resolutions** 66:20 68:12,16,22 69:7
**Resolved** 66:23 68:19 69:7
**respect** 9:8
**responded** 23:23 72:4
**response** 72:20,25 73:1,24,25 74:1 75:1
**responsibilities** 47:15,23 48:4,11 48:16 49:8,14
**responsible** 9:11
**rest** 33:1
**restriction** 26:16
**result** 9:24 28:18 29:11,15 64:2
**resulted** 9:25 25:17
**results** 26:16,17,23
**retail** 18:8
**retain** 68:5
**retroactive** 71:12 74:9
**reviewed** 8:2,18 12:25 60:8,9
**right** 5:9,25 6:12 7:13 9:13 27:5 30:16 31:25 39:12 42:1 45:19 51:23 52:13 53:17,22 54:4 58:7,12,15 60:1 61:3 62:12 62:19 67:15,18 70:15,21,22 72:4 72:17 73:9
**rights** 21:6,13
**role** 33:9,19,25 34:6 36:25 37:5,5 37:24 50:4
**room** 36:20
**rule** 52:7
**rules** 51:7 55:7,10
**running** 66:6
**Russo** 2:15 4:19

**S**

**S** 3:12,14 7:19,22
**sale** 71:22
**save** 19:23
**saved** 15:8 18:21
**saw** 58:3,5
**saying** 34:5
**says** 60:14 61:10,21 62:19,24 63:7,17 63:23 64:24 66:8 66:23 67:19 68:19 69:7 72:22
**scheme** 55:14
**screen** 5:21 30:15 53:11,16 58:13 59:17 70:22
**scroll** 30:19 50:12 50:15 56:21,24 61:13 66:22 67:18 68:18 71:25 72:21
**scrolling** 54:15 57:5
**seal** 79:11
**search** 13:17 24:25 25:3,7,10,12,14 25:20,23,25 26:3 26:8,12,15,24 27:9 28:18 29:11 29:15 30:5 32:11 33:3
**searched** 25:1,8 32:3,8,9
**season** 49:1
**SEC** 56:17 57:9,11 57:16 63:9,14
**SEC's** 17:20
**second** 53:10
**secretary** 44:17
**sections** 61:1
**Securities** 63:8
**see** 29:18 51:3 52:9 53:6 56:18,19 58:4 59:16,19 61:8,9 76:3

**seeing** 71:23
**seen** 8:2 30:23
**Seepersad** 2:17 5:2
**segregated** 76:19
**sell** 63:18,20 66:24 67:6,7,9,10,13 70:25 71:6 72:8 72:11,23 74:3
**sense** 52:4
**sent** 17:16,17,22
**separate** 12:12 48:7 51:24 65:15,16
**served** 33:21
**server** 15:9 19:8,8 19:10,12,14 20:4 20:6,13
**servers** 9:18,20 19:18,21
**service** 11:18
**services** 4:20,21 20:21 21:16
**set** 21:2 36:22 77:17 80:9,10
**seven** 76:25
**share** 30:15 58:17 58:17,18 70:21 74:14
**shorthand** 80:7
**Shortly** 26:5
**show** 72:17 75:1
**showed** 70:4,16
**showing** 30:16 39:23 50:9 58:19 74:15
**shows** 75:5
**sic** 61:11
**side** 72:1
**similar** 11:5 21:17
**Simon** 38:13 39:11 40:22 45:18
**simple** 56:5 70:3
**Simultaneous** 47:2 56:2
**single** 27:16
**singular** 41:8
**sir** 8:10,25 9:16 10:11 16:21 20:1 20:3 24:6,10,14 25:15 26:5,12,17 28:11 29:4,21,24 30:25 31:4 34:2 36:19,21 37:21,23 39:13,16 45:20 54:3 56:3,10,13 57:14,23 59:7 60:6,8,13 62:4,23 64:20,23 65:9 67:5,14,22 68:17 71:4,16,24 72:16 74:1 75:18,22,25 76:23
**Slack** 21:23,25 22:2
**small** 59:16
**sole** 41:7 42:2
**solution** 9:19,21
**somebody** 32:11 34:1 53:21
**sorry** 8:8 22:8 44:24 50:14 52:22 54:1 58:2,20 59:17 69:3
**Sounds** 70:2
**sources** 17:17 56:16
**space** 66:15
**speakers** 47:2 56:2
**Special** 60:5
**specific** 11:12 12:23 14:18,18 15:22 16:7 18:13 19:8 23:18 51:8 54:9 59:12 60:3 63:2,4,5,6 65:20 76:21
**specifically** 10:11 24:7,22 51:7 66:22 67:19
**specified** 65:17
**specify** 77:10
**spell** 8:22 15:6
**spending** 43:17
**spent** 76:17
**Spielman** 2:3 3:6 4:24,24 5:17,25 6:4,7 7:4,13,24 13:24 15:21 16:25 17:3,7,8 18:24 19:17 21:24 22:7 23:3 26:22 27:8 28:16 29:1,9,13 31:16 32:19,22 33:4 34:17,25 35:6,15,18 36:1,5 37:14 38:10 39:19 40:14 42:12,14,15 42:18,20 43:3,24 44:1,6,19 45:6 46:22 47:3,8,11 48:9,14 51:5,13 52:11 55:2 56:7 59:3 60:20,22 69:25 72:14 73:14 73:21 74:20 76:24 77:2,7,11,15,25
**split** 72:6
**spoke** 34:13,18 47:25
**start** 7:10 8:11 43:11 50:15 52:1
**starting** 37:2
**state** 4:8,22 18:9 39:25 40:12,12,13 55:7,11 79:3 80:2 80:5
**statement** 74:24
**states** 1:1 51:7
**status** 76:13
**stenotype** 80:6
**Steve** 37:17
**stop** 33:18 56:24 58:17
**stopped** 46:2,2
**stopping** 77:23
**storage** 16:9,9 18:7
**store** 16:11 18:4,11 18:19 20:21
**stored** 8:12,15 9:9 9:20 14:1 15:11 15:11,17 16:2,3,5 16:6,8,12,13,16 17:19,21,23 18:10 18:16 19:5,7 20:15,16,18 70:11
**storing** 8:20
**Stormy** 23:5,22 38:13,13 39:11 40:21 45:18,18
**story** 66:5
**structure** 11:10,12 11:21
**structured** 11:7
**stuff** 5:17
**subject** 35:22 55:5 62:7,7,9
**subsidiaries** 42:6
**subsidiary** 9:11,12 39:1,4 41:7,11
**substantially** 63:10
**suffix** 13:4,12 14:9
**suffixes** 13:6,15
**suggesting** 39:10
**Suite** 2:4
**supercede** 76:19
**supplement** 76:7
**supplemental** 50:10 56:11 59:6 59:8
**supposed** 28:24
**sure** 13:15 15:22 17:15 18:22 19:1 21:22 22:16 32:6 52:5,19 53:3,13 59:15 64:16 70:4
**swear** 5:8
**sworn** 5:15 79:9
**system** 9:14 19:23 51:4
**systems** 21:14

**T**

**T** 3:12,15 7:20,22
**take** 8:20 34:23,24 34:25 35:8 53:14 54:16,24 58:20 64:25 77:2
**taken** 1:18,20,22 4:2,6,16 65:4 68:20 80:9
**talk** 15:22 17:24 18:4,9 33:5 37:16 39:8 61:7,9
**talked** 10:16 22:19 37:10 39:7 46:18 69:13
**talking** 16:20 35:19 50:6,21 54:6
**Tampa** 2:10
**tape** 18:6
**taxes** 68:7
**technically** 43:4 44:13
**telephone** 2:5,11 22:11,12 24:3
**tell** 9:7 34:18 38:6 52:23 57:9
**telling** 14:24
**ten-minute** 43:7
**terminate** 66:9,16 66:17
**terminated** 38:5 45:9 64:4,8,13
**terms** 25:8,10,12 25:14,16,20 58:4 65:17
**testified** 5:16 20:14 24:2 41:13
**testify** 28:24
**testimony** 39:17 73:3
**text** 21:20 22:2 71:19,23 72:2
**Thank** 6:4 59:21
**thereof** 68:10
**thing** 59:10
**things** 6:1 43:6 57:11 60:10 66:20 68:1
**think** 13:20 14:20 17:19 18:6 23:6 26:13 30:11,11

33:13 34:9 39:6 41:13 43:8,15 46:15 47:8 48:3 51:20 52:7 56:22 60:11,20 64:15 65:25 66:3 69:20
**thought** 73:5,7
**thousands** 16:20
**three** 22:25 25:20
**Thursday** 36:3 71:20 77:3,22
**time** 4:15 6:13 10:9 11:24 22:25 23:11 23:15 24:1,18 26:3 29:25 33:7 34:12 37:3 38:25 39:8,14 41:2,16 43:2,13,14,17,23 45:3 46:4 47:18 47:21 48:12 54:1 54:16,21,24 56:23 57:20,21 63:1 67:20 69:18 72:7 80:9
**timeline** 62:1
**timely** 65:1
**times** 1:10 42:25 45:3,16
**title** 49:13
**today** 4:15 5:4 6:22 7:1 8:5 11:2 13:16 18:3 40:7 41:22 42:9,13 77:10
**today's** 8:2,14
**told** 52:1
**Tone** 56:4
**topic** 14:2 58:11
**topics** 8:4 61:7 77:20
**totally** 29:7,10
**Trans** 1:9 4:14 6:17 7:21 9:4,5,13 10:4 11:4 12:13 13:7 15:16,24 16:1 18:17 20:2,7 21:2 33:10,19 34:11 36:25 37:5,22 38:18,19,23,25 39:21 40:8,24 41:2,9,15,18,23 41:25
**transaction** 18:5
**transactions** 8:19
**transcript** 80:15
**transcription** 80:7
**transfer** 75:21
**treadmill** 66:6
**Trellian** 75:5
**tried** 32:11
**true** 80:6
**try** 43:6 51:23
**trying** 28:13 44:20 58:14,16 65:24 66:3 70:20
**Tuesday** 1:20 4:2
**turned** 27:12 53:25 54:1
**two** 6:16 7:25 23:1 33:15 43:3,5 51:19 59:11,14,22 59:24 77:5,7
**type** 43:21 64:12
**types** 11:22 44:15

**U**

**U** 3:15 58:20,22 59:1
**U.S** 23:1
**unable** 10:18 40:6
**unclear** 41:3
**under-** 12:5
**undersigned** 61:5 79:6
**understand** 12:6 28:13 57:3 59:13 62:1
**understanding** 43:22 48:7,10 62:3 70:18
**Understood** 77:25
**undertakings** 68:3
**undertook** 49:15
**Unit** 66:12,18
**UNITED** 1:1
**unprepared** 29:2
**unreasonable** 52:6
**unsure** 32:7,15 34:6 64:11
**upload** 51:3
**uploaded** 52:10 56:9 58:23
**uploading** 52:13,17 58:12
**use** 19:23 20:17,21 21:15,25 27:24 28:3,20,21 56:23
**uses** 23:18,20,24
**usual** 55:8,12
**utilized** 9:14

**V**

**V** 3:16 58:25 59:1,4
**vacancy** 33:22 38:8 40:22
**varies** 11:12
**various** 19:4 56:16
**Venice** 16:4 18:2 36:15 66:12
**verify** 33:25 34:3 61:14
**version** 46:10 47:3 47:6
**versus** 4:14 21:7
**vested** 49:18
**video** 5:24
**videographer** 2:15 4:11,19 5:7,19,23 6:3,5 35:1,5 78:2
**Videotape** 4:12
**videotaped** 1:15,20 1:22 2:1 4:1,6 35:3 78:4
**virtual** 9:21
**virtually** 4:17 20:21
**voice** 24:11,16 42:25 56:4
**vote** 41:8
**vs** 1:8

**W**

**W** 3:16 74:17,18
**waiting** 52:22
**want** 8:9 30:20 51:1 51:22 54:24 58:8 60:3 61:3,8 71:25 71:25 77:21
**wanted** 6:2 12:22 52:19 53:3
**wasn't** 27:2 30:11 49:2
**way** 30:20 45:2 61:25
**ways** 22:3
**we'll** 33:17 34:25 77:3
**we're** 8:11 16:20 30:13 36:1,2 43:13,16 47:9 50:6,15 51:25 54:20 58:10,19 59:25 69:14 74:16 77:25
**we've** 17:25 43:7 45:3 50:16
**Web** 21:8,11
**webmaster** 8:20
**website** 17:20 57:9 63:18 66:24
**week** 17:22
**Weiss** 37:17,18,19
**welcome** 6:5
**went** 35:3
**weren't** 52:22 76:21
**Weston** 31:2,5,6,17
**whatnot** 22:17 46:14 65:17
**WhatsApp** 21:22 22:2
**whichever** 31:15
**Wilshire** 66:10
**windows** 29:22
**wire** 75:1,5,21
**wired** 75:8
**witness** 3:4 5:8,12 15:19 17:6 21:19 22:24 26:21 32:25 34:14,20 38:5 40:11 44:9 55:25 56:3 73:19 79:7 79:11
**words** 25:8 67:16
**work** 31:22
**worked** 9:5
**wouldn't** 25:11 33:3
**written** 12:7 59:23 60:4 65:21 67:4
**www** 63:19 66:25

**X**

**X** 3:1,12

**Y**

**yeah** 34:24 44:4 52:18,21 53:10 58:14 65:23
**year** 33:17
**Yep** 16:22
**York** 1:10 39:25

**Z**

**Z** 7:9
**zoom** 1:15,20,22 2:1 4:1,6 29:20 35:3 50:25 51:17 54:21 59:15 78:4 79:8 80:6,7,8,9

**0**

**1**

**1** 4:12 50:10,13
**1-U** 63:9,15
**10** 73:19
**10.0** 64:1
**100** 41:10 42:6 57:18
**10437** 2:10

**10990** 66:9
**12** 73:19,20
**122** 56:20
**123** 31:11
**13** 64:4
**14th** 40:1
**15** 73:20
**16** 9:6
**1B** 66:12,18

**2**

**2** 1:20 4:2 72:1
**2:30** 1:21 43:12 52:1
**2:33** 4:16
**20** 51:11
**200** 12:17,18,21,25 13:2
**2019** 22:22 24:2,17 33:8,9,17,18 36:24 37:2,5 38:20 40:25 41:12 41:19 44:21,21 45:1 47:18 69:18 69:23 72:24 74:4
**2020** 24:18 30:2 40:1,4,8 44:22 45:2 47:19 61:15 62:21 63:13 64:4 69:18 70:1
**2021** 1:20 4:2,15 79:9,12,17 80:17
**2110** 16:4
**230,000** 64:5,10
**24** 50:13,16,17
**25** 3:16 50:15,16,18 74:16
**25th** 37:3
**26th** 33:8,16 37:3 38:7,8 45:10,15 46:1 71:20 72:7 72:24 74:4,13
**275** 72:4
**2nd** 4:15 79:8

**3**

**3:15** 35:1,4
**3:20-cv-17-J-34J...** 1:3
**3:26** 35:5
**3:50** 52:4
**30-** 75:2
**30(b)(6)** 7:16
**307-5** 76:9
**307,500** 75:2,3,6 76:9
**30th** 63:13
**33309** 2:5
**33647** 2:10
**350** 67:14,15
**350,000** 67:1,7,13 70:25 71:6 72:8 72:11,23 74:4
**350K** 72:2
**3rd** 79:11 80:17

**4**

**4** 30:21
**4:23** 1:21 78:2,4
**420.com** 13:13 14:6 14:9,11,14 24:9 24:20 25:18,24 27:18,24 28:3,19 29:16 30:18 32:15 63:19 66:25 71:6 71:22
**420.com's** 13:15

**5**

**5** 3:19 43:12,14
**5.0** 64:1,3
**50** 53:19
**500** 2:4
**500,000** 67:10
**59** 3:15,16
**5th** 61:15,21,23 69:4 71:9,11

**6**

**6** 3:6
**6,999** 50:19
**6400** 2:4

**7**

**7** 3:14,15 51:9 56:20,20 79:17
**7-hour** 51:6,9 52:3
**7,000** 27:15 50:23 54:17 55:6
**7,000-plus** 3:15 58:23 59:4
**7,024** 50:11 56:20 57:19 58:1
**724** 50:22
**727-371-9730** 2:11
**74** 3:16
**754-300-1500** 2:5
**79** 3:8

**8**

**8** 72:21
**80** 3:9 52:24
**815** 66:12,18

**9**

**90291** 66:13