UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CIVIL ACTION NO:   3:20-cv-17-J-34JBT

MERLIN KAUFFMAN, an individual
     Plaintiff,

v.

TRANS HIGH CORPORATION, a New
York company and HIGH TIMES HOLDING
CORPORATION, a Delaware company
     Defendant.
—————————————/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Merlin Kauffman (the "Plaintiff" of "Kauffman"), by and through undersigned counsel, and pursuant to Federal Rules of Civil Procedure, hereby files his Motion for Summary Judgment, and states as follows:

A: Statement of Undisputed Material Facts:

1. Plaintiff has bought and/or sold over 500 domains since 2003. [Kauffman Declaration, ¶3].

2. As one such acquisition, on or about December 27, 2019 Plaintiff negotiated a deal to purchase the domain name <420.com> from Defendants for $307,500.00. [Kauffman Declaration, ¶4].

3. Said domain is registered to Defendant Trans-High Corporation (herein "Trans-High") and is with domain registrar Network Solutions. [Kauffman Declaration, ¶10 and associated Exhibit B].

4. Trans-High is a wholly owned subsidiary of High Times Holding Corporation

(herein "High Times"). [Spielman Declaration ¶2, and associated Exhibit A; High Times Interrogatory Response No. 9]

5. Network Solutions is located in this district, and therefore the situs of the domain registration contract, and by the express terms thereof is in this district. [Kauffman Declaration, ¶11 and associated Exhibit C]

6. Plaintiff entered into a written agreement (herein the "Agreement") for the sale of the disputed domain through direct messaging communications including the WhatsApp messaging platform with Adam Levin (herein "Levin")on behalf of Defendants. [Kauffman Declaration, ¶13].

7. At the time of the Agreement, Levin was the Executive Chair of High Times and the CEO of Trans-High. [Spielman Declaration ¶3 and 4, Exhibit B, Levin "Depo 1", p.97 LL 22-25, Exhibit C, Levin "Depo 2", p.33 LL 7-24]

8. On January 14, 2019 and January 14, 2021, Defendant Trans-High filed their Biennial Statements with New York State confirming and identifying Adam Levin as CEO. [Kauffman Declaration ¶14 and associated Exhibit D; certified copy of New York State corporate filings].

9. Levin initiated the conversation about selling the 420.com domain with Kauffman. [Kauffman Declaration ¶15 and Spielman Declaration ¶3, Exhibit B, Levin "Depo 1", p.76, LL14-24, p. 88-89]

10. Plaintiff had a previous 8 year long relationship with Levin, and had direct

2

knowledge of Levin's roles with the Defendants. [Kauffman Declaration, ¶16].

11. Defendants provided a clear offer and Plaintiff accepted all of the essential terms of the Agreement. [Kauffman Declaration, ¶17].

12. Through Levin's multiple leadership roles with each Defendant, he had both actual and apparent authority to sell the domain. [Kauffman Declaration, ¶14 and 18, and associated Exhibit D; Spielman Declaration ¶5, Exhibit D, Simon Depo, p.26-27, 33].

13. Levin sent Defendants' wire information to Plaintiff for payment under the Agreement and the funds were wired to Defendants. [Spielman Declaration ¶3, Exhibit B Levin Depo 1, p.143, LL1-20]

14. Plaintiff expressly sought and Defendants expressly provided **written confirmation of the terms of the Agreement <u>twice</u>**. [Kauffman Declaration, ¶20 and associated Exhibit A; Spielman Declaration ¶3, and associated Exhibit B Levin Depo 1, p.72-74].

15. Defendant provided a third written confirmation of the deal as follows: "[Levin]: Lmk when it's sent and how you'd like to transfer"[1], "[Kauffman]: Wire Enroute", "[Levin]: Once received, I'll send it over cool???". [Kauffman

---

[1] LMK is a texting abbreviation and shorthand for "let me know". See https://www.urbandictionary.com/define.php?term=LMK (last accessed February 3, 2022)

3

Declaration, ¶21, and associated Exhibit A].

16. Defendant provided a fourth written confirmation of the deal when Plaintiff stated "I'm stoked – biggest domain I've bought in a while" and Levin responded "Great." [Kauffman Declaration, ¶22, and associated Exhibit A]..

17. Levin confirmed in writing that he had the log-in information for the transfer of the domain.   [Kauffman Declaration, ¶23; Spielman Declaration ¶3, and associated Exhibit B "Levin Depo 1", p.84-87].

18. On January 5, 2020, only nine (9) days after the Agreement, High Times Board of Directors, through a "Written Consent Of A Majority Of The Board Of Directors In Lieu Of A Special Meeting", retroactively confirmed Levin's authorization to sell the <420.com> domain. [Spielman Declaration ¶4, 6, Exhibit C "Levin Depo 2", p. 71 and Exhibit E].

19. A resolution entered that date provides: "WHEREAS, the Company deems it in its best interests to sell the website domain www.420.com…. RESOLVED, that the Company be, and hereby is, authorized to sell the website domain www.420.com for a cash purchase price of not less than $350,000 and be it further…RESOLVED, that the Executive Chairman of the Company (the "Authorized Person") be, and hereby is, authorized and directed to do and perform or cause to be done and performed….RESOLVED, that any and all actions taken by the Authorized Person, or any of them, prior to the date of the

4

foregoing resolutions adopted hereby, that are within the authority conferred thereby, are hereby ratified, confirmed and approved as the acts and deeds of the Company...." [Id.][Levin Depo 2, p. 67-69]

20.    Plaintiff retained an expert, Jeffrey Gabriel, a domain name broker, entrepreneur and co-founder of saw.com, an industry leading boutique domain brokerage company. [Spielman Declaration ¶7, and associated Exhibit F, Gabriel Report ¶3].

21. Plaintiff's unrefuted[2] expert Jeffrey Gabriel, explained that "the use of text messaging apps has quickly become commonplace in domain transactions....It is so common in domain name sale negotiations that it's difficult to remember a recent transaction that did not involve at least some text messaging during the sales process." [Id at ¶20-21].

22.    Gabriel concludes "From a domain brokerage perspective, or a sales management perspective this is 100% a sale, and I cannot see how there could have been confusion about the offer or the terms in the domain sale agreement." [Id at 24].

23. As CEO of Trans-High, the entity who was the registered owner of the disputed domain, Levin had actual authority to enter into the purchase or sale of business

---

[2] Defendants never submitted their own expert report(s), never submitted a rebuttal expert report, and never took the deposition of Gabriel.

assets, including the disputed domain. [Spielman Declaration ¶4, 6, Exhibit C "Levin Depo 2", p. 71 and Exhibit E].

24.    Stormy Simon, the former Board of Directors member and CEO of parent company High Times Holding Corporation, provided unrefuted deposition testimony further confirming the authority and power of Levin to act and enter into this transaction. [Spielman Declaration ¶5, Exhibit D, Simon Deposition, pp. 26-27, 35-36]. For example : "He was in charge. I mean, you didn't have to authorize him to do anything, he -- it's -- it was his -- his company... Yes, only his authority, only his.... It was making clear that Adam still -- even though Craig was the new CEO, that Adam still had authority over all. And we had that discussion as a board." [Id.]

B: Legal Memorandum

The Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To discharge this burden, the movant

must point out to the Court that there is an absence of evidence to support the nonmoving party's case. *Id.* at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, as Defendants have had here, they must come forward with affirmative evidence to refute Plaintiff's claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

"Summary judgment is proper, 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case.' 'In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Caracol Television S.A., v. Telemundo Television Studios, LLC, Telemundo Internacional, LLC, Telemundo Network Group, LLC*, 21-10515, 2022 WL 202546, at *2 (11th Cir. 2022)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

(B)(1): Contract

First, the issue of the Agreement itself is before the Court. Although this contract was in writing between the parties, it did not have signatures. That said, signatures are not required.  See *Birmingham Fire Ins. Co. of Pennsylvania v. Comcar Indus., Inc.*, No. 8:07–CV–762–T–24–MSS, 2008 WL 4642327, at *3 (M.D. Fla. 2008) ("Thus, the case law supports the proposition that unless a signature is required by the parties, as long as the elements of a contract exist-offer, acceptance, and consideration-the failure of a party to sign the contract is not dispositive of the validity of the contract."). Moreover, evidence of the agreement, "may be shown, for example, by a party's conduct indicating assent, such as performance of the contract." *Int'l Mulch Co., Inc. v. Novel Ideas, Inc.*,

8

8:14-CV-3024-T-27TGW, 2015 WL 12830375, at *3 (M.D. Fla. 2015); *see also Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 436 (11th Cir. 1995) ("However, the parties intent, of course, is what ultimately controls. Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound immediately by their oral or written negotiations.")

Guided by the foregoing, "Under Florida law, a breach of contract claim 'requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.' To prove the existence of a valid contract, a plaintiff must plead facts showing the following: '(1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms.'" *Salem v. City of Port St. Lucie*, 788 Fed. Appx. 692, 697 (11th Cir. 2019)(citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009).

> The interpretation of a contract, including whether it is ambiguous, is a question of law that we review de novo. *Reynolds v. Roberts*, 202 F.3d 1303, 1313 (11th Cir. 2000). .... Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract." *Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. Dist. Ct. App. 2009) (per curiam). "Before extrinsic matters may be considered by a court in interpreting a contract, the words used on the face of the contract must be ambiguous or unclear." *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. Dist. Ct. App. 1989)

(per curiam). "[I]n determining whether a contract is ambiguous, the words should be given their natural, ordinary meaning," and "where the language is plain a court should not create confusion by adding hidden meanings, terms, conditions, or unexpressed intentions." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (applying Florida law). And while a contract is ambiguous if it "is susceptible to two different interpretations, each one of which is reasonably inferred from the terms of the contract," a party's interpretation of the contract that is unreasonable in light of the contract's plain language does not make the contract ambiguous. *Frulla v. CRA Holdings, Inc.*, 543 F.3d 1252, 1253 (11th Cir. 2008) (quoting *Com. Cap. Res., LLC v. Giovannetti*, 955 So. 2d 1151, 1153 (Fla. Dist. Ct. App. 2007)).

*Caracol Television S.A., v. Telemundo Television Studios, LLC, Telemundo Internacional, LLC, Telemundo Network Group, LLC*, 21-10515, 2022 WL 202546, at *3 (11th Cir. 2022).

As the Court in *Salem* explained, a review of the factors to establish the existence of a valid contract are therefore appropriate, including (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms.

### (B)(1)(a) Offer and Acceptance

It is clear that Defendants, through Levin offered the domain 420.com for sale at a price of $307,500.00. The following text and Whatsapp exchanges solidify this point. First, through regular text messages the parties stated:

10



[Kauffman Declaration ¶5, and associated Exhibit A] [The above image shows Levin on left Kauffman on right]

Then, the parties migrated to the WhatsApp platform and Levin provided the High Times wire instructions followed by the exchange below:



[Kauffman Declaration ¶5, and associated Exhibit A] [The above image shows Levin on left Kauffman on right]

11

### (B)(1)(b) Consideration

Defendants provided the wire instructions, Kauffman had the money wired on his behalf, and sent confirmation to Levin of the money enroute. [Kauffman Declaration ¶5, and associated Exhibit A]. Levin confirmed that once the funds were received he would transfer the domain and inquired how Plaintiff would like the domain transferred.



[Kauffman Declaration ¶5, and associated Exhibit A] [The above image shows Levin on left and Kauffman on right]

Plaintiff, in fact, had the funds transferred to Defendants, which satisfies the consideration element for the Agreement. [Kauffman Declaration ¶5, and associated Exhibit A; Spielman Declaration ¶3, Exhibit B Levin Depo 1, p.143, LL1-13]

<u>(B)(1)(c) Sufficient specification of the essential terms:</u>

The only essential terms on the offer to sell the domain <420.com> was a payment of $307,500.00. Levin confirmed that once the money was received the domain would be sent over. [Kauffman Declaration ¶5, and associated Exhibit A]. There were no uncertain terms or restrictions, nor were any other terms required.

> "As long as an intent to settle essential elements of the cause can be established, it matters not that the agreement is not fully executed or reduced to writing, as even oral settlements have been fully recognized and approved by the [Florida courts]." *Allapattah Servs., Inc. v. Exxon Corp.*, Nos. 05-21338-CIV, 91-0986-CIV, 2007 WL 7756735, at *2 (S.D. Fla. Sept. 26, 2007). Moreover, "[e]ven though all the details are not definitely fixed, an agreement may be binding if the parties agree on all the essential terms and seriously understand and intend the agreement to be binding on them." *Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 408 (Fla. 1974).

*Omni Healthcare Inc. v. Health First, Inc.*, 613CV1509ORL37DCI, 2017 WL 3658837, at *2 (M.D. Fla. 2017).

The above facts unequivocally establish a valid and binding contract, through offer, acceptance, consideration and essential terms. Even if there is any doubt or uncertainty regarding the above clear facts, the underlying facts and circumstance solidify the existence of an enforceable agreement.

The circumstances between the parties, includes the 8 year long personal relationship and knowledge that Kauffman had with Levin, such that they were communicating via text and WhatsApp messaging. Kauffman was directly aware

13

of Levin's position and authority with Defendants. "[E]-mail communications do not need to be reduced to a formal, written settlement agreement to become binding." *Id* at *4. The custom and usage of contracting for the sale of a domain via text message is fully established and unrebutted through Plaintiff's expert Gabriel and his expert witness report.[3]

This significant sum of money clearly satisfies the requirement for consideration. Plaintiff fully performed his payment obligation under the Agreement established with Levin on behalf of Defendants. [Spielman Declaration ¶3, Exhibit B, Levin Depo pg 143 LL 1-20].  Defendants High Times Holding Corporation and Trans-high Corporation materially breached the contract by refusing to transfer the domain which Plaintiff now rightfully owned. Defendants have never turned over the domain, resulting in a material breach and causing harm and damage to Plaintiff, since Defendants have held the $307,500.

---

[3] "Other rules of construction permit consideration of: (1) the circumstances surrounding the parties at the time of contracting; (2) custom and usage; and (3) public policy concerns." *Omni Healthcare Inc. v. Health First, Inc.*, 613CV1509ORL37DCI, 2017 WL 3658837, at *2 (M.D. Fla. 2017)(Citing *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1247 (11th Cir. 2002)).

(B)(2): Authority

Defendants have suggested that Levin was without authority to enter into the subject Agreement. The undisputed facts, however, belie such a contention. Florida agency law is well settled that "the liability of a principal for the acts of its agent is not limited to what is expressly authorized. A principal also may be responsible for the acts of its agent if these acts lie within the apparent authority of the agent, unless the circumstances are such as to put one on inquiry." *Sec. Union Title Ins. Co. v. Citibank, Fla.*, 715 So. 2d 973, 974–75 (Fla. 1st DCA 1998)(citing to Restatement (Second) of Agency §§ 261, 262 (1958).

Here, there can be no credible argument against the fact that Defendants are responsible for the acts of Levin as CEO of Trans-High and Executive Chairman of parent company High Times. Indeed, as shown in the Special Meeting written consent resolution/minutes of January 5, 2020, Levin was vested with powers and executed his actions within those powers. [Spielman Declaration ¶4, Exhibit C Levin Depo 2, pp.60-72 and Exhibit E]. To be clear, and although not specifically required for purposes of authority under the subject Agreement, Levin was expressly authorized to sell the domain 420.com. [Spielman Declaration ¶6, and associated Exhibit E].

15

As our Florida Supreme Court has explained:

By apparent authority is meant, such authority as the principal wrongfully permits the agent to assume or which the principal by his actions or words holds the agent out as possessing. Apparent authority rests on the doctrine of estoppel and arises from the fact of representations or actions by the principal and a change of position by a third party who in good faith relies on such representations or actions. In *Fidelity & Cas. Co. v. D.N. Morrison Constr. Co.*, 116 Fla. 66, 156 So. 385, 387 (1934), appeal dismissed, 293 U.S. 534, 55 S.Ct. 348, 79 L.Ed. 642 (1935), the Florida Supreme Court stated that the principle of apparent authority embraces the following three elements: 1) a representation by the principal, 2) reliance on that representation by a third person, and 3) a change of position by the third person in reliance on the representation. Clearly, the reliance of a third party on the "apparent authority" of a principal's agent must be reasonable and rest in the actions of or appearances created by the principal, and "not by agents who often ingeniously create an appearance of authority by their own acts."

*Stiles v. Gordon Land Co.*, 44 So.2d 417, 421 (Fla.1950)(some citations omitted)(see also *See Ideal Foods, Inc. v. Action Leasing Corp.*, 413 So.2d 416, 418 (Fla. 5th DCA 1982); *Lensa Corp. v. Poinciana Gardens Ass'n, Inc.*, 765 So. 2d 296, 298 (Fla. 4th DCA 2000)).

The Florida Supreme Court applied this standard over 70 years ago and the law of apparent authority remains undisturbed. "The reliance of a third party on the apparent authority of a principal's agent must be reasonable and rest in the actions of or appearances created by the principal, and 'not by agents who often ingeniously create an appearance of authority by their own acts.' As to acts in the ordinary course of business, courts have consistently recognized that a

16

presumption of authority exists in the case of acts made or done by presidents. "
*Lensa Corp. v. Poinciana Gardens Ass'n, Inc.*, 765 So. 2d 296, 298 (Fla. 4th DCA
2000)(citations omitted).

Applying the foregoing, there can be no credible argument that Levin did
not, at a bare minimum, possess apparent authority. In fact, Levin confirmed the
deal points of the sale of the domain 420.com at least four times directly with
Plaintiff, and a closer reading of the communications shows that his other words
substantiated his clear display of authority and ability to bind Defendants. Levin
negotiated pricing with Plaintiff and stated "Could you do 350kk. I'd do that now."
[Kauffman Decl. ¶5, and associated Exhibit A]. After the essential terms were
established, Levin even stated "You'll do well on it. No Doubt. And love knowing
that." [Id.] After Kauffman stated "I'm stoked – biggest domain I've bought in
awhile," then Levin responded "Great," and giving the clear confirmation that the
domain was purchased and the deal was done. [Id.]. Levin also asked if Kauffman
knew any buyers [Id.].

In fact, as part of Levin's show of control and authority, Levin sent Kauffman
wire instructions [Id.], which former CEO Stormy Simon testified that even she did
not have access to this information. [Spielman Declaration ¶5, Exhibit D, Simon
Deposition, pp. 26-27]. As another show of control and authority Levin confirmed
that after receipt of the wired funds he would transfer the domain. [Kauffman

17

Declaration ¶5, and associated Exhibit A, see screenshot in section (B)(1)(b) above)]

Relying on Mr. Levin's unambiguous essential terms, multiple confirmations and wire instructions, Kauffman promptly wired the agreed amount of $307,500.00 to the account of the parent company Defendant High Times to purchase the domain <420.com>. [Kauffman Decl. ¶5, and associated Exhibit A].

To this end, the law is clear, that:

> A principal can create the appearance of an agent's authority by "knowingly permit[ting] [an] agent to act in a certain manner as if he were authorized," *Rushing v. Garrett*, 375 So.2d 903, 906 (Fla.Ct.App.1979), by failing to correct a known misrepresentation by an agent that he or she has certain authority, *Owen Inds., Inc. v. Taylor*, 354 So.2d 1259, 1262 (Fla.Ct.App.1978), or by silently acting in a manner which creates a reasonable appearance of an agent's authority, *American Eagle Credit Corp. v. Select Holding, Inc.*, 865 F.Supp. 800, 813 (S.D.Fla.1994).

*Ja Dan, Inc. v. L-J, Inc.*, 898 F. Supp. 894, 900 (S.D. Fla. 1995).

Moreover, as the Middle District has made clear:

> It is true that an "apparent agency can arise even in the face of the principal's silence when the principal by its actions creates a reasonable appearance of authority." And [w]here a principal has, by his voluntary act, **placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform a particular act**, and therefore deals with the agent, the principal is estopped, as against such third person, from denying the agent's authority.

*Premier Gaming Trailers, LLC v. Luna Diversified Enterprises, Inc.*, 304 F. Supp. 3d 1270, 1283 (M.D. Fla. 2018)(citations omitted)(emphasis added)

Defendants, through Levin's top-level positions, titles, express communications and actions, unequivocally provided Levin with actual authority, or at least the apparent authority, to enter into this contract and sell the domain <420.com>. On this point, it must not be overlooked that "courts have consistently recognized that a presumption of authority exists in the case of acts made or done by presidents." *Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC*, 993 So.2d 86, 90 (Fla. 4th DCA 2008) (alteration added, citation omitted); *see also Pan–American Constr. Co. v. Searcy*, 84 So.2d 540, 544 (Fla. 1955) ("We have held that in a proper case the signature of the president of a corporation may bind the corporation, under the doctrine of inherent powers."). Levin's role as CEO of Trans-High, the entity that is the listed owner of the domain, permits him to sell company assets and falls directly under the control and authority that a CEO would possess in the normal course of business. Levin and Plaintiff are both conversant in business parlance, and specifically in domain name buying and selling. Levin was, no doubt acutely aware of Kauffman's history and knowledge in the domain industry as shown by Levin's <u>initiation</u> of the conversation asking Plaintiff the range of value for the domain 420.com. [Kauffman Decl. ¶5, 15, and associated

19

Exhibit A]. Without question, Levin possessed the requisite authority to enter into the subject Agreement.

### (B)(3) Permanent Injunctive Relief

Plaintiff seeks the specific performance of the Agreement and the Court should enter injunctive relief to support the transfer of the domain <420.com> into the Plaintiff's control. "A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

Here, Plaintiff is without an adequate remedy at law because the bargained for transfer of the registration of the domain name <420.com>, an inherently unique and rare domain name for which money damages cannot fully compensate. [Kauffman Decl. ¶ 25] More specifically, the domain <420.com> represents a small and special subset of domains, such that damages alone cannot adequately compensate for Defendant's misconduct in refusing to honor the Agreement. [Kauffman Decl. ¶ 26] Notably, there are only 46,656 possible three letter and/or

20

number domain combinations and every single <.com> three letter/number domain is currently registered by someone. [Kauffman Decl. ¶ 27] Even more rare are the three-digit number domains, which reflect only 1,000 possible combinations. [Kauffman Decl. ¶ 28] The high demand and public value of a three-digit number domain is immense and unmeasurable. [Kauffman Decl. ¶ 29] Plaintiff has been unable to use or exploit <420.com>. [Kauffman Decl. ¶ 30] Money damages alone cannot compensate Plaintiff since Plaintiff is unable to secure a comparable substitute purchase of a domain. [Kauffman Decl. ¶ 31] For all of these reasons, prongs 1 and 2 are satisfied, wherein Plaintiff has suffered irreparable injury whereby monetary damages alone are insufficient.

In disputes involving intangible assets courts often consider domain names and telephone numbers as analogous. *S. Grouts & Mortars, Inc. v. 3M Co.*, 2008 WL 11333151, at *3 (S.D. Fla. 2008); *MailPlanet.com, Inc. v. Lo Monaco Hogar, S.L.*, 2007 WL 9698307, at *1 (S.D. Fla. 2007), aff'd, 291 Fed. Appx. 229 (11th Cir. 2008); *Fischer v. Forrest*, 2017 WL 2992663, at *23 (S.D.N.Y. 2017), report and recommendation adopted, 286 F. Supp. 3d 590 (S.D.N.Y. 2018), aff'd, 968 F.3d 216 (2d Cir. 2020); *Borescopes R U.S. v. 1800Endoscope.com, LLC*, 728 F. Supp. 2d 938, 947 (M.D. Tenn. 2010). In this regard, compelled transfer through specific performance of a contract has been held proper by Courts. "'The purpose of specific performance is to compel a party to do what it agreed to do pursuant to a contract.'

Accordingly, the undersigned finds that Plaintiff is entitled to a decree of specific performance ordering that Defendant surrender to Plaintiff the telephone numbers and the facsimile number." *PuroSystems, Inc. v. Maclean*, 2012 WL 13133869, at *6 (S.D. Fla. 2012)(quoting *Anthony James Dev., Inc. v. Balboa Street Beach Club, Inc.*, 875 So. 2d 696, 698 (Fla. 4th DCA 2004)).

Based on the foregoing, it is clearly within the Court's power to Order the Registrar or Registry of the <420.com> domain to transfer the domain on Defendants' behalf, or to divest Defendants of their interest, pursuant to Federal Rule of Civil Procedure 70(b). No difficult or extraordinary measures need be taken for the Court to ensure that an order of specific performance is carried out. In sum, Plaintiff has shown actual success on the merits and entitlement to this relief. Defendants breached the Agreement by not conveying the <420.com> domain, and the equitable considerations support the Court's award of specific performance through injunctive action in this case. The balance of hardships thus weighs in favor of Plaintiff, especially in light of the fact that Defendants have held the $307,500.00 since the day the contract was created between the parties and by failing to transfer the domain have therefore deprived Plaintiff of the ability to use or exploit the domain during this time. The transfer of the domain to Plaintiff also serves the public interest, so as to dissuade others from violating Court Orders and

to honor contracts. For all these reasons, the entry of a permanent injunction through the transfer of the domain <420.com> to Plaintiff is warranted.

WHEREFORE, Plaintiff respectfully requests that the Court enter Summary Judgment in favor of Plaintiff, including a permanent injunction compelling the transfer of the domain <420.com> to Plaintiff and any additional relief the Court deems just.

February 4, 2022.                            Respectfully Submitted:

*/s/Darren Spielman*
Darren Spielman, Esq. (FL Bar No 10868)
DSpielman@Conceptlaw.com
Alexander D. Brown, Esq. (FL Bar No 752665)
abrown@conceptlaw.com
Robert C. Kain, Jr., Esq. (FL Bar No. 266760)
RKain@Conceptlaw.com
The Concept Law Group, P.A.
6400 N. Andrews Ave., Suite 500
Fort Lauderdale, Fl 33309
ph: 754-300-1500
fax: 754-300-1501
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 4, 2022, that the foregoing document is being filed via ECF and served this day on all counsel of record identified below on the Service List via email.

23

By:   */s/Darren Spielman*
      Darren Spielman

Jesse A. Haskins
Fla. Bar No. 78974
Jesse@jhaskinslaw.com
J Haskins Law, PA
10437 Canary Isle Drive
Tampa, Florida 33647
Telephone: (919)667-4689
Attorney for Defendants

24