UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MERLIN KAUFFMAN,
an individual,

      Plaintiff,

v.                          CASE NO. 3:20-cv-17-MMH-JBT

TRANS HIGH CORPORTATION, a New
York company and HIGH TIMES HOLDING
CORPORATION, a Delaware company

      Defendants.

_____/

**DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT**

Defendants Trans High Corporation and High Times Holding Company (collectively, "Defendants") move for summary judgment and state in support:

**UNDISPUTED FACTS**

1. This lawsuit arises from negotiations between Adam Levin in his capacity as "the executive Chair of Defendant HIGH TIMES" and Plaintiff on behalf of Trellian Pty Ltd ("Trellian"). Compl, ¶ 10; Compl., Ex. B, pp. 31-32.[1] Critically, Plaintiff is not a party to this agreement. Plaintiff invokes Florida law to govern the unexecuted contract. *See* Compl, ¶ 1.

2. On Friday, December 27, 2019, Plaintiff Merlin Kauffman started to discuss with Defendants' Chairman, Adam Levin, the preliminary terms of

---

[1] Page numbers correspond to the "PageID" stamp appearing on the upper right of every page of Exhibit B to the Complaint.

the sale of the domain www.420.com. Compl, Ex. B, p. 27. This discussion transpired exclusively via text message, followed by further messages over the communications platform WhatsApp, voicemail, and phone calls. Compl, Ex. B.

3.  After confirming "307.5k for 420.com" as a reasonable purchase price, Mr. Levin indicated an intent "to sign an agreement." Compl, Ex. B, p. 29.

4.  On December 28, 2019, Mr. Levin stated: "I'm having a board call to approve transaction as well I'll need a contract as well As we're a public company." *Id.* at 30.

5.  On December 29, 2019, Mr. Kauffman replied in agreement: "All good to go with resolutions? Board approval etc." *Id.*

6.  Mr. Kauffman added that he did not want execution to occur until January 1, 2020: "Is there any way we can make the contract purchase agreement date 1/1/20, as long as the wire hits Monday?" *Id.* at 31. Mr. Levin agreed that the execution date cannot occur until January 1, 2020, "[e]ven later." *Id.*

7.  Throughout the chat, Mr. Kauffman referred to plans to execute a "purchase agreement" or "pa." *Id.* Mr. Kauffman used these terms seven times in the WhatsApp transcript. *Id.* at 31-35. Mr. Kauffman also referred to Trellian as the "buyer." *Id.* at 31.

8.  When Mr. Kauffman learned that his identity could not be kept confidential, Mr. Kauffman asked that he not be a party to the "PA." *Id.* Mr.

Kauffman stated: "Actually for PA, use name: Trellian Pty Ltd Since it is the wiring Perry Lol *wiring party." *Id.* at 31-32.

9. On December 30, 2019, after Mr. Kauffman identified Trellian as the buyer and agreed to board approval as a condition precedent, High Times Holding Corp. received via wire $307,500 originating from "Trellian Pty Limited." Ex. A-1, Decl. of Maxx Abramowitz regarding business records ("Business Records Decl.").

10. On December 30, 2019, Mr. Kauffman inquired whether the "wire hit," and then for a second time recognized board approval as a condition precedent: "Hey, one other minor detail to socialize during board vote—pls buzz me ASAP thanks." Compl, Ex. A., at p. 32.

11. On January 3, 2020, Messrs. Kauffman and Levin continued to discuss. Mr. Kauffman sent the message "PA coming your way," and sent an unexecuted purchase agreement as an attachment using WhatsApp. Compl, Ex. A, at p. 34.

12. The unexecuted purchase agreement attached in the WhatsApp chat is attached as Exhibit B and incorporated by reference. Ex. B, Decl. of Adam Levin. The unexecuted purchase agreement contains signature spaces for Trans High Corporation and Merlin Kauffman to affix their signatures—but is bereft of signatures. *Id.*

13. Mr. Kauffman asked for "redline," and Mr. Levin replied, "[s]end back if any today." Compl, Ex. B, at p. 34. Mr. Kauffman then asked for a phone

call back. *Id.* But ultimately, nothing happened. No redline was returned. No papers were signed. *See* Compl, Ex. B.

14. The Board of Directors of High Times Holding Corp. "discussed 420.com and what should happen with it." D.E. 81-1, p. 22, lines 13-14 (Dep. Stormy Simon); *accord* D.E. 61-3, p. 94, lines 16-25 and p. 95, lines 1-15 (First Dep. Adam Levin). Board member Stormy Simon was against the sale to Mr. Kauffman, and board member Justin Ehrlich requested to buy the domain at a higher price. D.E. 61-3, p. 97, lines 5-19 (First Dep. Adam Levin).

15. On January 5, 2020, three of five members of the Board of Directors for Defendant High Times Holding Corporation passed a resolution authorizing the sale of the "website domain www.420.com for a cash purchase price of not less than $350,000." Ex. A-2, Business Records Decl.

16. On January 6, 2021, Mr. Kauffman asked Mr. Levin on WhatsApp, "Can we get this fully executed and domain transferred today?" Compl, Ex. B, at pp. 34-35; Ex. C-3, Decl. of Michael Kapin.

17. On January 6, 2021, Mr. Levin responded with the message "Have an idea" and attempted to call Mr. Kauffman over the phone. *Id.* at 35; Ex. B, Decl. of Adam Levin, ¶ 10.

18. When Mr. Levin and Mr. Kauffman spoke on the phone in January of 2021, Mr. Levin explained to Mr. Kauffman that the Board of Directors would not accept a purchase price of less than $350,000. Ex. B, Decl. of Adam Levin, ¶ 11.

19. Mr. Kauffman refused to make the payment required by the Board of Directors for High Times Holding Corporation. *Id.* at ¶ 12.

20. When Mr. Kauffman declined the conditions set forth by the Board of Directors for Defendant High Times Holding Corporation, Mr. Levin offered to return all moneys that Mr. Kauffman caused to be wired to Defendants. *Id.* at ¶ 13.

21. On July 16, 2020, Mr. Levin repeated his offer to return the funds, but Mr. Kauffman ignored Mr. Levin's numerous attempts to contact him. Ex. C-3, Decl. of Michael Kapin.

## MEMORANDUM OF LAW

Plaintiff has brought this lawsuit to enforce an unexecuted agreement between Defendants and nonparty Trellian Party Ltd ("Trellian") negotiated on the instant messaging platform WhatsApp, phone calls, and text messages. Every stage of the unconsummated transaction renders the contract unenforceable. In the formation stage, there was no meeting of the minds to consummate a formal agreement. Even if the Parties did reach an agreement, they both agreed to board approval as a condition precedent, and board approval never occurred. At the execution stage, the agreement lacked the signature necessary to comply with the UCC's statute of frauds. Further, Mr. Levin lacked both actual and apparent authority to execute an agreement on behalf of the Defendants. Finally, the enforcement of this action is flawed. Mr. Kauffman in his individual capacity lacks standing to enforce the purported contractual rights of a corporate entity.

And aside from lack of standing, Mr. Kauffman has chosen the wrong jurisdiction to enforce a chat transcript.

## I.   No Meeting of the Minds to Form Agreement

Because the WhatsApp exchange concluded with the transmission of a proposed unexecuted purchase agreement, there was no meeting of the minds to create an enforceable contract. "Where parties intend that their verbal negotiations shall be reduced to writing as the evidence of the terms of their agreement, there is nothing binding on them until the writing is executed." *Rork v. Las Olas Co*., 23 So. 2d 839, 842 (Fla. 1945) (quoting *Ocala Cooperage Co. v. Fla. Cooperage Co*., 52 So. 13 (Fla. 1910)). The same rule precludes enforcement of informal written documents. *See Triton Stone Holdings, LLC v. Magna Bus., LLC*, 308 So. 3d 1002, 1004 (Fla. 4th DCA 2020).

Courts have considered several factors to consider whether the parties intend to be bound only upon physical signatures on a written agreement. First, the absence of a signature in a contract containing a signature block creates "a presumption against that agreement's execution because of the lack of external manifestation of acceptance." *Arnold v. Heritage Enters. Of St. Lucie, LLC*, 2:13-cv-14447, 2017 U.S. Dist. LEXIS, at *32 (S.D. Fla. Jul. 8, 2017). Second, indications that "a more detailed and formal Purchase Agreement" will follow show that prior correspondence "is nothing more than an 'agreement to agree.'" *Midtown Realty v. Hussain,* 712 So. 2d 1249, 1252 (Fla. 3d DCA 1998); *see also Triton*, 308 So. 3d at 1005 ("the Defendants also note that the handwritten

document expressly provided that formal contracts and promissory notes would be prepared and signed by the parties.").

Third, transmittal documents with the terms "subject to your approval" show an intent to be bound only upon physical signature on written documents. *Cohen v. Amerifirst Bk.*, 537 So. 2d 1108, 1109 n. 2 (Fla. 3d DCA 1989). Fourth, "the degree of formality attending similar contracts" determines enforceability. *PB Legacy, Inc. v. Am. Mariculture*, Inc., 2:17-cv-9, 2020 U.S. Dist. LEXIS 62947, at *29 (M.D. Fla. Apr. 10, 2020) (quoting *Midtown Realty,* 712 So. 2d at 1252 (Fla. 3d DCA 1998)). A handwritten term sheet with "incomplete sentences" was found to lack the requisite level of formality to enforce an agreement "involving hundreds of thousands of dollars." *PB Legacy, Inc.*, 2020 U.S. Dist. LEXIS at *29.

Finally, in agreements involving the transfer of interests, "the method of timing of conveyance" constitutes indispensable terms, the absence of which shows a lack of complete agreement. *See Triton*, 308 So. 3d at 1008 (considering contract for transfer of membership interests in company). Even when a handwritten agreement states the sales price, the schedule of installment payments, the sellers, and other general terms, the omission of several key terms rendered the agreement unenforceable. *See id.* The absence of a closing date killed enforceability because the interests had not yet "been conveyed or even tendered." *Id.* at 1009.

The WhatsApp chat at issue contains all of the indicia of an unexecuted agreement discussed above. **First**, the signature block of the "purchase agreement" shows that the Parties intended that a transaction would be executed only upon the affixation of signatures in the signature blocks. *See* Ex. B, Decl. of Adam Levin. The absence of signatures therefore shows no external manifestation of acceptance and execution. Ex. B, Decl of Adam Levin; *Arnold*, 2017 U.S. Dist. LEXIS, at *32. Mr. Kauffman expressly recognized the signature requirement when he asked Mr. Levin, "Can we get this fully executed and domain transferred today." Compl, Ex. B. **Second**, throughout the WhatsApp chat, both parties expressly stated that a more formal "purchase agreement," abbreviated "PA," will follow. Compl, Ex. B, p. 34. Consistent statements that the more formal agreement will follow shows the absence of intent to be bound by a WhatsApp transcript. *See Midtown Realty,* 712 So. 2d at 1252.

**Third,** Mr. Kauffman acknowledged in the WhatsApp transcript after purchase price discussion that the agreement was not yet executed: "Can we get this fully executed and domain transferred today? Hey dude, where we at? Any need for redline in agreement" Compl, Ex. B., p. 34. By asking about "redline," Plaintiff acknowledged that the discussion is subject to a more formal agreement. *See Amerifirst Bk.*, 537 So. 2d at 1109 n. 2. Plaintiff recognized that execution of the agreement was subject to "Board approval etc." Compl, Ex. B, p. 30.

**Fourth,** the WhatsApp platform lacks the requisite level of formality to execute an agreement involving "hundreds of thousands of dollars." *PB Legacy,*

*Inc.*, 2020 U.S. Dist. LEXIS at *29. The informality is also apparent from the consistent use of "incomplete sentences," colloquialisms, and profanity. *Se PB Legacy, Inc.*, 2020 U.S. Dist. LEXIS at *29. **Finally**, on Sunday, December 30, 2019, the Parties recognized that they had not yet agreed on the method of timing. Plaintiff asked: "Is there any way we can make the contract purchase agreement date 1/1/20, as long as the wire hits Monday?" Mr. Levin replied: "No problem … Even *later*." Compl., Ex. B, p. 31 (Emphasis added). When Mr. Kauffman asked Mr. Levin if the proposed transaction could be executed "today," Mr. Levin replied: "CAll [*sic*] you in 2. Have an idea." Compl, Ex. B, p. 35. There is no written elaboration of Mr. Levin's idea, but the absence of assent to execution of an agreement "today" shows a lack of agreement over timing and therefore lack of agreement over the entirety of the proposed contract. *See Triton*, 308 So. 3d at 1008. Further, neither Mr. Kauffman nor Mr. Levin made any mention of exactly when the domain would transfer. The only mutual understanding between Mr. Levin and Mr. Kauffman was that they had agreed to refrain from executing anything "until "1/1/20" (Mr. Kauffman) or "even later" (Mr. Levin).

## II.        Unsatisfied Condition Precedent

Four days before agreeing that a potential contract would not be executed before January 1 at the earliest, Mr. Levin and Mr. Kauffman agreed on board approval as a condition precedent to the contract. Mr. Levin informed Mr. Kauffman that execution required Board approval: "I'm having a board call to approve transaction as well. I'll need a contract as well. As we're a public

company." Compl., Ex. B. at p. 30. Mr. Levin and Mr. Kauffman agreed to a condition precedent—board approval—that was never satisfied.  Mr. Kauffman accepted that board approval was a condition precedent when he asked, "All good to go with resolutions? Board approval etc." *Id.* In fact, Mr. Kauffman proposed details to "socialize during the board vote," in recognition of the Board's decisive role in executing a contract. *Id.*

Mr. Kauffman's repeated recognitions of board approval renders board approval a part of the contract itself, pursuant to section 672.207, Florida Statutes, adopting the Uniform Commercial Code.  Section 672.207(2), Florida Statutes, provides that additional terms may become part of a contract between merchants,[2] unless the terms "materially alter" the original bargain. If the additional term materially alters the bargain, the additional term may still be deemed part of the contract if "expressly agreed to by the other party." § 672.207, Fla. Stat. comment 3. "[E]xpress assent requires some clear indication that the parties intended to incorporate the materially altering terms into their contract, whether by negotiating and bargaining for the terms or by reaching an express and unequivocal agreement to that effect after the fact." *Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1335 (7th Cir. 1985). Accordingly, express consent includes a "course of conduct," such as making inquiries about the additional term. *Id.; accord Am. Coach Lines of Orlando, Inc. v. N. Am. Bus*

---

[2] Both Parties are merchants because they are engaged in the sale of goods, as explained in Section III B, below.

*Indus*, 6:09-cv-1999, 2011 U.S. Dist. LEXIS 14417, at *28-39 (citing *Twin Disc, Inc.*) (M.D. Fla. Feb. 14, 2011). Express assent may be given simply by reading the additional terms and declining an express invitation to return the product for a full refund. *See Am. Coach Lines of Orlando*, 2011 U.S. Dist. Lexis 14417, at *39 (discussing *Monsanto Agr. Prods. Co. v. Edenfield*, 427 So. 2d 574, 577-78 (Fla. 1st DCA 1982)). *Monsanto* involved a farmer who read on a pesticide label "an express invitation ... to return the product if the terms of the warranty were unacceptable." *Monsanto,* 427 So. 2d at 577-78. The court held that the farmer assented by reading the invitation, "even if [he] did not know of the limitation of warranty at the time of purchase of the product." *Id.* at 578.

When a contract requires board approval as a condition precedent, and board approval is not granted, there is no enforceable contract—even if board approval is withheld in bad faith. *See Southern Internet Sys. v. Pritula*, 856 So. 2d 1125, 1127 (Fla. 4th DCA 2003) (holding that trial court could not enforce settlement agreement regardless of whether board of directors acted in bad faith); *see also Belfor United States Grp., Inc. v. Bray & Gillespie, LLC*, 6:05-cv-1624, 2008 U.S. Dist. LEXIS 7076, at *9 (M.D. Fla. Jan. 31, 2008) (citing *Southern Internet*, 856 So. 2d at 1128) (finding lack of third party consent rendered assignment unenforceable). This is because "[a] written document, complete on its face and delivered to one of the signatories, does not become an enforceable contract if it was delivered to a condition or with a reservation until that condition is satisfied. *Southern Internet*, 856 So. 2d at 1128 (quoting *Carson*

*v. Fishtail Marine of Naples, Inc.*, 697 So. 2d 1222 (Fla. 2d DCA 1997)); *accord Harrell v. Wood & Assocs. of Am., Inc.*, 351 B.R. 221, 243 (Bankr. M.D. Fla. 2006) (citing *Southern*, 856 So. 2d at 1128) ("Where provisions of a contract require approval of that contract by a third party, the obligations under such contract do not mature until after the approval has been given and no contract is fully formed.").

This rule bars enforcement of a corporate document "which specifically conditions the contractual effectiveness of a proposal by a projected seller upon its own subsequent approval." *S. Internet*, 856 So. 2d at 1128 (citing *Meekins-Bamman Prestess v. Better Constr, Inc.*, 408 So. 2d 1071 (Fla. 3d DCA 1982)). For example, in *Meekins*, the defendant corporation put forth a document thanking plaintiff corporation for "acceptance of … our proposal," but nevertheless requiring "approval" of the defendant's own corporate officer. *Meekins,* 408 So. 2d at 1072. Notwithstanding the term "acceptance," the Court held that there was no agreement. *Id.* at 1073. The rule also bars enforcement of a contract "conditioned upon execution by all six" stockholders but was in fact executed by only three. *S. Internet Sys.*, 856 So. 2d at 1128 (citing *Sousa v. Palumbo*, 426 So. 2d 1072 (Fla. 4th DCA 1983)). In *Southern Internet Systems*, a court held a settlement agreement unenforceable negotiated by the defendant's president and CEO could not be enforced because the agreement required approval the defendant's board of directors and the board of directors of a related

12

corporation. *S. Internet Sys.*, 856 So. 2d at 1128. "Neither board ever approved of the settlement agreement's terms." *Id.*

The WhatsApp transcript falls into the same situation. Mere "acceptance" of a price as reasonable does not override the condition of board approval set forth in the same chat transcript. *Meekins,* 408 So. 2d at 1073. Mr. Levin expressly conditioned execution upon "a board call to approve the transaction as well" because "we're a public company." Compl., Ex. B. at p. 30. Plaintiff confirmed his understanding of "Board approval etc" as a condition precedent, and lobbied Mr. Levin to "socialize" the Board to reach a favorable resolution. *Id.* The Board resolved to allow for the sale of the domain if a purchase price higher than the price discussed could be reached. Ex. A-2 (Bus. Rec. Affidavit). Because the condition precedent agreed to by both parties—board approval—never happened, the WhatsApp transcript is not enforceable.

### III.        Uniform Commercial Code Statute of Frauds

Because the chat transcript involves the sale of goods, the chat is subject to section 672.201(1), Florida Statutes, which provides in part: "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker."

### A. Statutory Intent

"The statute of frauds grew out of a purpose to intercept the frequency and success of actions based on nothing more than loose verbal statements or mere innuendos." *Tannenbaum v. Biscayne Osteopathic Hosp., Inc.*, 190 So. 2d 777, 779 (Fla. 1966). Such "loose" statements and "mere innuendos" are the types of communication at issue here.

### B. Internet Domains as Goods

Because Messrs. Levin and Kauffman negotiated for the sale of an undeveloped website, the UCC's Article 2 applies. Specifically, section 672.201, Florida Statutes, applies to "transactions of goods."

The UCC Statute of Frauds applies to "intangible personal property contract rights." *See Wharfside, Inc. v. Superior Bk.*, 741 So. 2d 542, 545 (Fla. 4th DCA 1999) (discussing predecessor statute section 671.206). Accordingly, the UCC's Article II encompasses abstract goods such as computer programs. *See First. Nat'l Bk. v. Fla. Software Serv's, Inc.*, 770 F. Supp. 1537, 1543 (M.D. Fla. 1991). Internet domains also constitute a good subject to the Uniform Commercial Code because "a web page has a physical presence on computer drive, causes tangible effects on computers, and can be perceived by the senses." *Margae, Inc. v. Clear Link Techs, LLC*, 620 F. Supp. 2d 1284, 1288 (D. Ut. 2009).

Even if the sale of an internet domain cannot be considered a pure sales contract, an internet domain sale may nevertheless be subject to the UCC's

Article II as a "hybrid" contract. *See BMC Indus. v. Barth Indus.*, 160 F.3d 1322,

1329-30 (11th Cir. 1998). The Eleventh Circuit applies the predominant factor

test to determine whether the sale is a transaction in goods (subject to the UCC's

Article 2) or a transaction in services. *See id.* "Under this test, the court

determines 'whether their predominant factor, their thrust, their purpose,

reasonably stated, is the rendition of service, with goods incidentally involved

(e.g. contract with artist for painting) or is a transaction of sale, with labor

incidentally involved (e.g. installation of a water heater in a bathroom)." *Id.* at

1322, 1329-30 (11th Cir. 1998). The Eleventh Circuit recognized three factors to

determine whether to apply Article II to hybrid contracts. First, words like

"purchase," "buyer," and "seller" in the contract "indicates that the transaction is

for goods rather than services. *Id.* at 1330. Second, "a bill that does not include

services indicates a contract for goods." *Id.* (citing *Triangle Underwriters, Inc. v.*

*Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir. 1979). Finally, "[m]ovable goods is

another hallmark of a contract for goods rather than services." *BMC Indus.*, 160

F. 3d 1322, at 1330.

### C. Signature

Section 671.205 requires not only that the agreement be made in writing,

but that the writing be "signed." An "'electronic signature' means any letters,

characters, or symbols, manifested by electronic or similar means, executed or

adopted by a party with *an intent to authenticate a writing*," pursuant to section

668.003, Florida Statutes. For example, a completed signature block manifests

an intent to authenticate an e-mail. *See Rouse v. Nationstar Mortg., LLC,* No. 8:14-cv-497-T-30AEP, 2014 U.S. Dist. LEXIS 81545, at *6 (M.D. Fla. June 16, 2014). But in themselves, "text messages are not an adequate writing" sufficient to satisfy the UCC's electronic signature requirement. *Debellis v. Hollahan*, No. 16-382, 2017 U.S. Dist. LEXIS 87803, at *7 (D. N.J. June 8, 2017); *accord Tayyib Bosque, Corp. v. Emily Realty, LLC*, 17 Civ. 512, 2019 U.S. Dist. LEXIS 100900, at *17 (S.D. NY June 17 2019) ("Here, however, Bosque merely defines an electronic signature as 'an electronic process' but does not point to any text messages signed by LaFrieda.").

### D. Analysis

The statute of frauds was designed to prevent exactly the kind of situation that has unfolded here: attempts to enforce casual "loose statements" as binding contracts, despite the absence of actual signatures and manifestations of intent to enter into legally binding transactions. *Tannenbaum*, 190 So. at 779. The chat satisfies all criteria for UCC's Article 2 to apply.

The chat is subject to the UCC's Article 2 because it relates to the sale of property that has "physical manifestations on computers." Even if the chat involves a hybrid of sales and services, the factors recognized by the Eleventh Circuit weigh in favor of applying the UCC. *See BMC Indus.*, 160 F.3d at 1329-30. With respect to the first factor, the language of the contract, Mr. Kauffman himself used variants of the word "purchase" at least five times. *See* Compl, Ex. B. Mr. Levin referred to the subject of the transaction as an object as well—"a steal."

*See id.* Second, the transaction specifically excluded services. Mr. Levin stated in the transcript that the domain was "never developed" –meaning that no labor was performed to enhance the domain. Compl, Ex. B, at p. 28. Third, domains are movable in that they cause "tangible effects on computers." *Margae,* 620 F. Supp. 2d at 1288.

UCC's Article 2, codified as section 671.205, Florida Statutes, requires that the agreement be "signed." There is no such signature in the WhatsApp transcript, or any modicum of solemnity indicated an intent by Defendants to be legally bound.

### IV.        No Standing

Because Plaintiff deliberately requested not to be a party to an abandoned negotiation, Plaintiff lacks standing. "A rule of contract law is that one who is not a party to an agreement cannot enforce its terms against one who is a party." *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1168 (11th Cir. 2011). The only party with standing to enforce a contract is the party "named" in the contract. *MSP Recovery Claims, Series LLC v. USAA Gen. Indem. Co.*, 18-21626, 2018 U.S. Dist. LEXIS, at *35 (S.D. Fla. Oct. 19, 2018). Consequently, a shareholder can assert his rights "only through the corporation." *Latele TV, C.A v. Telemundo Communs. Grp., LLC*, 9 F. 4th 1349, 1358 (11th Cir. 2021) (quoting *Cook v. Trinity Univ. Ins. Co. of Kan.*, 297 F. App'x 911, 913 (11th Cir. 2008) (considering standing in underlying copyright infringement suit). Under this rule, "even sole shareholders .... lack standing." *Latele, T.V.* 9 F. 4th at 1358 (quoting *Fla. Seed*

*Co. v. Monsanto Co.*, 105 F.3d 1372, 1376 (11th Cir. 1997) (ellipsis in original).
Similarly, a corporation's sole shareholder, officer, and director cannot pursue a
claim inuring to the corporation itself. *See eLandia Int'l, Inc. v. Ah Koy*, 09-
20588-Civ-Moreno/Torres, 2010 WL 2179770, 2010 U.S. Dist. LEXIS 53193, at
*19-20 (S.D. Fla. Feb. 22, 2010) (citing *Rawoof v. Texor Petroleum Co., Inc.*, 521
F.3d 750 (7th Cir. 2008)) (considering tortious interference claim). Courts
considering breach of contract actions have relied on *e-Landia* to conclude that
the plaintiff lacks standing. *See Crowley Mar. Corp. v. Robertson Forwarding
Co.*, No. 20-20151, 2020 U.S. Dist. LEXIS 135131, at *8 (S.D. Fla. Jul. 30, 2020)
(citing *MSP Recovery Claims, Series LLC v. USAA Gen. Indem. Co.*, No. 18-
21626, 179891, 2018 WL 5112998, at *12 (S.D. Fla. Oct. 19, 2018)); *see also
Richardson v. Route 1, Inc.*, No. 8:12-cv-2888, 2013 U.S. Dist. LEXIS 76771, at *6
(M.D. Fla. May 31, 2013) (finding that owner and chief executive officer of
corporation lacked standing to enforce his company's contract). Individual
officers of a corporation cannot establish standing by showing that their
corporation's contractual commitments were "personally financed" or whether
the officer is the "sole shareholder." *Richardson*, 2013 U.S. Dist. LEXIS 76771, at
*7-8.

Plaintiff bears the burden of proving standing to enforce a contract, "in the
same way as any other matter on which the plaintiff bears the burden of proof,
i.e. with the manner and degree of evidence required at the successive stages of
the litigation." *Richardson*, 2013 U.S. Dist. LEXIS at *6 (quoting *Bochese v.*

*Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)). At the summary judgment stage, this means setting forth "by affidavit or other evidence 'specific facts." *Bischoff v. Osceola Cnty,* 222 F.3d, 878 (quoting *Lujan v. Defenders of Wildlife*, 505 U.S. 555, 561 (1992)).

Through its discovery responses, it is clear that Plaintiff will not be able to set forth such "specific facts." *See id.* Plaintiff has produced no documents that would establish standing, despite Defendant's Request for Production No. 12, which requests "Any and all documents which You intend to use at the trial of this action which You have not previously provided." Ex. C-2, Decl. of Michael J. Kapin. Because Defendant has failed to provide any documents to show standing (i.e. his relationship with Trellian), the doctrine of standing destroys Plaintiff's claim at this summary judgment stage. *See Bischoff v. Osceola Cnty,* 222 F.3d at 878.

Further, Defendant's responses to Plaintiff's request for admission and documents produced create a negative syllogism that Trellian and Kauffman are separate entities:

**Major premise**: Defendants offered either Mr. Kauffman, Trellian, or both their money back. Plaintiff produced a WhatsApp transcript showing that Mr. Levin make the following message to Mr. Kauffman: "Let me just wire you all your Money back and pay your costs?" Ex. C-, Decl. of Michael Kapin. The word "you" could only be used to refer to either Kauffman or Trellian.

**Minor premise**: Defendants did not offer to return payment to Mr. Kauffman. Mr. Kauffman denied that "Defendant High Times Holding

Corporation offered to return Your money to You in full." Ex C-1, Decl. of
Michael Kapin (Resp. to Req. for Admission No. 15).

**Conclusion**: Defendants offered to return money to Trellian only (because
Trellian was the "wiring Party," in Kauffman's words). *See* Compl, Ex. B.

To highlight this point, in the instant case, if this Court were to award Mr.
Kauffman possession of the www.420.com domain (which it should not, as no
contract was formed), there could be no assurance that Defendants would not later
face a claim from Trellian Pty Ltd that they are either entitled to the domain or
entitled to the funds that were received by Defendants. Trellian "is a privately
owned company based in Melbourne, Australia with offices in India, France and
Los Angeles, California," according to its website. Ex. D, Decl. of Maxx
Abramowitz.[3] Mr. Kauffman has not claimed any connection with Trellian on his
Linkedin profile. *Id.* In the event this Court awards Plaintiff any relief, it would
open Defendants to potential double liability if Trellian Pty Ltd. were to bring an

---

[3] Print-outs of websites are sufficiently authenticated "where the proponent declared that they
were true and correct copies of pages on the internet and the print-outs included their webpage
URL addresses and the dates printed." *Z Indus. United States, LLC v. Circuitronix, LLC*, 17-cv-
60727, 2018 U.S. Dist. LEXIS 201847, at *48 (S.D. Fla. June 19, 2018) (quoting *Haines v. Home
Depot U.S.A., Inc.*, No. 1:10-cv-01763-SKO, 2012 U.S. Dist. LEXIS 49767, 2012 WL 1143648, at
*7 (E.D. Cal. Apr. 4, 2012)). Internet print-outs coupled with declarations of the person
accessing information may be used to provide evidence relating to a corporation's terms of use.
*See Harbers v. Eddie Bauer,* LLC, C9-1012, 2019 U.S. Dist. LEXIS 200703, at *12 n. 3 (W.D.
Wash. Nov. 19, 2019) ("Although the court declines to rule on Eddie Bauer's request for judicial
notice at this time, the court notes that Ms. Harbers cites no case in which a court declined to
take judicial notice of an image from the Internet Archive when a party declaration separately
authenticates the document at issue."). There is no reason why other basic facts of a corporate
entity should be treated differently.

action in, for example, the courts of Australia where Trellian Pty Ltd. is based. Given Plaintiff's admissions, Plaintiff does not have standing to proceed.

Finally, the absence of standing in this proceeding is apparent through Plaintiff's purposeful request *not* to be the buyer. When Mr. Levin asked, "Who should be the buyer," Plaintiff responded, "make purchase agreement with Merlin Kauffman"—and then changed his mind: "Actually for PA, use name: Trellian Pty Ltd." Compl, Ex. B. pp. 31-32. Plaintiff's use of the word "actually" shows that to even if there was any meeting of the minds (there was none as discussed below), the parties specifically intended that Plaintiff in his individual capacity *not* be a party to the purported agreement. *Id.*

## V.        No Agency Relationship

Mr. Levin lacked both actual and apparent authority to enter into a contract on behalf of Defendants. With respect to actual authority, only the Board of Directors has authority to approve of domain sales. *See Lensa Corp v. Poinciana Gardens Ass'n*, 765 So. 2d 296, 298 (Fla. 4th DCA 2000) ("The statute mandates that only the board has the power to authorize a sale."); *accord* 8 Del. C. § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation."). Under Delaware law (which determines High Times Holding Corporation's governance), "'effective power to control' is not enough to establish a principal-agent relationship." *Skye Mineral Inv'rs, LLC v. DXS Capital (U.S.*

*Ltd*), 2018-0059, 2020 Del. Ch. LEXIS 72, at *54 (Del. Chan. Feb. 24, 2020)

(quoting *Weinstein Enters., Inc. v. Orloff,* 870 A.2d 499, 509 (Del. 2005.

Similarly, "[e]ven when the parent owns all the stock in the subsidiary, [the

subsidiary's directors] are not agents of the parent." *Skye*, 2020 Del. CH. LEXIS,

at *54-55 (quoting *Cochran v. Stifel Fin. Corp.*, 2000 Del. Ch. LEXIS 58, 2000

WL 286722, at *17 n. 70 (Del. Ch. Mar. 8 2000)). It is solely the legal "*right* of

control" that determines actual authority. *Skye,* 2020 Del. Ch. LEXIS, at *55

(quoting *Weinstein Enters, Inc. v. Orloff,* 870 A.2d 499, 509 (Del. 2005)). The

Resolution of the Board of Directors for High Times Holding Corporation

conclusively shows that Mr. Levin lacked authority to execute any sale for less

than $350,000. Ex. A-2, Bus. Rec. Decl. And under the law of Delaware, where

High Times Holding Corporation is incorporated, only the Board has actual

authority. The bylaws give the Chair of the Board authority only to "preside" and

to "be a member of the executive committee." Ex. A-3, § 4.07. The Bylaws of both

Defendants give the board exclusive power to manage the "business of the

corporation." Ex A-3 at § 3.01; Ex. A-4, § 3.11.

Nor did Mr. Levin possess apparent authority because as the Florida

Supreme Court has held, apparent authority means "such authority as the

*principal* wrongfully permits the agent to assume or which the *principal* by his

actions or words holds the agent out as possessing." *Stiles v. Gordon Land Co.*,

44 So. 2d 417, 421-22 (Fla. 1950) (emphasis added). "In considering a claim

based on apparent authority, the inquiry properly focuses on the actions of or

22

appearances created by the principal, not the agent." *Jackson Hewitt, Inc v. Kaman*, 100 So. 3d 19, 31 (Fla. 2d DCA 2011). A president's signature on a contract combined with corporate minutes do not establish either actual or apparent authority. *See Lensa Corp*, 765 So. 2d at 298.

The WhatsApp transcript shows that Defendants' boards of directors did not hold Mr. Levin out as possessing authority to execute the agreement. In fact, Mr. Levin stated that he was "having a board call to approve" and Mr. Kauffman acknowledged in his response that "Board approval" was required. Compl, Ex. B, p. 30. Mr. Kauffman asked, "All good to go with resolutions?" *Id*. Accordingly, Mr. Kauffman recognized that Mr. Levin lacked authority to execute a contract with "board approval" in the form of resolutions. Mr. Kauffman also had accessed to the publicly filed bylaws. *See* Exh. A-2 Bus. Rec. Decl., ¶ 4.

## VI.        No Personal Jurisdiction

Finally, Defendants preserve their objections to the exercise of personal jurisdiction. *See* D.E. 35 Am. Ans., 2d Aff. Def, 3d Aff. Def. While Mr. Kauffman seeks to enforce a WhatsApp transcript, he relies on an entirely different boilerplate contract allegedly between Defendants and Web.com. *See* Compl, Ex. A. Mr. Kauffman was not a party to the Web.com agreement. A choice of law provision in a defendant's contract "is insufficient in itself to confer jurisdiction." *Digi-Tel Holdings v. Proteq Telcoms.,* 89 F.3d 519, 523 (8th Cir. 1996); *accord North Am. Elecs. Components LLC v. Smart Packaging*, 3:12-cv-81, 2013 U.S. Dist. LEXIS 202841, at *14 (N.D. Ga. Feb. 19, 2013) (citing *Digi-Tel*).

Mr. Kauffman admits that the Parties have no connections to Florida. Mr. Kauffman resides in Puerto Rico. Compl, ¶ 1. Defendant High Times Holding Corporation is incorporated in Delaware, with its principal place of business in California. Comp, ¶ 6. Defendant Trans High Corporation is incorporated and located in New York. Compl, ¶ 5. The alleged agreement was done "through the WhatsApp messaging platform," with no physical meetings in Florida. Compl, ¶ 10. Because there is no activity that would reinforce Defendant's "deliberate affiliation with the forum State," there is no personal jurisdiction. *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 482 (1985).

## CONCLUSION

The WhatsApp exchange that Plaintiff attempts to enforce as a "contract" is bereft of the kind of formality that would signify a legally binding document. Plaintiff even indicated that he would not want to be a party to the formal agreement—creating a fundamental issue of standing. Further, the Parties conditioned the contract on two events that never materialized: the execution of a formal "purchase agreement" and the authorization of High Times Holding Corporation Board of Directors. This case illustrates how the statute of frauds is not an exercise of technicalities for the sake of formalism, but a practical safeguard to prevent the enforcement of causal banter.

WHEREFORE, it is respectfully requested that summary judgment be entered in favor of Defendants.

Respectfully submitted,

_/s/ Jesse Haskins_____
Jesse A. Haskins
Fla. Bar No. 78974
Jesse@jhaskinslaw.com
J Haskins Law, PA
10437 Canary Isle Drive
Tampa, Florida 33647
Telephone: (919) 667-4689
Attorney for Defendants

## CERTIFICATE OF SERVICE

I certify that on February 4, 2022, the foregoing documents have been furnished by e-portal to Concept Law Group, PA, 6400 N. Andrews Ave., Suite 500, Ft Lauderdale, FL 33309; (754) 300-1500; rkain@complexip.com and DSpielman@ConceptLaw.com.

/s/ Jesse Haskins
Jesse A. Haskins
Fla. Bar No. 78974
Jesse@jhaskinslaw.com
J Haskins Law, PA
10437 Canary Isle Drive
Tampa, Florida 33647
Telephone: (919)667-4689
Attorney for Defendants