UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MERLIN KAUFFMAN,
an individual,

      Plaintiff,

v.                              CASE NO. 3:20-cv-17-MMH-JBT

TRANS HIGH CORPORATION, a New
York company and HIGH TIMES HOLDING
CORPORATION, a Delaware company

      Defendants.
_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR FINAL SUMMARY JUDGMENT**

Mr. Kauffman's motion for summary judgment collapses the distinction between a preliminary negotiation of individual terms and a final, binding agreement. To show that the Parties never reached a final agreement, this Response traces the stages of the preliminary negotiation: from haggling over the payment amount to discussion about two essential conditions precedent to the formation of the contract: reduction to formal writing and board approval. Plaintiff's motion for summary judgment fails to meet the summary judgment standard for establishing a meeting of the minds and the non-existence of conditions precedent. Even if these flaws can be ignored (they cannot), Plaintiff misconstrues the meaning of actual and apparent authority, and he has

completely failed to establish standing, personal jurisdiction, and satisfaction of the UCC's statute of frauds. Finally, specifically performance is not available.

## I. The Price Haggle

### A. The chat reflects a negotiation, not a binding contract.

The WhatsApp transcript begins as nothing more than two negotiators haggling over a potential agreement between their principals. There was no meeting of the minds to enter into a binding agreement on all essential terms. "When determining whether there has been a meeting of the minds on all essential terms, courts should distinguish preliminary negotiations from a final agreement." *Triton Stone Holdings, L.L.C. v. Magna Bus., L.L.C.*, 308 So. 3d 1002, 1007 (Fla. 4th DCA 2020). The purpose of this distinction—between preliminary negotiations on one hand a final agreement on the other— is to ensure that "legal representatives will negotiate without fear of unintentionally entering into a binding agreement." *Williams v. Ingram*, 605 So. 2d 890, 894 (Fla. 1st DCA 1992).

Agreement over the amount of payment does not constitute assent to a final, binding agreement. *See TB Food USA, Ltd. Liab. Co. v. Am. Mariculture, Inc.*, 2:17-cv-9-FtM-29NPM, 2021 U.S. Dist. LEXIS 61745, at *16 (M.D. Fla. Mar. 31, 2021) (refusing to recognize as assent defendant's signature of settlement term sheet that provided a payment amount to be made by plaintiff); *Meekins-Bamman Prestress. v. Better Const.*, 408 So. 2d 1071 (Fla. 3d DCA 1982) (finding no assent despite defendant's recognition of plaintiff's "acceptance"). The

2

asynchronous features of "Whatsapp conversation fail to show assent," particularly when electronic correspondence shows that negotiators "continue[d] to bicker over the terms." *Esprit Stones Private v. Rio Stone Grp.*, No. 6:19-cv—637, 2021 U.S. Dist. LEXIS 205743, at *16-17 (M.D. Fla. Jul. 28, 2021) (alternations in original) (quoting *TB Food USA, Ltd. Liab. Co. v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29NPM, 2021 U.S. Dist. LEXIS 61745, at *15-16 (M.D. Fla. Mar. 31, 2021)).  In determining whether there is a meeting of the minds on all essential terms, "[a] court may consider any number of factors, including 'the type of contract at issue, the number of details yet to be ironed out, the relationship of the parties, and the degree of formality attending similar contracts.'" *Midtown Realty v. Hussain*, 712 So. 2d 1249, 1252 (Fla. 3d DCA 1998).

Plaintiff's own "expert," Jeffrey Gabriel, bolsters this point. Mr. Gabriel acknowledges that e-mails are "common in domain sale *negotiations*." [D.E. 111-12, ¶ 21] (emphasis added). Mr. Gabriel states that he uses messaging applications to make the sales pitch—"*targeting* buyers and or sellers in Asia." *Id.* at ¶ 19 (emphasis added). Mr. Gabriel reiterates that messaging apps like WhatsApp are used in the "sales process." *Id.* at ¶ 21. Mr. Gabriel then concedes that after Mr. Levin stated "Yes … confirmed," the negotiation remained an "opportunity." *Id.* at ¶ ¶ 22-23. A negotiation is not a contract. Therefore, by Mr. Gabriel's own admission, the WhatsApp messages are by their nature indicative

of preliminary "negotiations" and "opportunities"—not a final, binding agreement.

The only statements Mr. Gabriel makes in support of Mr. Kauffman are pure legal conclusions: "Adam made a specific offer," and "100% a sale."[1] *Id*. at ¶ ¶ 22-23. Legal conclusions in expert declarations cannot form the basis for a motion for summary judgment. "An affidavit or declaration used to support or oppose a motion for [summary judgment] must be made on personal knowledge[.]." *Smith v. City of Port St. Lucie*, 20-14252, 2021 U.S. Dist. LEXIS 152043, at *17 (S.D. Fla. Aug. 11, 2021) (quoting Fed. R. Civ. P. 56(c)(4)). Expert opinion cannot be used to put forward an "interpretation" of a purported agreement. *See McMahan Sec. Co. v. FB Foods, Inc.*, 8:04-cv-1791, 2007 U.S. Dist. LEXIS 9128, at *6 (M.D. Fla. Feb. 8, 2007). "Courts regularly exclude expert opinions that opine on the interpretation of written contracts," regardless of whether such "expert" declarations are offered for the "court's consideration" or for the jury's. *Herman v. Seaworld Parks & Entm't, Inc.*, 320 F.R.D. 271, 281-83 (M.D. Fla. 2017) (excluding opinions in opposition to class certification).

Beyond the legal conclusions of his purported expert, Mr. Kauffman relies exclusively on cases over the enforceability of settlement agreements. [D.E. 111 at 13 (quoting *Omni Healthcare, Inc. v. Health First, Inc.*, 6:13-cv-1509, 2017 U.S.

---

[1] A *Daubert* motion and redundant points need not be raised in a separate motion. *Variable Annuity Life Ins. Co. v. Fawn Laeng*, 8:12-cv-2880, 2013 U.S. Dist. LEXIS 108869, at *8 (M.D. Fla. Aug. 2, 2013). Further, when stripped of its legal conclusions, the "expert" declaration supports Defendants' position.

Dist. LEXIS 135865, at *9 (M.D. Fla. Aug. 24, 2017)). In contrast to Mr. Kauffman's business opportunity at issue here, "settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits." *Pearson v. Skydell*, 522 F.2d 171, 176 (5th Cir. 1975) (quoting *D.H. Overmyer Co. v. Loflin*, 440 F.2d 1213, 1215 (5th Cir. 1971)). Because of this strong public policy factor favoring settlement agreements, courts applying Florida law apply a more relaxed set of rules to the execution of settlement agreements. *Compare Hannah v. Armor Corr. Health Servs.*, 8:19-cv-596, 2021 U.S. Dist. LEXIS 122341, at *7 (M.D. Fla. June 3, 2021) ("The execution of a settlement agreement is merely a procedural formality and is not a condition precedent to an enforceable settlement agreement.") *with Arnold v. Heritage Enters. of St. Lucie, LLC*, 2:13-cv-14447, 2017 U.S. Dist. LEXIS 225609, at *32 (S.D. Fla. Jul. 8, 2017) ("Neither Arnold's agent nor Riverside Marina executed the licensing agreement creating a presumption against the agreement's execution because of the lack of external manifestation of acceptance.")

    Even in these "highly favored" settlement agreements, the language of assent is far more unequivocal than the language used by Messrs. Kauffman and Levin. *Pearson*, 522 F.2d at 176. In *Omni*, for example the party proposing settlement unequivocally stated that he was putting forth a final, binding offer rather than negotiating: "This offer will be good for 72 hours, or until Judge Dalton rules, whichever comes sooner." 2017 U.S. Dist. LEXIS 135865, at *9.  And the reply

contained an unequivocal acceptance: "The Boone Plaintiffs have carefully considered Dr. Deligdish's offer, below, from April 3, 2017[,] and accepted it." Another example of formal acceptance via e-mail appears in *Palmer v. Diamond Resorts Int'l Club, Inc.*: "Diamond accepts the Palmers' settlement offer." *Palmer*, 6:19-cv-2178, 2020 U.S. Dist. LEXIS 37599, at *2 (M.D. Fla. Feb. 14, 2020).

There is no such solemn and unequivocal acceptance between Messrs. Kauffman and Levin. Neither person uses specific terms, such as "offer" and "accept." Nor has a party to the agreement indicated some modicum of finality, such as "will be good for 72 hours." *Omni,* 2017 U.S. Dist. LEXIS 135865, at *9.

It is unclear whether Plaintiff believes binding assent was given when 1) Mr. Levin replied "yes" to "$307.5k for 420.com," 2) when Mr. Levin replied "confirmed" to "Thanks," or 3) when Mr. Kauffman later agreed that "send[ing] it over" is in fact "cool." Motion for Summary Judgment, pp. 11-12. The term "cool" is not only colloquial and accordingly indicative of informal negotiations, but the term cannot be construed as assent because it is ambiguous. Merriam-Webster's dictionary ascribes several potentially applicable meanings to the word "cool": "free from tensions or violence," "very good; excellent"; "all right"; and "fashionable; hip." *Cool*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/cool. The vast majority of these definitions do not indicate formal assent, but rather a casual acknowledgement that a proposal will not cause "tensions" in the course of negotiations, or that the proposal is "fashionable." *See id*. To the extent Mr. Kauffman construed the word "cool" as

assent, there nevertheless was no meeting of minds between the negotiators as to whether the words "yes," "confirmed," and "cool" constitute intent to enter into a binding agreement, or merely an interest in continuing preliminary negotiations. Further, providing wiring instructions does not indicate an intent to be bound by a contract. *See Esprit*, 2021 U.S. Dist. LEXIS, at *5 (finding no assent despite fact that "Defendant sent Plaintiff information about its bank" via WhatsApp); *Abbott Labs. v. Alpha Therapeutic Corp.*, 97 C 1292, 1997 U.S. Dist. LEXIS 20859, at *21-24 (N.D. Ill. Dec. 29, 1997) (concluding no intent to be bound by exchange of letters despite transmission of wire transfer instructions).

## B. The Relationship Factor

The close relationship between Messrs. Kauffman and Levin weigh against finding a meeting of the minds because of difficulty discerning the boundaries between friendship, business negotiation, and contract formation. *See Eastman Kodak Co. v. Ricoh Co.*, 13 Civ 3109, 2013 U.S. Dist. LEXIS 113204, at * 25 (S.D.N.Y. Aug. 9, 2013). ("Naturally, a willingness to work cooperatively and pursue mutually beneficial business ventures does not automatically translate into a grant of intellectual property rights."). Indeed, where there is any lack of clarity as to whether a discussion is a business agreement or a "friend helping a friend," there is no meeting of the minds. *Lambert v. Don Barron Contractor, Inc.* 974 So. 2d 198, 202 (La. App. 2d Cir. 2008).

The personal relationship Messrs. Kauffman and Levin does not include a history of entering into binding contracts with one another. To the contrary, their

WhatsApp history shows casual talk about valuation and business connections with respect to a variety of unrelated transactions. For example, the WhatsApp transcript shows a prior discussion about airline miles—their valuation and potential third-party sellers. Mr. Kauffman asked about the purchase of airline miles, and Mr. Levin referred him to a third-party seller (Seth Elliot). [D.E. 112-3, P. 23]. Discussion about 420.com began the same way. Mr. Levin asked Mr. Kauffman 1) "what's a range of value" and 2) "any buyers." Contrary to Mr. Kauffman's characterization in his motion for summary judgment, Mr. Levin did not ask Mr. Kauffman directly if Mr. Kauffman wanted to buy. Mr. Levin indicated that he found a "strategic buyer," and Mr. Kauffman replied in conditional terms: "I'd do 275k right now"—as in "I *would*," not "I will." So when Mr. Kauffman sent the WhatsApp message "307.5k for 420.com please confirm," it appeared that Mr. Kauffman was asking for confirmation that he would be presented as a potential buyer to the appropriate board of directors, just as when Mr. Levin referred Mr. Kauffman to Mr. Elliott, Mr. Kauffman knew that Mr. Levin was not making an offer on behalf of Mr. Elliott. Mr. Kauffman recognized that he would need to ask for "board approval" to purchase an internet domain, just as Mr. Kauffman knew he had to ask Mr. Elliott to purchase airline miles. Mr. Kauffman's understanding that Mr. Levin was merely the messenger is clear from Mr. Kauffman's consistent inquiries about "board approval."  The structure of the chat between the two unrelated transactions is comparable, but Mr. Kauffman twists the meaning of "confirmed" in his motion for summary judgment.

### C.  Lack of Essential Terms

The negotiators had not agreed on several essential terms at this juncture. The precise identity of the parties are essential terms. *See Nu-Air Mfg Co. v. Frank B. Hall & Co.*, 822 F.2d 987, 990 (11th Cir. 1987) (recognizing "identity of parties" as essential term in oral insurance contract); *Marine Depot v. James River Grp.*, 19-cv-24821, 2021 U.S. Dist. LEXIS 124827, at *20 (S.D. Fla. July 2, 2021) ("Here too the Parties had not agreed to many of these essential terms including a closing date, financing, the identity of the entity to purchase Ayassure and ownership transfer."). The "timing of conveyance" is an essential term. *Triton*, 308 So. 3d at 1008. "Specific" components on the delivery of an internet product are essential terms. *See Remember Everyone Deployed v. Ac2t, Inc.*, 20-cv-62355, 2021 U.S. Dist. LEXIS 44430 at *36 (S.D. Fla. Mar. 8, 2021) (rep. & rec.) (finding lack of clarity over "exactly what was being discussed" with respect to a website "fix").

Messrs. Kauffman and Levin did not agree on the precise identity of the parties. Up to the point where Mr. Levin provided the routing information for Defendant High Times Holding Corporation, Mr. Levin did not identify whether he was representing Defendant High Times Holding Corporation, Defendant Trans High Corporation, both corporate entities, or himself. In this portion of the chat, Mr. Kauffman referred to the potential seller simply as "u" [*sic*]. Mr. Levin referred to the potential seller as "I." Later, when Mr. Levin asked, "Who should be the buyer," Mr. Kauffman responded with questions, including "Anyway [*sic*]

to keep confidential?" When Mr. Levin replied "Nope," Mr. Kauffman replied, "use name: Trellian Pty Ltd." This continued "bicker[ing]" about the identity and disclosure of the buyer shows that there was never any meeting of the minds over the corporate identity of either the seller or the buyer. *TB Food USA, Ltd. Liab. Co. v. Am. Mariculture, Inc.*, No. 2:17-cv-9-FtM-29NPM, 2021 U.S. Dist. LEXIS 61745, at *15-16 (M.D. Fla. Mar. 31, 2021)). The identity of parties cannot be based on ambiguous pronouns. *Cf. Owen Industries v. Taylor*, 354 So. 2d 1259, 1261 n. 2 (Fla. Ct. App. 1978) ("It is unclear as to just who 'them' is.").

The negotiators had not agreed on the date of transfer at this juncture. Finally, the negotiators had not agreed on whether the transaction would cover the domain only, or also trademarks associated with the domain. On December 26, 2020, Mr. Levin referred to the "*domain* 420.com." Compl, Ex. B., p. 25 (emphasis added). But the draft purchase agreement transmitted by Mr. Kauffman refers "interest in and to the Domain Name *and* the Trademarks." [D.E. 112-2, Decl. of Adam Levin, p. 5]. This discrepancy shows no meeting of the minds over exactly what the subject of the proposed sale was.

## II.   Continued Discussion About Conditions Precedent Shows that the Parties did not agree to all essential terms.

The negotiators' incessant discussion of various conditions precedent and contract terms *after* Mr. Levin said "yes" demonstrates that the "yes" constitutes a negotiating position, not assent to a binding agreement. Such subsequent "bickering" endemic to the entire WhatsApp discussion demonstrates that there

never was any meeting of the minds. In *TB Food*, because of an e-mail referencing "draft revised agreements" one day after the parties executed a settlement term sheet, the "parties were not in agreement about the terms of the Settlement Term Sheet." 2021 U.S. Dist. LEXIS at *15-16. The chat between Messrs. Levin and Kauffman follows the same structure. One day after Mr. Levin's "yes" to a negotiating position, Mr. Levin introduced two additional terms to indicate that there was no final agreement: "I'm having a board call" and "I'll need a contract as well." Compl, Ex. B., p. 30. Mr. Kauffman agreed to these two conditions precedent the next day: "All good to go with resolutions? Board approval etc" *Id.* at 30. The same day, Mr. Kauffman indicated that he did not want to execute the agreement until the following year: "Is there any way we can make the contract purchase agreement date 1/1/20, as long as the wire hits Monday?" *Id.* Not only does this continuous discussion indicate the absence of final agreement, but even if a final agreement was entered into, the conditions precedent to the agreement was never satisfied. *See, e.g., S. Internet Sys. v. Pritula*, 856 So. 2d 1125, 1127 (Fla. 4th DCA 2003); [D.E. 112, pp. 9-13].

## III.   Authority

Plaintiff relies on cases and undisputed facts that support the position of Defendants.

### A. Actual Authority

With respect to actual authority, Mr. Kauffman relies on a resolution passed by the board of directors for High Times Holding Corp. But this resolution

establishes that the board of directors did not give Mr. Levin any kind of authority to dispose of the 420.com internet domain until board passed the resolution, on January 5, 2020, nearly one week after the alleged WhatsApp contract. [D.E. 112-1, p. 12]. Even then, the Board imposed critical restriction on Mr. Levin's authority to sell 420.com: "a cash purchase price of not less than $350,000." *Id.* at p. 9. The Resolution specifically restricted the authority of Mr. Levin to "carry out fully the purpose and interest of all of the foregoing resolutions." *Id.* at p. 10. Because the resolution did not allow the company to sell the domain for less than $350,000, Mr. Levin's authority was "limited to" executing agreements to the "amount specified in the resolution." *Bd. of Supervisors v. Deyoe*, 77 N.Y. 219, 222 (N.Y. 1879).[2] Where a resolution imposes conditions on an authorized agent, the agent lacks actual authority to enter into transactions that do not comply with the resolution's conditions. *See All Seasons Condo. Ass'n v. Patrician Hotel, LLC*, 274 So. 3d 438, 447 (Fla. 3d DCA 2019) ("Paragraph 9(f), however, does not evince an actual agency relationship whereby a Unit Owner, in signing a Supplemental Contract, manifested their intent to grant the BOD and Dedesma actual authority to take *any* action on their behalf in order to effectuate a closing.") (emphasis in original).

### B. Apparent Authority

Mr. Kauffman argues that Mr. "*Levin's* top-level positions, titles, express communications and actions" provided Mr. Levin with apparent authority, and in

---

[2] Because High Times Corp. is incorporated in New York, New York law may apply.

support, quotes *Ja Dan, Inc. v. L-J, Inc.*, 898 F. Supp. 894, 900 (S.D. Fla. 1995). *See* [D.E. 111, p. 19 (emphasis added)]. But the full quotation of the applicable paragraph in *Ja Dan* demonstrates that apparent authority cannot be based on the agent's actions alone:

> *Apparent authority does not arise from the subjective understanding of the person dealing with the purported agent, nor from the appearance created by the purported agent himself; instead, apparent authority exists only where the principal creates the appearance of an agency relationship.* Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P.A., 483 So. 2d 775, 777 (Fla. Ct. App. 1986). A principal can create the appearance of an agent's authority by "knowingly permitting [an] agent to act in a certain manner as if he were authorized," *Rushing v. Garrett,* 375 So. 2d 903, 906 (Fla. Ct. App. 1979), by failing to correct a known misrepresentation by an agent that he or she has certain authority, *Owen Inds., Inc. v. Taylor,* 354 So. 2d 1259, 1262 (Fla. Ct. App. 1978), or by silently acting in a manner which creates a reasonable appearance of an agent's authority, *American Eagle Credit Corp. v. Select Holding, Inc.,* 865 F. Supp. 800, 813 (S.D. Fla. 1994).

*Ja Dan, Inc. v. L-J, Inc.*, 898 F. Supp. 894, 900 (S.D. Fla. 1995) (emphasis added). None of the three established methods of a principal creating the appearance of an agency relationship apply to the exchange between Messrs. Kauffman and Levin.

In the "knowingly permitting" for of agency action, a conferral of position in itself is insufficient. For example, in *Rushing*, which established the predicate for this method in *Ja Dan,* the principal hired an attorney. *Rushing,* 375 So. 2d at 904-05. The principal making its attorney publicly known did not confer

apparent authority upon the attorney. *Id.* at 905. To establish apparent authority under this method, the plaintiff must show that 1) the principal knew of the specific offer, and 2) deliberately "permitted or tolerated her agent to act as though authorized." *Miller v. Mueller*, 343 A.2d 922, 927 (Md. 1975) (cited in *Rushing*, 375 So. 2d at 906-07). Plaintiff points to no evidence showing that Defendants' boards of directors deliberately permitted Mr. Levin to assent to the sale of the domain for $307,500. In fact, the resolution demonstrates that the High Times Holding Corp. board of directors actively did not tolerate a sale at this amount by passing a resolution to that effect.

With respect to the "known misrepresentation by an agent" method of establishing apparent authority, an agent may expressly misrepresent his authority by affirmatively signing a contract "as president" of defendant Cambridge. *Cambridge Credit Counseling Corp. v. 7100 Fairway, LLC*, 993 So. 2d 86, 88 (Fla. 4th DCA 2008). It is the "execution" of a contract (a signature with the imprimatur of presidential authority) that may lead to a "presumption of authority." *Id.* at 90. Even then, the presumption only applies to transactions "in the ordinary course of business." *Id.* (quoting *Lensa Corp. v. Poinciana Gardens Ass'n,* 765 So. 2d 296, 298 (Fla. 4th DCA 2000). For example, in *Cambridge,* the court found that the president had apparent authority to allow for the temporary disposition of property, in the form of a commercial lease. *See Cambridge,* 993 So. 2d at 88. On the other hand, major permanent dispositions of property do not occur in the "ordinary course of business," and are therefore not subject to the

same presumption of apparent authority. *See Lensa Corp.*, 765 So. 2d at 298 (involving sale of "all or substantially all" of corporate assets).

Mr. Kauffman does not point to a single "known misrepresentation." *Cambridge*, 993 So. 2d at 88. He cannot. Unlike the president of Cambridge, Mr. Levin never stated that he is executing a transaction on behalf of either of the Defendants. Instead, Mr. Kauffman relied on accurate representations made by Mr. Levin, such as the routing information of High Times Holding Company. Mr. Kauffman also refers to Mr. Levin's "Once received I'll send it over" statement. But because Mr. Kauffman points to no evidence that this statement was shared with any other member of the board of directors, this statement cannot be the basis for apparent authority. *See Owen Indus.*, 354 So. 2d at 1262 (holding no apparent authority when no record evidence of principal's knowledge of agent's statements). Further, within a day, Mr. Levin clarified that a "board call" and "contract" would be required. The Board of Directors of Trans High Holding Corporation passed a resolution "to correct" any potential misunderstanding. *See Ja Dan, Inc.*, 898 F. Supp. at 900. Mr. Kauffman recognized that 420.com would be his "biggest domain ... bought in a while," placing the purported transaction outside of the ordinary course of business and eliminating the presumption of apparent authority.

Finally, there is no "silently acting" of Defendants. "Silently acting" means that the "principal by its actions creates a reasonable appearance of his agent's authority." *Am. Eagle,* 865 F. Supp. at 813. For example, a defendant's

representation that he agrees to terms "as stated by my employees," imbues individuals with apparent authority, regardless of whether they actually are employees. *Id.* This method of establishing authority requires some affirmative act on the part of the defendant principal to the plaintiff. Here, there is absolutely no communication from Defendants' boards of directors to Mr. Kauffman.

### C. Duty to Inquire

Even if Mr. Kauffman can establish actual or apparent authority (he cannot), Mr. Kauffman was not entitled to rely upon such purported authority because he had a duty to inquire about Mr. Levin's authority. The duty to inquire "can arise where an agent acts 'facially contrary' to the interests of his principal." *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1312 (S.D. Fla. 2017) (quoting *Palafrugell Holdings, Inc. v. Cassel*, 940 So. 2d 492, 494 (Fla. 3d DCA 2006)). In the WhatsApp exchange, the sale of the domain 420.com is "facially contrary" to the interests of Defendants. Mr. Levin disclosed that a competing offer would be "netting HT [High Times] 400k." [Compl, Ex. B, p. 26]. Within three minutes of providing Defendants' wiring information, Mr. Levin stated more bluntly: "I have you a steal" and "I have two firms who were going to pay 1mm And just haven't pulled the trigger." [D.E. 112-3, p. 24]. Mr. Levin advised Mr. Kauffman to inquire further: "Happy to sign an agreement or anything you need." [Compl, Ex. B, p. 29]. But Mr. Kauffman opted for head-in-sand approach: "Not worried about it." *Id.* As Mr. Kauffman's subsequent messages indicate, Mr. Kauffman was already aware of the requirement of "board approval."

**IV.    Plaintiff has failed to meet his burden of establishing standing, compliance with the Uniform Commercial Code, and jurisdiction.**

Even if Mr. Kauffman has met the summary judgment standards for establishing meeting of the minds, authority, agreement to essential terms, and satisfaction of conditions precedent (he has not for reasons stated above), Mr. Kauffman has failed to meet his burden of establishing several additional requirements to enforce a WhatsApp transcript: standing, compliance with the Uniform Commercial Code, and jurisdiction.[3]

### A. Standing

Standing is an "indispensable part of the plaintiff's case." *Church v. City of Huntsville,* 30 F.3d 1332, 1336 (11th Cir. 1994). The Eleventh Circuit held that the plaintiff bears the burden of establishing standing at the summary judgment stage: "When standing is challenged in a motion for summary judgment, the plaintiff 'must 'set forth' by affidavit or other evidence 'specific facts'' demonstrating standing, which are taken as true for summary judgment purposes." *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Mr. Kauffman has not introduced a single fact as to how Mr. Kauffman can enforce the rights of Trellian Pty Ltd. Mr. Kauffman lacks standing to enforce purported

---

[3] Defendants' arguments are more fully set forth in their motion for summary judgment [D.E. 112], and is recapped here to demonstrate why Plaintiff is not entitled to summary judgment even if he prevails on every one of his arguments raised in his own motion for summary judgment [D.E. 111].

contract rights of a non-party corporate entity. *See Latele TV, C.A. v. Telemundo Communs. Grp., LLC*, 9 F. 4th 1349, 1358 (11th Cir. 2021).

### B. Uniform Commercial Code

Regardless of whether signatures are required to show intent to accept an offer, section 672,201(1), Florida Statutes, imposes an independent requirement to affix signatures in contracts for the sale of goods over $500. A domain constitutes a good because it is not a service, in that the sale is based on "the product ... of concepts," not on the performance of labor. *Sys. Design & Mgmt. Info., v. Kan. City Post Office Empls. Credit Union*, 788 P.2d 878 (Kan. 1990)(cited in *First Nationwide Bk.*, 770 F. Supp. 1537, 1543 (M.D. Fla. 1991)). Further, internet domains constitute goods because their value is based on their "tangible effects on computers." *Margae, Inc. v. Clear Link Techs, LLC*, 620 F. Supp. 2d 1284, 1288 (D. Utah 2009).

### C. Personal jurisdiction

Plaintiff erroneously relies on a contract that he is not a party assert jurisdiction that no party to this proceeding has any connection with. *See, e.g. Digi-Tel Holdings v. Proteq Telcoms*, 89 F.3d 519, 523 (8th Cir. 1996).

### V.    Specific Performance

Specific performance is not an available remedy for Mr. Kauffman. Specific performance is reserved for situations where the asset's value is "indefinite, speculative, or uncertain." *Glob. Dig. Sols. v. Grupo Rontan Electro*, 18-80106, 2019 U.S. Dist. LEXIS 229680, at *13 (S.D. Fla. Nov. 25, 2019) (quoting *Hogan v.*

*Norfleet*, 113 So. 2d 437, 439 (Fla. 2d DCA 1959)). There is "no hardline rule" about whether a certain type of asset justifies specific performance. *Glob. Dig. Sols.,* 2019 U.S. Dist. LEXIS, at \*13 (discussing *Baruch v. W.B. Haggerty*, 188 So. 797 (Fla. 1939)). For example, breach of a stock agreement may require specific performance when "the stock has no market value," but not when it is "commonly bought and sold in the market." *Global Dig. Sols,* 2019 U.S. Dist. LEXIS, at \*13 (quoting *Baruch v. W.B. Haggerty*, 188 So. at 804).

Similarly, the availability of specific performance in one dispute over a phone number does not mean that the remedy is available in all disputes over internet domains. In the sole case relied upon by Mr. Kauffman, the plaintiff sued for specific performance of transfer of phone numbers because the phone numbers represented "to the public the identity, reputation and goodwill" of the Plaintiff, and as such, could not assigned a fair market value. *Purosystems Inc. v. Maclean*, 11-62336, 2012 U.S. Dist. LEXIS 201804, at \*11 (S.D. Fla. June 18, 2012).

The situation of Mr. Kauffman is entirely different. Mr. Kauffman recognizes that there is "high demand" for the domain name 420.com, and a corresponding "public value." D.E. 111-1, at ¶ 29. On the supply side, there are "46,656" comparable domain names. *Id.* at ¶ 27. The WhatsApp chat itself demonstrates that a fair market value can be easily determined based on the offers of potential purchasers have made and the negotiations at issue here. Even if Mr. Kauffman is entitled to relief (he is not), such relief would be limited to the fair market value of the website domain at issue.

WHEREFORE, it is respectfully requested that Plaintiff's motion for summary judgment be denied.

Respectfully submitted,

/s/ Jesse Haskins
Jesse A. Haskins
Fla. Bar No. 78974
Jesse@jhaskinslaw.com
J Haskins Law, PA
10437 Canary Isle Drive
Tampa, Florida 33647
Telephone: (919) 667-4689
Attorney for Defendants

## CERTIFICATE OF SERVICE

I certify that on March 7, 2022, the foregoing documents have been furnished by e-portal to Concept Law Group, PA, 6400 N. Andrews Ave., Suite 500, Ft Lauderdale, FL 33309; (754) 300-1500; rkain@complexip.com and DSpielman@ConceptLaw.com.

/s/ Jesse Haskins
Jesse A. Haskins
Fla. Bar No. 78974
Jesse@jhaskinslaw.com
J Haskins Law, PA
10437 Canary Isle Drive
Tampa, Florida 33647
Telephone: (919)667-4689
Attorney for Defendants