UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
CIVIL ACTION NO:   3:20-cv-17-J-34JBT

MERLIN KAUFFMAN, an individual
          Plaintiff,

v.

TRANS HIGH CORPORATION, a New
York company and HIGH TIMES HOLDING
CORPORATION, a Delaware company
          Defendant.
─────────────────────────────/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Merlin Kauffman (the "Plaintiff" of "Kauffman"), by and through undersigned counsel, and pursuant to Federal Rules of Civil Procedure, hereby files his Response in Opposition to Defendants' Motion for Summary Judgment, and states as follows:

A: Defendants Statement of Undisputed Material Facts:

1. Disputed. Levin was also negotiating and contracting on behalf of TransHigh Corporation ("TransHigh"), the listed registrant of the domain, as the CEO of the company. (ECF 111-1, ¶10; 111-3); Plaintiff was not acting on behalf of Trellian Pty Ltd ("Trellian"). (Exh A, Kauffman 2nd Declaration; ECF 111-2).

2. Disputed. The domain discussion did not begin on December 27, 2019 as compared to date/time stamp on messages showing that the discussions actually began on at 9:53 pm on December 26 , 2019. (ECF 111-2). Furthermore, it was Defendants (through Levin) that began the discussion about the sale of

the domain. Id. The alleged discussion via voicemail or phone calls is without substantive evidence in the record and should be disregarded. Nonetheless, any phone calls that occurred between the parties did not divert from the essential terms established up until the execution of the agreement.

3. Disputed. Levin confirmed the agreement without any conditions other than payment. Indeed, all Levin initially said concerning a writing was that he was "Happy to sign an agreement or anything **you need,**" thereby making it clear that he was offering to memorialize the already consummated agreement into a written document, ***at Plaintiff's election of preference***. (ECF 111-2, emphasis added).

4. Disputed. The "statement" referenced by Defendants in this enumerated paragraph actually consisted of three different statements, not a singular sentence; but, more importantly, the referenced verbiage cited was sent well after the agreement was fully consummated; in other words, it was nothing more than an "afterthought" by Levin, and one that Plaintiff was willing to accommodate, but Plaintiff never agreed to restructure or modify the agreement so as to cause this afterthought to suddenly impose a condition precedent to the already negotiated agreement. (ECF 111-2).

5. Disputed. This statement by Defendants is entirely misleading as Kauffman did not reply "in agreement," and the text cited is taken out of context as it is not a

singular sentence. (ECF 111-2).

6. Disputed. The cited text does not discuss "execution" as the words speak for themselves relating to "contract purchase agreement date." Inasmuch as Levin requested an after-the-fact written document to memorialize the already consummated agreement, Plaintiff merely inquired as to whether the agreement "date" could be dated on a date of January 1, 2020 for business planning reasons. It was not a requirement or material term to the already negotiated agreement between the parties, and was certainly not intended to constitute a modification to the agreement. (ECF 111-2).

7. Disputed. The alleged plans to execute a separate written agreement do not appear anywhere prior to the parties consummating the agreement. (ECF 111-2, p.1-6). Additionally, the number of times references were made to the written agreement is irrelevant in light of the timing occurring after the consummation of the contract. Lastly, reference to Trellian as buyer is improper given the full context. (Kauffman 2nd Declaration).

8. Disputed. The discussions in the text after the contract was formed speak for itself. The only reason this issue came up was because Levin requested a written document for Defendants' internal record keeping purposes, but it was simply to memorialize the already consummated agreement that was negotiated between the parties; it was never meant to modify the already consummated

agreement. Even the preceding indications changed as to names and even the alleged "Domain name and trademark assignment agreement" (ECF 111-2 and 112-2, pp 5-7), lists TransHigh and Kauffman as the parties (See also ¶12 herein).

9. Disputed. Defendants alleged receipt of the wire on December 30, 2019 is out of context as it was initiated on Friday December 27, 2019 over the holiday weekend. (ECF 111-2 p.6 and 8) Thus, it was sent prior to any reference to Trellian which was not for two more days and well after consummation of the agreement including all material terms. (Id at 8) (Kauffman 2nd Declaration).

10. Disputed. Kauffman never recognized board approval as a condition precedent, and this statement certainly fails to rise to that level. (Kauffman 2nd Declaration ¶3 and 4).

11. Disputed. Defendants' suggestion here that the parties "continued to discuss" is, at best, misleading. Indeed, Defendants do not say what the parties "continued to discuss." This is because the agreement was fully negotiated and consummated well before the exchange of the "Domain name and trademark assignment agreement," a document that was only sent because of Levin's after-the-fact thought of desiring a written document for Defendants' own internal records. (ECF 112-2, pps 5-7).

12. Disputed. The missing signatures on the after-the-fact proposed writing does

4

not vitiate or nullify the previously reached agreement that was negotiated and agreed to in all material respects between the parties. (ECF 112-2, pps 5-7).

13. Not disputed that the referenced discussion occurred; but, the implied significance is disputed as the referenced discussion does not vitiate or nullify the previously reached agreement that was negotiated and agreed to in all material respects between the parties. (ECF 111-2 p.2-6)

14. Disputed. Further, the statement that "Board member Justin Ehrlich requested to buy the domain at a higher price" is inadmissible hearsay, and not supported by any record evidence; indeed, the only written board minutes on the topic are devoid of any such request. As such, this statement should be given no weight by the Court. *Shockley v. Barbee*, 747 F. App'x 754, 757 (11th Cir. 2018); *Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, 743 F. App'x 269, 274 (11th Cir. 2018). (See also ECF 111-11) Additionally, Simon's unrefuted testimony found that Levin often acted and bound the companies without getting board approval. (ECF 111-10 Simon depo pages 26-27, 35-36)

15. Not disputed that the referenced resolution was passed; but, the implied significance is disputed as the referenced resolution does not vitiate or nullify the previously reached agreement that was negotiated and agreed to in all material respects between the parties. (ECF 111-2 p.2-6).

16. Not disputed that the referenced discussion occurred; but, the implied

significance is disputed as the referenced discussion does not vitiate or nullify the previously reached agreement that was negotiated and agreed to in all material respects between the parties. (ECF 111-2 p.2-6).

17. Not disputed that the referenced text was sent; but, the implied significance is disputed as the referenced text does not vitiate or nullify the previously reached agreement that was negotiated and agreed to in all material respects between the parties. (ECF 111-2 p.2-6).

18. Disputed. The alleged statement referenced herein constitutes inadmissible hearsay should be given no weight by the Court, especially since the record is devoid of any evidence to suggest that such a call ever occurred; indeed, Defendants do not even provide a specific date in January 2021 when the alleged call occurred. Moreover, even if such a call were shown to have occurred, the implied significance would be disputed as the referenced discussion (even if shown to have taken place) does not vitiate or nullify the previously reached agreement that was negotiated and agreed to in all material respects between the parties; instead, at best, such a discussion would amount to a belated attempt by Defendants to seek a material modification to the already consummated agreement. (ECF 111-2 p.2-6).

19. Disputed. Plaintiff incorporates fully his response to paragraph 18 above, as if fully set forth separately herein.

20.    Disputed. Plaintiff incorporates fully his response to paragraph 18 above, as if fully set forth separately herein. Moreover, it should be noted that, to date, Defendant has not refunded any portion of the payment made by Plaintiff once the agreement was reached, through bank wire, check or otherwise. (Kauffman 2nd Declaration)

21. Disputed. Plaintiff incorporates fully his response to paragraphs 18 and 20 above, as if fully set forth separately herein. Furthermore, it should not be overlooked that the referenced text by Defendants was sent more than 6-months <u>after</u> the agreement was reached between the parties, **<u>AND</u>** 6-months <u>after</u> the instant litigation was filed to enforce the agreement between the parties. In other words, the "offer to return the funds" was merely a litigation-borne strategy that should be given no weight whatsoever. Indeed, had Defendants genuinely desired to return any portion of the funds to Plaintiff, an attempt to do so (i.e., by transmission of a written check or initiation of a return wire to Plaintiff) would have occurred. It is telling that no such effort was ever made, and only highlights that the "offer to return" was simply a litigation strategy aimed at creating a litigation defense. Such should be given no weight by this Court.

B: Legal Memorandum

Defendants have structured their Memorandum of Law in such a manner that Plaintiff believes misses the mark and tends to mislead away from the issues in this case regarding contract formation. That said, for the Court's benefit of being able to follow the briefing more easily, Plaintiff will adhere to the outline structure of Defendants' brief.

**(B)(1): The Requisite Meeting of the Minds occurred temporally to contract formation; the fact that there may not have been a meeting of the minds regarding a post-contract request by Defendants to modify the terms is of no moment and should be disregarded.**

Glaringly absent from Defendants' brief is any citation or reliance on case law regarding the fundamental requirements of proving a breach of contract. Instead, Defendants focus entirely on the "meeting of the minds" aspect of contract formation, hoping to shift the Court's focus away from the interactions of the parties that unequivocally consummated an enforceable agreement. Indeed, the strategic motivation of Defendants' focus on this concept is revealed when Defendants focus solely on discussions between the parties that occurred **<u>after</u>** the formation of the contract at issue. Defendants then base this entire after-the-fact argument on the misguided falsehood that a written executed agreement was required in this instance. Such a contention misses the mark, ignores contract law,

and overlooks the interactions between the parties that established the enforceable agreement at play here.

A closer look at the chronology and actual formation of the agreement is appropriate to dispel Defendants' attempts to avoid the simplicity of this matter. After negotiating the purchase and its price through text messages and with no additional terms, Plaintiff received, via Whatsapp, the wire instructions from Mr. Levin, the CEO of Defendant Trans High and Executive Chairman of Defendant High Times. The contract formation was then memorialized and occurred through multiple confirmations of all essential terms. Attached to Kauffman's Declaration as Exhibit 1 is a detailed review of the relevant communications between the parties, annotated to provide explanation, where the parties' actual written communications provided in bold italics:[1]

Although totally omitted from Defendants' briefing, the unequivocal exchange shown in Exhibit 1 to Kauffman's Declaration (part A), irrefutably establishes that a contract was formed between the parties, and the only material terms were payment in exchange for delivery of the domain. Not once in the transcript between the parties do Defendants ever hint at there being open deal terms to negotiate, or the possibility that a condition precedent needed to be

---

[1] References to "Plaintiff" are made wherever Plaintiff Merlin Kauffman is communicating. References to "Defendants' CEO" are made whenever Adam Levin, the CEO of Defendant Trans High and Executive Chairman of Defendant High Times, is communicating.

discussed. Indeed, there was <u>never</u> a discussion of any other conditions, and no conditions precedent. (Kauffman 2ⁿᵈ Declaration, ¶3-4) There was never a discussion regarding additional approvals, including any form of board approval. (*Id*.) The dialogue between the parties presents an absolutely clear offer and acceptance with multiple confirmations, followed by full performance by Plaintiff. After review of , Exhibit 1 to Kauffman's Declaration (part A), the Court should stop there and make a clear finding that the contract was properly formed and the parties had a meeting of the minds and closing of the deal.

The review of the additional conversation that occurred <u>after</u> the formation of the contract, is not proper. (See Exhibit 1 to Kauffman's Declaration (part B)). That said, to the extent the Court seeks to entertain such a review of post-formation dialogue, the additional annotated version is instructive. *Id*. Defendants' "doesn't need to be signed" admission against interest statement underscores the gaping holes that Defendants cannot fill to support their defense in this litigation. *Id*. Despite their multitude of distracting arguments, Defendants are simply having sellers-remorse and are refusing to honor a straightforward agreement. Defendants cite to no case law, however, that would permit them the opportunity to unilaterally re-open the already settled deal terms, to attempt to include board approval and a written executed agreement as conditions precedent. Problematic to Defendants' pursuit here, however, is that there is simply no ambiguity in the

10

terms of the agreement. The plain language of the terms is the best evidence of the parties' intent, and absolutely no conditions existed except for payment (which occurred) in exchange for the domain's transfer (which has not occurred and is the underlying breach in this case).

To be clear, neither a written document nor wet signatures are required for an agreement to be effective. *See, e.g., Birmingham Fire Ins. Co. of Pennsylvania v. Comcar Indus., Inc.*, No., 2008 WL 4642327, at *3 (M.D. Fla. 2008). Rather, evidence of an enforceable agreement, "may be shown...by a party's conduct indicating assent, such as **performance of the contract**." *Int'l Mulch Co., Inc. v. Novel Ideas, Inc.*, 2015 WL 12830375, at *3 (M.D. Fla. 2015)(emphasis added); *see also Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 436 (11th Cir. 1995). Yet, despite these widely accepted principles, Defendants' brief only focuses on whether there was a written contract, and it does not address any of the other elements of a breach of contract claim. Upon the Court confirming that a contract was properly formed, Defendants' failure to address these other topics is a waiver of any such arguments.

"Under Florida law, a breach of contract claim 'requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach.' To prove the existence of a valid contract, a plaintiff must plead facts showing the following: '(1) offer; (2)

acceptance; (3) consideration; and (4) sufficient specification of the essential terms.'" *Salem v. City of Port St. Lucie*, 788 Fed. Appx. 692, 697 (11th Cir. 2019)(citing *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). Furthermore, the

> [I]nterpretation of a contract, including whether it is ambiguous, is a question of law that we review de novo. *Reynolds v. Roberts*, 202 F.3d 1303, 1313 (11th Cir. 2000).... Under Florida law, "[c]ontract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract." *Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. Dist. Ct. App. 2009) (per curiam). "Before extrinsic matters may be considered by a court in interpreting a contract, the words used on the face of the contract must be ambiguous or unclear." *Acceleration Nat'l Serv. Corp. v. Brickell Fin. Servs. Motor Club, Inc.*, 541 So. 2d 738, 739 (Fla. Dist. Ct. App. 1989) (per curiam). "[I]n determining whether a contract is ambiguous, the words should be given their natural, ordinary meaning," and "where the language is plain a court should not create confusion by adding hidden meanings, terms, conditions, or unexpressed intentions." *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996) (applying Florida law).

*Caracol Television S.A., v. Telemundo Television Studios, LLC, Telemundo Internacional, LLC, Telemundo Network Group, LLC*, 21-10515, 2022 WL 202546, at *3 (11th Cir. 2022).

Defendants improperly seek to have the Court examine multiple extrinsic matters, and gloss over the words on the face of the agreement. Defendants fail to rebut the unambiguous and plain meaning of the language of the parties' agreement to the essential terms, and instead resort to ignoring said agreed-upon terms in pursuit to shift focus to after-the-fact discussions. Defendants even fail to adequately address the basic elements of contract formation, including (1) offer;

(2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms. Therefore, Defendants have waived any such arguments as well.

Defendants also generally discuss the concept that consideration may at times be given to the degree of formality attending to similar contracts in assessing whether a contract has been formed. Defendants stop noticeably short, however, of providing any support showing that domain transfers must be (or are ordinarily) done through an executed written instrument. To the contrary, Plaintiff's **<u>unrefuted</u>** expert witness report establishes the standard industry practice of such deals via text messaging platforms. *See* (ECF 111-12). Defendants' mere reference of cherry-picked wording from some cases is woefully inadequate to meet this burden of indicia or proof regarding similar contracts. Defendants provide no admissible evidence of similar contracts, nor a single case with a similar factual situation.

Indeed, Defendants' argument and case law citations are curious at best, and misleading at worst. Defendants' legal arguments shift back and forth in the same section between arguing that, (i) an agreement cannot be formed unless there was a separate executed instrument, and (ii) the text messages could have been an agreement if they included all the terms. Defendants cannot have it both ways. Defendants cite to *Triton Stone Holdings, L.L.C. v. Magna Bus., L.L.C.*, 308 So. 3d 1002, 1008 (Fla. 4th DCA 2020), *review denied sub nom.* SC21-259, 2021 WL

2885851 (Fla. July 9, 2021) for the idea that key missing terms renders an agreement unenforceable. This particular case is highly distinguishable for the simple reason that the *Triton Stone* court specifically noted "that **the parties intentionally left open essential terms** for future consideration," and there were "**no details** concerning the transfer" of what was being purchased. *Id.* (emphasis added). Contrasted against the instant matter, the text message exchange makes unequivocally clear that the purpose of the agreement was the sale of the domain in exchange for a specified sum of money; no other terms were left open for discussion.

For all of the foregoing reasons, there was a clear meeting of the minds and thus Defendants cross motion for Summary Judgment must be denied.

### (B)(2) Defendants' Claim of an Unsatisfied Condition Precedent Must be Rejected as there is No Support in the Record of a Contemporaneously Imposed Condition Precedent at the Time of Contract Formation.

As discussed throughout this brief, there was no express or implied condition precedent present during the formation of the contract, and any insinuation or argument otherwise belies the essential terms of the contract. There was never even a hint of the "board approval" concept until Levin brought it up a day <u>after the contract was formed and Plaintiff had fully performed</u>. Against these facts, Eleventh Circuit precedent is clear that Defendants premise is fatally flawed:

14

under Florida law, **whether a condition precedent is at issue is not relevant to contract formation**. Instead...a condition precedent arises as a "defense of non-performance." *Id.* at 396; *see also Custer Med. Ctr. v. United Auto. Ins. Co.*, 62 So.3d 1086, 1096 (Fla. 2010) ("[A] defending party's assertion that a plaintiff has failed to satisfy conditions precedent necessary to trigger contractual duties under an existing agreement is generally viewed as an affirmative defense, for which the defensive pleader has the burden of pleading and persuasion.") (emphasis in original); *cf. Christian Mut. Life Ins. Co. v. Penn Mut. Life Ins. Co.*, 163 F.Supp.2d 260, 262–63 (S.D.N.Y.2001) (holding under New York law that conditions precedent are not a defense to contract formation). As such, the issue is not one of contract formation...under Florida law.

*Solymar Investments, Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 996–97 (11th Cir. 2012)(emphasis added).

Defendants improperly use "condition precedent" as a means to argue that no contract was formed, and, therefore, have the entire analysis backwards. The court in *Solymar* made clear, such a theory is merely a defense. This Court instead is required to analyze contract formation by reviewing the essential terms between the parties. "What matters is whether the parties have objectively agreed to all essential terms—'one party to a settlement is not required to be a mind reader or to know the private thoughts or intentions of the other party; rather, the parties need only agree on what they have actually said or expressed to each other.'" *U.S. ex rel. Osheroff v. MCCI Group Holdings, LLC*, 10-24486-CV-SCOLA, 2013 WL 3991964, at *4 (S.D. Fla. Aug. 2, 2013); *see also Boyko v. Ilardi*, 613 So.2d 103, 103 (Fla. 3d DCA 1993) ("execution of the settlement documents was not a condition precedent to the settlement agreement, but rather a mere procedural formality which both parties to the settlement agreement were obliged to perform").

15

Likely aware of this inherent flaw in their posture, Defendants take a long shot by relying on cases pertaining to a distinguishable topic, namely implied warranties. *See Am. Coach Lines of Orlando, Inc. v. N. Am. Bus Indus., Inc.*, 2011 WL 653524, at \*10 (M.D. Fla. Feb. 14, 2011). Nevertheless, even despite the highly distinguishable factual nature in the *Am. Coach* case, it observes in the context of warranties that a warranty disclaimer need not be in writing if the **"evidence of trade custom or course of dealing"** establish that such a disclaimer was meant to exist as part of the transaction. *Id.*(emphasis added). Defendants' cross motion is completely devoid of any evidence regarding trade custom or course of dealing, both of which are important in this case and have been opined on by Plaintiff's **unrebutted** expert.

Furthermore, the alleged "board approval" condition that Defendants seek to insert as part of the transaction was not conspicuous at the time the agreement was reached, and, in fact, was a departure from the essential agreed-upon terms of the contract itself. Yet, Defendants rely on another highly distinguishable case of *Southern Internet Sys. v. Pritula*, 856 So. 2d 1125, 1127 (Fla. 4th DCA 2003) where the board of directors for one of the parties had to act "in bad faith" to prevent the company from incurring financial hardship. *Id.* The entire Board in *Pritula* all mutually determined that the company could not enter into the agreement because it did not have the financial means to comply with the purposed terms therein. *Id.*

16

Drastically different from the matter at hand, the agreement there <u>was conditioned</u> upon the company's financial position—which was not capable of conforming to the proposed agreement without leaving the company at risk of insolvency. *Id*. Compared to the instant situation where no such condition was even present at the formation of the contract, reliance on *Pritula* is misplaced. Even assuming this Court determines that review of the post formation discussions and activities is warranted, Defendants sought to make a higher profit ($350k instead of $305.7k) at the expense of the Plaintiff. In other words, Defendants were acting in bad faith because they wanted to, not because they needed to.

Defendants further rely on *Carson v. Fishtail Marine of Naples, Inc.*, 697 So.2d 1222 (Fla. 2d DCA 1997). Just like *Pritula*, *supra*, however, the agreement in *Carson* included express provisions requiring approval and/or inspection. *Id*; *See also Haddad v. RAV Bahamas, Ltd.*, 2008 WL 11399704, at *11 (S.D. Fla. Nov. 6, 2008). That express requirement provision was absent from the essential terms of the agreement between the parties in this matter, and is thus irrelevant. *See, e.g., In re Rolsafe Intern., LLC*, 477 B.R. 884, 906 (Bankr. M.D. Fla. 2012) ("Unlike *Pritula [Southern]*, there was no indication that the Bank's credit committee had to approve the settlement as a condition precedent to its existence. Whether Davis and the Bank intended for the counteroffer and the ultimate

settlement to be subject to other conditions **is irrelevant**, as those conditions were never disclosed to Kafka.") (emphasis added).

Simply put, since the existence or non-existence of a condition precedent is only capable of existing as an affirmative defense, and not to be considered in contract formation, Defendants' arguments fail as a matter of law. Nonetheless, a factual review further shows that the alleged condition precedent was never part of the essential terms of the agreement at the time the parties formed the agreement. For all of these reasons, Defendants cross motion for Summary Judgment must be denied.

### (B)(3) Defendants Improperly Assert that the UCC and Statute of Frauds are Applicable in this Case. Neither are for the Reasons That Follow.

Defendants completely miss the mark on this section, and improperly classify this transaction as the sale of goods. There is not a single case cited by Defendants that establishes that domains are goods. Defendants rely on *First Nationwide Bank v. Florida Software Services, Inc.*, 770 F. Supp. 1537, 1543 (M.D. Fla. 1991) for an improper equivalency that "computer programs" have been found to be goods, but such is not at issue in this matter. The domain name service contract at issue here is not a computer program and, therefore, Defendants' statute of frauds arguments fall apart quickly. The actual case law on domains

results in the complete opposite conclusion for application by the Court. For example, a district court in the Eastern District of Virginia observed the following:

> a domain name registration is the product of **a contract for services between the registrar and registrant**. By this view, the contracted-for service produces benefit and value depending upon how the party receiving the service exploits it. Thus, a judgment debtor "owns" the domain name registration in the same way that a person "owns" a telephone number. A telephone number can be a valueless means of reaching a party, or it can be an extremely valuable commercial tool. In most cases, a domain name registration is valueless apart from the way it is used by the entity with rights to it, and if the only value that comes from transfer of the domain name is from the value added by the user, it is inappropriate to consider that an element subject to execution. Some domain names, however, are valuable assets as domain names irrespective of any goodwill which might be attached to them. And, of course, domain names can be freely transferred apart from their content. Indeed, there is a lucrative market for certain generic or clever domain names that do not violate a trademark or other right or interest, but are otherwise extremely valuable to Internet entrepreneurs.

*Dorer v. Arel*, 60 F. Supp. 2d 558, 561 (E.D. Va. 1999)(citations omitted) (emphasis added); *see also Lockheed Martin Corp. v. Network Sols., Inc.*, 141 F. Supp. 2d 648, 656 (N.D. Tex. 2001). Other district courts have found similarly, including a district court in Utah:

> **a domain name registrant…has a contractual right to the services provided by the domain name registrar, not an independent property interest in the domain name itself**. In this respect, a domain name, like a telephone number, does not exist separate and apart from the service contract that "created it and that maintains its continued viability."

*Cyber Sec. Int'l, Inc. v. Network Sols., LLC*, 2:04-CV-979 DS, 2005 WL 8177142, at *5 (D. Utah Feb. 16, 2005)(citations omitted)(emphasis added). Consistent with the foregoing, since domain names are not goods, and are, instead, contractual

rights to services with the Registrar, Defendants' arguments on this entire section fail as a matter of law, and should be rejected.

Domain names are not goods under the UCC and, even if they were, there is full performance by Plaintiff, which removes this analysis from the Statute of Frauds. Defendants point to *BMC Industries, Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1329–30 (11th Cir.1998) but fail to identify that such analysis was tied to a contract involving both goods and services and therefore inapplicable here. See also *E. Portland Cement Corp. v. F.L. Smidth Inc.*, 2009 WL 3010820, at *5 (M.D. Fla. Sept. 16, 2009). If the Court adopted the *BMC* approach, the instant matter raises genuine issues of material facts and thus Defendants Motion for Summary Judgment must be denied.

Nevertheless, to the extent the statute of frauds is applicable here (*which it is not*), a clear exception applies in the instant matter, namely the partial or complete performance exception. "Partial or complete performance removes an agreement from the statute of frauds...Thus...courts may use the doctrine of part performance to remove a contract from the statute of frauds for the purpose of granting specific performance or other equitable relief..." *Hosp. Corp. of Am. v. Associates In Adolescent Psychiatry, S.C.*, 605 So. 2d 556, 558 (Fla. 4th DCA 1992)(citations omitted). The reach of the foregoing doctrine is only limited inasmuch as it is "not available in an action solely for damages at law." Id. This

instant matter, however, is not an action solely for damages, and is clearly vested in the specific performance of transferring the contractual rights to the domain name. The partial performance exception thus removes any claim of statute of frauds based upon the undisputed facts.

### (B)(4) Plaintiff is the Proper Party with Standing to bring this Suit, and any Claim to the Contrary Should be Rejected

Defendants take an unjustified leap suggesting there was an "abandoned negotiation" which then resulted in further discussions about who to be a named party on a separate written agreement. This leap ignores the fact that a contract was formed and there was no ambiguity as to who the parties to the contract were at the time of its consummation. Defendants, who throughout this litigation even failed to depose Plaintiff, have not presented a credible challenge to Plaintiff's standing. Nevertheless, to avoid any potential concerns, Plaintiff's Declaration dispels of this standing ruse regarding Trellian. (Kauffman 2nd Declaration ¶5-14)

Defendants further try a convoluted semantics game over an alleged negative syllogism. This reasoning fails on multiple fronts. Defendants hang their hat on a premise that a text message in July 2020 between Levin and Kauffman was somehow a roundabout admission that Kauffman was not the party in interest. Most clearly defeating this concept though is the fact that this occured, *seven months __after__ the initiation of the lawsuit.*

Defendants further claim that they have no assurance that Trellian would not make a later claim fails miserably. Defendants have known about the existence of Trellian since the moment this matter began. Defendants, if they legitimately believed Trellian was a necessary party, have never moved to add Trellian as such a necessary or third party. Defendants never conducted any third party discovery to Trellian. Defendants never conducted a deposition of Plaintiff to inquire about Trellian. Defendants never issued written discovery requests to Plaintiff about Trellian. Defendants' failure of complaining about Trellian is a waiver of such claims, and Defendants improperly use this as a red herring to assert a standing defense at this late stage.

## (B)(5): Levin's Agency Relationship With Defendants

Plaintiff's arguments on Levin's authority are thoroughly examined in the cross Motion for Summary Judgment (ECF 111) and Plaintiff relies on and incorporate them herein. Some additional response to Defendants' position, however, is merited. Defendants rely on *Lensa Corp. v. Poinciana Gardens Ass'n, Inc.*, 765 So. 2d 296, 298 (Fla. 4th DCA 2000) for the proposition that only the board has authority to approve domain sales. This is simply not what that case holds. The *Lensa* case related to Board Authority for "the sale of all or substantially all of Association's assets..." *Id*. No one is suggesting (nor has it ever been alleged) that Levin was offering to sell "all or substantially all" of Defendants' assets.

Defendants conveniently shift back and forth between Delaware law when referring to actual authority, and Florida law when referring to apparent authority, but their arguments fail under either approach. The *Lensa* case, relied upon by Defendants, further establishes: "As to acts in the ordinary course of business, courts have consistently recognized that a presumption of authority exists in the case of acts made or done by presidents." *Id.*

Regardless of Levin's actual authority, established by both law and factual written assent of the Board of Directors to sell the domain, it is clear that Levin had apparent authority because, *inter alia*, he personally engaged in substantive discussions (which included his making and entertaining counteroffers) during the original negotiation of the domain contract. (ECF 111-2, p.3). A court in this district has found similar facts to support a finding of apparent authority to enforce a contract negotiated on behalf of a principal who later asserted that the apparent agent lacked authority to enter:

> [the plaintiff] was perfectly justified in believing that when [the apparent agent] responded to his initial offer with a counteroffer, the appropriate personnel had been consulted. And, as noted, even if [the apparent agent] lacked actual authority to present [the plaintiff] with the counteroffer, the [principal] is nevertheless liable under Florida law for the counteroffer relayed to [the plaintiff] because of the unrestrained apparent authority [the apparent agent] wielded in the negotiations.

*In re Rolsafe Intern., LLC*, 477 B.R. 884, 906 (Bankr. M.D. Fla. 2012). The facts at bar are the same, and the contract here must be enforced against Defendants.

23

Levin had actual authority to enter into the agreement as evidenced by the Board Resolution, which was retroactive (ECF 111-11). Nonetheless, even despite that retroactive resolution, Levin certainly had apparent authority to enter into the agreement, given *inter alia*: (a) his position with both Defendant corporate entities (ECF 111-3 Levin "Depo 1", p.97 LL 22-25, ECF 111-4, Levin "Depo 2", p.33 LL 7-24); (b) his direct negotiations with plaintiff (ECF 111-2, p.2-3)(c) his delivery of the wiring instructions to Plaintiff (Id at 4); (d) his multiple confirmations of the essential terms (Id at 1-6); and (e) his acknowledgment that he had the log in credentials for the transfer of the domain rights (Id. at 7). Bottom line, Defendants' claim that Levin lacked actual and apparent authority is specious, at best, and should be rejected.

### (B)(6) This Court has Personal Jurisdiction Over Defendants, and Defendants' Claims to the Contrary Should be Flatly Rejected

Defendants' final ditched effort to escape an adverse ruling from this Court is its frail challenge to personal jurisdiction. Defendants never moved to dismiss based upon personal jurisdiction, and their brief remarkably fails to detail or establish any of the elements necessary to challenge personal jurisdiction. Suffice it to say, Defendants' registration of the <420.com> domain through the Registrar located in this situs (ECF 111-4) results in Defendants' purposeful availment to this Court's jurisdiction as it relates to the services contract for the <420.com> domain. Additional case law in the ACPA context over cybersquatting claims is instructive:

24

This Court also has in rem jurisdiction over the Defendants under 15 U.S.C. § 1125(d)(2)(A) because the registrars wherein the Domain Names are registered are located within this district. (Compl. ¶¶ 9, 10; Mem. Supp. Mot. Default J. at 5.) Similarly, venue is appropriate in this District under 28 U.S.C. § 1391(a), as well as 15 U.S.C. § 1125(d)(2)(C)(i), which states that "**a domain name shall be deemed to have its situs in the judicial district in which … the domain name registrar, registry, or other domain name authority that registered or assigned the domain name is located**."

*Avalere Health, LLC v. AVALERE.ORG*, 2013 WL 1790137, at *1 (E.D. Va. Apr. 10, 2013), report and recommendation adopted, 2013 WL 1789614 (E.D. Va. Apr. 26, 2013) (emphasis added).

Defendants' half-hearted undeveloped attack on the jurisdiction of this Court should be flatly rejected, and their Motion should be denied.

WHEREFORE, Plaintiff respectfully requests that the Court deny Defendants Motion for Summary Judgment.

March 7, 2022.                              Respectfully Submitted:

*/s/Darren Spielman*
Darren Spielman, Esq. (FL Bar No 10868)
DSpielman@Conceptlaw.com
Alexander D. Brown, Esq. (FL Bar No 752665)
abrown@conceptlaw.com
Robert C. Kain, Jr., Esq. (FL Bar No. 266760)
RKain@Conceptlaw.com
The Concept Law Group, P.A.
6400 N. Andrews Ave., Suite 500
Fort Lauderdale, Fl 33309
ph: 754-300-1500
fax: 754-300-1501
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on <u>March 7, 2022</u>, that the foregoing document is being filed via ECF and served this day on all counsel of record identified below on the Service List via email.

By:  <u>/s/*Darren Spielman*</u>
Darren Spielman


Jesse A. Haskins
Fla. Bar No. 78974
Jesse@jhaskinslaw.com
J Haskins Law, PA
10437 Canary Isle Drive
Tampa, Florida 33647
Telephone: (919)667-4689
Attorney for Defendants